Stephen G. Larson (SBN 145225)
Mary Carter Andrues (SBN 138486)
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:  213.629.7400
Facsimile:  213.629.7401
E-mails:    larson.stephen@arentfox.com
            andrues.mary@arentfox.com

*Attorneys for Jeffrey S. Burum*

FILED
CLERK, U.S. DISTRICT COURT

OCT – 4 2011

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION     BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>THE PREMISES KNOWN AS:<br>10621 CIVIC CENTER DRIVE,<br>RANCHO CUCAMONGA,<br>CALIFORNIA,<br><br>                    Defendant. | Case No.  ED CV 11-01570 VAP (OPx)<br><br>**NOTICE OF MOTION AND MOTION FOR REVIEW OF JUDGE OSWALD PARADA'S SEPTEMBER 27, 2011, ORDER DENYING *EX PARTE* APPLICATION FOR APPOINTMENT OF SPECIAL MASTER TO REVIEW SEIZED MATERIALS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF STEPHEN G. LARSON AND ERIC NGO; EXHIBITS**<br><br>COURT:  TBD<br>DATE:   TBD     11/07/2011<br>TIME:   TBD     2:00 pm |

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORIGINAL

MOTION FOR REVIEW OF ORDER RE APPOINTMENT OF SPECIAL MASTER
CASE NO. ED CV 11-01570 VAP (OPx)

**TO THE ABOVE ENTITLED COURT AND THE UNITED STATES ATTORNEY'S OFFICE:**

**PLEASE TAKE NOTICE** that on a date and time to be determined based upon the availability of the Court and pursuant to Federal Rule of Criminal Procedure 59, Federal Rule of Civil Procedure 72, and Local Civil Rule 72-2.1, Jeffrey S. Burum hereby respectfully objects to and moves for review of U.S. Magistrate Judge Oswald Parada's September 27, 2011, Order denying his *Ex Parte* Application for Appointment of Special Master to Review Seized Materials.  The basis for this motion is that Judge Parada's Order was based on false statements in the Declaration of FBI Special Agent Jonathan Zeitlin in opposition to the Application, and Mr. Burum was not given the opportunity to respond to the Declaration.

This motion is based on this Notice; the attached Memorandum of Points and Authorities; the attached Declarations of Stephen G. Larson and Eric Ngo, and exhibits referenced therein; all papers and pleadings on file in this matter; and upon such further evidence and argument as may be presented prior to, or at, the hearing of this motion.

Dated:          October 3, 2011                    Respectfully submitted,

ARENT FOX LLP

By: _____

Stephen G. Larson
Mary Carter Andrues
*Attorneys for Jeffrey S. Burum*

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -
MOTION FOR REVIEW OF ORDER RE APPOINTMENT OF SPECIAL MASTER
CASE NO.
ED CV 11-01570(VAP)(OPx)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................1

II.   FACTUAL BACKGROUND.......................................................................3

    A.    Procedural Background ..................................................................3

    B.    Law Enforcement Made False Statements to Mr. Larson, the
        U.S. Attorney's Office, and the Court....................................................4

    C.    Judge Parada Relied on the False Statements and
        Representations....................................................................................7

    D.    Law Enforcement Seized Privileged Materials From Diversified
        and Mr. Burum's Home........................................................................8

    E.    The Government's Proposed "Taint Procedures" Do Not Protect
        the Attorney-Client, Work-Product, and Joint Defense Privileges.....10

III.  ARGUMENT ..............................................................................................12

    A.    An Independent Special Master Should Be Appointed Because
        Mr. Larson's Office Was Searched and Privileged Materials
        Were Seized From Diversified and Mr. Burum's Home ...................12

    B.    Mr. Burum's Defense Strategy in Connection With a Pending
        Criminal Case Will Be Compromised Unless an Independent
        Special Master Is Appointed ...............................................................14

IV.   CONCLUSION ..........................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*United States v. Abbell,*
    914 F. Supp. 519 (S.D. Fla. 1995) ........................................................ 13

*United States v. Comprehensive Drug Testing, Inc.,*
    621 F.3d 1162 (9th Cir. 2010) (en banc) ............................................... 12

*DeMassa v. Nunez,*
    747 F.2d 1283 (9th Cir. 1984) ........................................................ 12, 13

*United States v. Stewart,*
    No. 02 CR. 396 JGK, 2002 WL 1300059 (S.D. N.Y. 2002) .......................... 13

*In re U.S.'s Application For A Search Warrant To Seize and Search*
*    Electronic Devices From Edward Cunnius,*
    No. 02 CR. 396 JGK, 2002 WL 1300059 (S.D. N.Y. 2002) .......................... 12

**RULES**

Local Civil Rule 72-2.1 ........................................................................ 4

Federal Rule of Civil Procedure 72 ........................................................ 4

Federal Rule of Criminal Procedure 41(g) ................................................ 1

Federal Rule of Criminal Procedure 59 .................................................... 4

1

# MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        In support of its opposition to Jeffrey S. Burum's *Ex Parte* Application for

4   Appointment of Special Master to Review Seized Materials, the government

5   submitted the declaration of its lead case agent, FBI Special Agent ("SA") Jonathan

6   Zeitlin.  However, SA Zeitlin's declaration was riddled with false statements and

7   material omissions about the execution of a search warrant at the offices of

8   Diversified Pacific Development Group, LLC ("Diversified").[1]  Judge Parada did

9   not hold a hearing on the *Ex Parte* Application, and Mr. Burum otherwise was not

10  given an opportunity to respond to SA Zeitlin's false statements before the Court

11  issued its order.  Unfortunately, the Court mistakenly relied on false information

12  provided by the case agent which, if known to the Court prior to issuing its order,

13  could have materially affected the Court's ruling.

14        Specifically, contrary to representations and statements made to Judge

15  Parada, FBI agents searched the office of Mr. Burum's criminal defense counsel,

16  the undersigned Stephen G. Larson, which is located at Diversified and clearly

17  marked.  Relying on SA Zeitlin's attached declaration, government counsel

18  unequivocally represented to Judge Parada that "[a]gents never searched this room

19  [Mr. Larson's law office] or anything located in the room."  Opp. at p. 5.[2]  In the

20  attached declaration describing the search, SA Zeitlin, who describes himself as

21  having been admitted to the Georgia State Bar and a former assistant district

22  attorney, only disclosed to Judge Parada that the FBI agents "encountered an office

23  with a door that had affixed to it a label which read, 'Law Office of Stephen G.

---

24  [1] Mr. Burum also has filed a motion pursuant to Federal Rule of Criminal Procedure 41(g) for return of all property

25  (and copies thereof) that was seized from Diversified and his home.  If the Court grants that motion, then it may be
    unnecessary to appoint an independent Special Master.

26

27  [2] For the Court's convenience, Mr. Burum's *Ex Parte* Application for Appointment of Special Master, including all
    supporting declarations and exhibits, is attached to the Declaration of Stephen G. Larson as Exhibit 4.  The
    government's Opposition to the *Ex Parte* Application, including all supporting declarations and exhibits, is attached

28  as Exhibit 5.  Judge Parada's September 27, 2011, Order Denying the *Ex Parte* Application is attached as Exhibit 6.

1   Larson,'" and, upon Mr. Larson's arrival at the scene of the search, "[w]ith Mr.

2   Larson's consent and while being accompanied by Mr. Larson, SA Montero and SA

3   Almeda walked through the office marked 'Law Office of Stephen G. Larson'" and

4   "determined that the 'Law Office' would not be searched." Zeitlin Decl. ¶ 1, 14.

5       The representation by the government that the agents never searched Mr.

6   Larson's office, and the sworn declaration of SA Zeitlin upon which that

7   representation is expressly based, is completely false, omits material facts, and is

8   grossly and materially misleading.  Security videotape clearly and unmistakably

9   reveals that FBI agents entered Mr. Larson's office 12 times during the execution of

10  the search warrant and on no occasion were they ever accompanied by Mr. Larson.

11  On some of those occasions the agents physically opened and looked into the

12  cabinets above the desk and near the door.  They also crouched at and apparently

13  searched file cabinets (off camera) where Mr. Larson keeps work-product and other

14  materials related to a pending criminal case against Mr. Burum as well as highly-

15  sensitive work-product and case materials regarding other clients completely

16  unrelated to Mr. Burum.  Although Mr. Larson did accompany SA Montero into the

17  "law library" which is not part of Mr. Larson's law office, at no time did Mr.

18  Larson give FBI agents consent, oral or written, to enter or search his personal law

19  office.

20      Moreover, during their search of Diversified, FBI agents seized a significant

21  amount of materials that are protected by the attorney-client, attorney work-

22  product, and joint defense privileges.  FBI agents also seized privileged materials

23  from Mr. Burum's home pursuant to a search warrant.  Much of the privileged

24  materials seized from Diversified and Mr. Burum's home were prepared at Mr.

25  Larson's direction and under his supervision.  The government's review and

26  identification of those privileged materials must be conducted in a manner that

27  preserves the applicable privileges and does not compromise Mr. Burum's legal

28  strategies in connection with the pending state court criminal case against him.  The

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1    government's suggestion that the use of a "taint group" comprised of federal

2    prosecutors and law enforcement agents is sufficient to protect Mr. Burum's

3    privileges is not credible in light of the government's flagrant and unjustified search

4    of Mr. Larson's office, followed by the government's false representation and SA

5    Zeitlin's false declaration.

6          Law enforcement agents assigned to this case have demonstrated at the outset

7    of this investigation that they are not trustworthy and cannot be believed.  The lack

8    of due diligence by the lead case agent in verifying the statements attributed to

9    other agents in his declaration, and the patently false information provided by these

10    agents to SA Zeitlin, demonstrate that determinations regarding privileged

11    documents cannot and should not be entrusted to their care.  Indeed, the agents'

12    egregious misconduct demonstrates that the government should not be allowed to

13    designate the procedures or set the terms for the review of privileged materials.

14    The appointment of an independent Special Master is the only remedy to protect the

15    privileges at stake here and Mr. Burum's constitutional rights.

16    **II.**    **FACTUAL BACKGROUND**

17         **A.**    **Procedural Background**

18          On September 15, 2011, law enforcement personnel executed broad, general

19    search warrants at the business offices of Diversified and Mr. Burum's home.  Law

20    enforcement personnel seized a significant amount of material that is protected by

21    the attorney-client, attorney work-product, and joint defense privileges.  On

22    September 20, 2011, Mr. Burum's counsel sent the Assistant U.S. Attorneys

23    overseeing the searches and seizures, Jerry Behnke and Joseph B. Widman, a letter

24    and requested that an independent Special Master be appointed to review all seized

25    materials for applicable privileges.  Mr. Widman rejected the request and instead

26    indicated that the government would use a "taint group" to conduct a privilege

27    review.  However, Mr. Widman failed to proffer any procedures that would be used

28

1   to conduct this review, and no such procedures were attached to the search

2   warrants. *See Ex Parte* App., Exs. 3, 4.

3         On September 23, 2011, Mr. Burum filed an *Ex Parte* Application for

4   Appointment of Special Master, and on September 26, 2011, the government filed

5   its opposition. Attached to, and in support of, the government's opposition was the

6   declaration of SA Zeitlin referenced above. Approximately 24 hours later, without

7   conducting a hearing or giving Mr. Burum any opportunity to respond to the

8   government's opposition and SA Zeitlin's declaration, Judge Parada denied Mr.

9   Burum's *Ex Parte* Application. *See* Larson Decl. ¶¶ 18-20, Exs. 4-6.

10         Pursuant to Federal Rule of Criminal Procedure 59, Federal Rule of Civil

11   Procedure 72, and Local Civil Rule 72-2.1, Mr. Burum hereby files the instant

12   motion for review of Judge Parada's order within 14 days of service of the written

13   ruling (*i.e.*, October 11, 2011). Review and reversal of Judge Parada's order is

14   particularly necessary because the order is based on false representations by the

15   government and false statements in SA Zeitlin's declaration.

16       **B.**    **Law Enforcement Made False Statements to Mr. Larson, the U.S.**

17             **Attorney's Office, and the Court**

18         In opposition to the *Ex Parte* Application for Appointment of Special Master

19   to Review Seized Materials, the government and law enforcement made

20   categorically false representations and statements about the search of the "Law

21   Office of Stephen G. Larson" and the "Law Library" at Diversified. Based on SA

22   Zeitlin's false statements, the government unequivocally represented to the Court

23   that "searching agents encountered a room used by applicant's current attorney,

24   Stephen Larson. Agents *never searched* this room or anything located in the

25   room." Opp. at p. 5 (citing Zeitlin Decl. ¶ 14) (emphasis added). This is absolutely

26   false.

27         Security videotape from Diversified shows that FBI agents entered and

28   searched Mr. Larson's office 12 times. They opened cabinets. They repeatedly and

thoroughly visually inspected the office itself.  They also appeared to search a highly-sensitive file cabinet (off camera), crouching down to examine Mr. Larson's privileged and work-product materials related to a pending criminal case against Mr. Burum as well as privileged materials related to other clients.  *See* Larson Decl. ¶¶ 9-12, Exs. 2, 3; Ngo Decl. ¶ 4, Ex. 7.  The following is a summary of the activities in Mr. Larson's office on September 15, 2011—the day FBI agents searched Diversified:

| 9:20:20[3]: | Three agents entered the office with their handguns drawn.  One agent opened the lower pantry cabinet. |
| 9:22:51: | An agent entered the doorway of the office and then left. |
| 9:23:08: | An agent returned to the office and stood in the doorway. |
| 9:24:41: | An agent entered the office. |
| 9:25:10: | An agent entered the doorway of the office and then left. |
| 9:29:34: | An agent entered the office.  He opened the cabinet doors above the desk area and then he walked to the file cabinet area (off camera). |
| 9:31:47: | Two agents entered the office and went directly to the file cabinet area (off camera).  One agent apparently crouched at the file cabinet for an extended period of time and searched it. |
| 9:32:47 | An agent entered the doorway of the office and then left. |
| 9:46:26: | An agent entered the office.  He paced while apparently talking on a cell phone. |
| 9:47:40: | An agent entered the office while speaking on a cell phone.  He left, but he returned at 9:47:59. |

---

[3] The times are provided by the onscreen DVR display.

| | |
|---|---|
| 1 | 9:49:18: An agent entered the office and grabbed a pen or a pencil to |
| 2 | write on a small pad on the desk. When he left, he closed the |
| 3 | door behind him. |
| 4 | 9:50:33: An agent entered the office and removed something from a |
| 5 | notepad. When he left, he closed the door behind him. |
| 6 | 10:28:07: Three unidentified males entered the office. One male had what |
| 7 | appears to be a holstered handgun. The male with the handgun |
| 8 | left, and there was a brief discussion between the other two |
| 9 | males. |
| 10 | 10:57:24: An agent entered the office. When he left, he turned off the |
| 11 | lights and closed the door. |
| 12 | 18:03:26: An unidentified person opened the door to the office without |
| 13 | entering the office. |

*See* Exs. 2, 3, 7.

SA Zeitlin specifically represented that SAs Anthony Montero and Kristin Almeda walked through the Mr. Larson's office with Mr. Larson's consent and in his presence. *See* Zeitlin Decl. ¶ 14(b). This is absolutely false. As demonstrated on the security videotape, Mr. Larson never entered the office with any FBI agents during the search of Diversified. Mr. Larson arrived at Diversified at approximately 10:30 a.m.—after FBI agents had already entered Mr. Larson's office 11 times, opened cabinets, and searched the file cabinets where Mr. Larson keeps work-product and case materials related to Mr. Burum's criminal defense, as well as work-product and case materials related to other clients. *See* Larson Decl. ¶¶ 9-12; Exs. 1-3, 7.

Moreover, when Mr. Larson arrived at Diversified, SA Montero falsely told him that FBI agents had only conducted a security sweep of his office, placed a "Do Not Search" sign on the door of the office, and closed the door to the office. *See* Larson Decl. ¶ 5. However, at the same time Mr. Larson was in the parking lot, it

1    appears that agents were in his office even though they completed the security

2    sweep approximately one hour before.  Apparently, agents also were in Mr.

3    Larson's office as Mr. Larson was making his way into the building.  *See* Exs. 2, 7.

4           Contrary to SA Zeitlin's representations to the Court, Mr. Larson was never

5    asked to give and never gave consent to SAs Montero, Almeda, Christopher Parris,

6    and/or anyone else to enter and/or to search Mr. Larson's office.  Larson Decl. ¶ 13.

7    Mr. Larson never even entered his law office during the execution of the search

8    warrants.  *See id.* ¶¶ 8, 13; Exs. 2, 7.  In fact, when Mr. Larson entered the second

9    floor of Diversified where his office is located, he observed that the door to his

10   office was closed and that there was a "Do Not Search" sign on the door.  Larson

11   Decl. ¶ 8.  Mr. Larson had no way of knowing, until he was shown the security

12   videotape, that his law office already had been searched.  *Id.* ¶¶ 9-11.

13          SA Zeitlin's representations about the search of the law library also are

14   incorrect.  SA Zeitlin stated:  "SA Montero and Mr. Larson together reviewed the

15   contents of the boxes in the 'law library.'"  Zeitlin Decl. ¶ 14(d).  Mr. Larson never

16   reviewed the contents of the boxes in the law library with SA Montero.  Instead,

17   Mr. Larson explained to SA Montero that the law library contained discovery

18   materials from the state criminal case in which Mr. Burum and others are named as

19   defendants.  Mr. Larson accompanied SA Montero to the law library and pointed

20   out the types of materials present (*e.g.*, binders with grand jury transcripts, grand

21   jury exhibits, and discovery materials received from state prosecutors).  Mr. Larson

22   also *demonstrated* that a stack of boxes was empty by pressing gently on the stack.

23   *See* Larson Decl. ¶ 7.  SA Zeitlin's statements to the contrary in his declaration are

24   simply false.

25          **C.     Judge Parada Relied on the False Statements and Representations**

26          Based on the false and misleading representations and statements in the

27   government's opposition, Judge Parada ruled that there was no need to appoint an

28   independent Special Master.  Judge Parada accepted the representations as true,

1   stating "[i]n fact, with regard to the office of Mr. Burum's counsel and the law

2   library, no materials were seized.  The agents merely conducted a walk through

3   with the consent of and in the presence of Mr. Burum's counsel." Sept. 17, 2011,

4   Order at p. 4.  Given SA Zeitlin's false statements, Judge Parada concluded that it

5   was unnecessary to appoint an independent Special Master.  *See id.* at pp. 3-5.

6   Unfortunately, Mr. Burum was never given an opportunity to address SA Zeitlin's

7   false statements.

8        **D.    Law Enforcement Seized Privileged Materials From Diversified**

9              **and Mr. Burum's Home**

10        The search warrants for Diversified and Mr. Burum's home allowed law

11   enforcement personnel to broadly seize a wide variety of material, including

12   virtually all computer equipment and data.  *See Ex Parte* App., Exs. 1, 2.  The

13   warrants did not provide any instructions or procedures to be used to identify and

14   segregate privileged materials.  Although "taint procedures" are described in the

15   declarations of SA Zeitlin and Assistant U.S. Attorney Widman in opposition to

16   Mr. Burum's *Ex Parte* Application, these alleged procedures were not included

17   with the warrants.  *Compare id.*, *with* Zeitlin Decl. ¶¶ 5-10, Widman Decl. ¶ 2.

18   Given SA Zeitlin's false statements and the false information provided to him by

19   other agents, there is no basis to believe such procedures were followed during the

20   execution of the search warrants.

21        Furthermore, due to the extraordinary breadth of the warrants, law

22   enforcement personnel searched and seized a substantial amount of hard-copy and

23   electronic documents and records that relate to ongoing or recent litigation matters.

24   For example, the Colonies Partners, L.P., was involved in significant litigation with

25   the San Bernardino Flood Control District in Case No. RDV 061971.  Item No. 1 of

26   both warrants sought "[a]ll documents, records, applications, communications, and

27   materials" pertaining to this litigation (hereinafter referred to as the "Colonies

28   litigation").  *Ex Parte* App., Exs. 1, 2.  Documents and records pertaining to the

1   Colonies litigation were maintained at Diversified. Although those documents and

2   records are protected by the attorney-client and/or work-product privileges, FBI

3   agents seized them.

4        In addition, there continues to be litigation derivative of the Colonies

5   litigation, and Mr. Burum has retained counsel to provide him with legal advice

6   pertaining to that litigation. Privileged documents and records pertaining to the

7   derivative litigation also were maintained at Diversified, both in hard-copy and

8   electronic forms. Mr. Burum and several of his entities are involved in litigation

9   unrelated to the Colonies litigation for which he has retained other counsel, and a

10  significant amount of materials related to those matters are similarly protected by

11  the attorney-client and/or work-product privileges. *See Ex Parte* App. at p. 3.

12       Mr. Burum also has been indicted in the pending San Bernardino County

13  Superior Court case entitled *People v. Biane et al.*, Case No. FSB1102102. Arent

14  Fox LLP is counsel of record in that matter and is in the process of actively

15  defending Mr. Burum. As part of this representation, Mr. Larson maintains a law

16  office at Diversified. Ms. Lorraine Le Clear, an executive assistant to Mr. Burum,

17  also provides assistance to Mr. Larson as needed at Diversified. Often in response

18  to requests by Mr. Larson, Ms. Le Clear assists in preparing materials for the

19  criminal matter. Ms. Le Clear also provided assistance to Mr. Burum and his

20  counsel in the Colonies litigation as well as in other litigation described above. Ms.

21  Le Clear is a certified paralegal, with prior experience working at a law firm, which

22  is precisely why she has been, and continues to be, uniquely situated to assist Mr.

23  Larson, Mr. Burum, and Mr. Burum's other counsel with legal matters. *See id.* at p.

24  3; Larson Decl. ¶¶ 14-16.

25       Included in the materials seized at Diversified are documents and records

26  contained on computer and digital media in Ms. Le Clear's work area, including

27  numerous attorney-client privileged communications and attorney work product.

28  Also, numerous other business entities operate out of the Diversified office

1   building, and materials from those entities were seized as well—including

2   documents and records relating to litigation and/or legal advice provided to those

3   entities.  *See* Larson Decl. ¶¶ 14-16.

4        The Diversified offices have also been used for regular meetings and

5   communications among some or all of the co-defendants and some or all of their

6   attorneys in the state criminal case pursuant to a joint defense agreement.  Materials

7   protected by the joint defense privilege also are among the materials seized from

8   Diversified and Mr. Burum's home.  *See Ex Parte* App. at p. 3.

9        As can be seen, a significant amount of privileged material was seized.  To

10  protect those privileged materials, counsel for Mr. Burum requested that the

11  government agree to the appointment of an independent Special Master, but the

12  government refused.  Mr. Burum then filed his *Ex Parte* Application for

13  Appointment of Special Master to Review Seized Materials on September 23, 2011.

14  Without conducting a hearing, Judge Parada denied the Application.  *See id.*, at p.

15  4.  Mr. Burum's counsel then informed the government's counsel, Assistant U.S.

16  Attorneys Jerry Behnke and Joseph B. Widman, that Mr. Burum planned to appeal

17  Judge Parada's order.  Mr. Burum's counsel further requested that the government

18  "preserve the status quo and not review any documents until the issue is decided by

19  the District Judge."  Larson Decl. ¶ 17.

20  **E.**   **The Government's Proposed "Taint Procedures" Do Not Protect**

21       **the Attorney-Client, Work-Product, and Joint Defense Privileges**

22       Along with misleading the Court and the U.S. Attorney's Office, FBI agents

23  have ignored and compromised the privileges that apply to the seized materials.  In

24  his declaration, SA Zeitlin describes the "taint procedures" for reviewing

25  potentially privileged materials.  The procedures focus almost entirely on attorney-

26  client communications and almost completely ignore the work-product and joint

27  defense privileges.  *See* Zeitlin Decl. ¶¶ 5-10, Exs. A, B.

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Unless seized materials contain an attorney's name or some unknown magic

2    words, the materials will not be reviewed by the government's "taint group." *Id.*

3    SA Zeitlin described how law enforcement personnel culled potentially privileged

4    materials as follows:

> The operational plan listed numerous attorneys believed
> to have had an attorney client relationship with each of
> the searches' subjects at some point. As to Mr. Burum,
> the names, law firms, addresses, and known telephone
> numbers of six attorneys were provided, including his
> current attorneys from Arent Fox LLP. In addition,
> before the searches were conducted, I e-mailed the team
> leaders for each search location the names of additional
> attorneys ....

10   *Id.* ¶ 9.

11

12   The taint procedures do not instruct law enforcement personnel how to

13   identify and handle privileged materials that do not contain an attorney's name and

14   are not marked as privileged. *See id.* ¶¶ 5-9, Exs. A, B. In fact, the conduct of the

15   agents in seizing a privileged document demonstrates their cavalier attitude towards

16   Mr. Burum's privileges. For example, after the search at Diversified was

17   completed, Mr. Larson reviewed the FBI inventory of seized property. He

18   identified a document prepared by Ms. Le Clear at his direction and under his

19   supervision. The document itemized meetings between Mr. Burum, San

20   Bernardino County District Attorney Michael A. Ramos, and others.

21   Documentation of those meetings relates to a recusal motion based on Mr. Ramos's

22   conflict of interest in prosecuting Mr. Burum which is being litigated (most recently

23   being the subject of a hearing before San Bernardino Superior Court Judge Michael

24   A. Smith on September 27, 2011). The document does not contain Mr. Larson's

25   name and it is not stamped "attorney-client privilege" or "attorney work product."

26   Mr. Larson expressly informed the FBI agents that the document is attorney

27   work product and is privileged. He specifically told the FBI agents that Ms. Le

28   Clear had created the document at his direction for purposes of Mr. Burum's

1    criminal defense.  The agents refused to accept Mr. Larson's assertion of these

2    privileges and to leave the document at the premises.  Instead, they identified it as a

3    potentially tainted document and seized it.  *See* Larson Decl. ¶¶ 14-16.

4         At Mr. Larson's direction and under his supervision, Ms. Le Clear has

5    prepared other documents that relate to Mr. Burum's legal strategy and criminal

6    defense.  Many of those documents do not contain his name and are not stamped

7    "attorney-client privilege" or "attorney work product."  *Id.*  Under the taint

8    procedures, such privileged documents will not be subject to taint review.  *See*

9    Zeitlin Decl. ¶¶ 5-9, Exs. A, B.  Rather, they will be passed onto the case agents

10   and prosecutors, effectively invalidating and eviscerating the privileges that protect

11   the documents from review.

12   **III.   ARGUMENT**

13        **A.      An Independent Special Master Should Be Appointed Because Mr.**

14                **Larson's Office Was Searched and Privileged Materials Were**

15                **Seized From Diversified and Mr. Burum's Home**

16        This Court may appoint a Special Master to review the materials seized from

17   Diversified and Mr. Burum's home.  *See, e.g., United States v. Comprehensive*

18   *Drug Testing, Inc.*, 621 F.3d 1162, 1179-80 (9th Cir. 2010) (en banc) (Kozinski,

19   Kleinfeld, W. Fletcher, Paez, and M. Smith, JJ., concurring) (stating that a court

20   may appoint an independent third party to review seized computer data); *DeMassa*

21   *v. Nunez*, 747 F.2d 1283, 1285 (9th Cir. 1984) (noting that a special master was

22   appointed to supervise a search and seizure).  It is particularly appropriate to

23   appoint a Special Master where, as here, "the privacy interests of numerous other

24   parties who are not under suspicion of criminal wrongdoing are implicated by the

25   search."  *Comprehensive Drug Testing, Inc.*, 621 F.3d at 1179; *see also In re U.S.'s*

26   *Application For A Search Warrant To Seize and Search Electronic Devices From*

27   *Edward Cunnius*, 770 F. Supp. 2d 1138, 1149 (W.D. Wash. 2011) (stating that this

28   guideline is "hardly revolutionary").

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

1    Courts have appointed a Special Master when a defense attorney's law

2    offices have been searched.  In fact, the government conceded this point in its

3    Opposition to Mr. Burum's *Ex Parte* Application: "Special masters ordinarily

4    become involved in review of potentially privileged materials when a criminal

5    defense attorney's office is searched."  Opp. at p. 10.  Judge Parada accepted the

6    government's point and concluded that a Special Master was not necessary because,

7    based on the government's representation and SA Zeitlin's false statements, Mr.

8    Larson's office had not been searched.  *See* Sept. 27, 2011, Order at p. 3 (citing

9    *United States v. Stewart*, No. 02 CR. 396 JGK, 2002 WL 1300059, at *7 (S.D.N.Y.

10   June 11, 2002); *DeMassa*, 747 F.2d at 1285; *United States v. Abbell*, 914 F. Supp.

11   519, 520 (S.D. Fla. 1995)).

12   Here, FBI agents seized privileged materials related to several litigation

13   matters and multiple parties.  They seized privileged materials related to litigation

14   in which the numerous business entities that operate at Diversified have been or are

15   involved.  They seized privileged materials related to the Colonies litigation and the

16   derivative litigation matters.  Finally, they seized privileged materials related to Mr.

17   Burum's criminal defense and other litigation matters.  FBI agents have seized

18   privileged materials of multiple parties related to various litigation matters.  These

19   are exactly the circumstances where courts have concluded that the appointment of

20   an independent Special Master is imperative.

21   Unfortunately, law enforcement personnel have proven they cannot be

22   trusted or entrusted to safeguard privileged materials.  Agents made false

23   statements to Mr. Larson, the U.S. Attorney's Office, and the Court.  The

24   government has unequivocally represented that Mr. Larson's office was not

25   searched when, in fact, the security videotape belies that claim.  Law enforcement

26   personnel, including the taint group, simply cannot be trusted to review and protect

27   materials covered by the attorney-client, work-product, and joint defense privileges.

28   Moreover, if any procedures or the government's conduct in reviewing the

Arent Fox LLP
Attorneys At Law
Los Angeles

1   privileged documents are later called into question, the agents cannot be trusted to

2   provide truthful and accurate descriptions of their conduct in completing the

3   privilege review.  Under these circumstances, the appointment of a Special Master

4   is imperative.

5   **B.      Mr. Burum's Defense Strategy in Connection With a Pending**

6   **Criminal Case Will Be Compromised Unless an Independent**

7   **Special Master Is Appointed**

8          The government's taint procedures also are entirely inadequate.  The

9   procedures, as described in the government's declarations, focus almost exclusively

10   on attorney-client communications.  Privileged materials are subjected to taint

11   review only if they contain an identified attorney's name or some unknown magic

12   words.  The taint procedures ignore the attorney work-product and joint defense

13   privileges entirely.  *See* Zeitlin Decl. ¶¶ 5-10, Exs. A, B; Widman Decl. ¶ 2.  For

14   example, at Mr. Larson's request and under his direction, Ms. Le Clear has

15   completed tasks related to Mr. Burum's criminal defense.  Her work area and

16   computer contained materials protected by the attorney-client, work-product, and

17   joint defense privileges, and many of those materials are not clearly identifiable as

18   privileged under the government's taint procedures.  FBI agents seized those

19   materials even though they were specifically informed about their privileged nature.

20          The problems with the government's taint procedures are compounded by the

21   entirely one-sided nature of the government's taint review.  The government

22   proposes that the taint group—which, again, would be comprised of federal

23   prosecutors and law enforcement agents—have the unfettered ability to deem

24   materials privileged or not privileged, with any material deemed not privileged

25   being passed on directly to the primary investigative team, which includes lead case

26   agent SA Zeitlin.  This procedure is unacceptable.  As discussed above, the

27   materials seized include substantial material relating to numerous litigation matters

28   involving numerous parties and legal counsel.  Some of these matters also involve

Arent Fox LLP
Attorneys at Law
Los Angeles

joint defense agreements.  In short, it is highly likely that there will be disputes between the government and Mr. Burum about the scope and applicability of the various privileges.  Providing the government with the sole discretion to decide such disputes is fundamentally unfair and contrary to any notion of justice.  An independent Special Master, on the other hand, would bring an impartial view to these issues, could facilitate informal resolutions of any such disputes, and when necessary could submit disputed material to the Court for an *in camera* review.

## IV.   CONCLUSION

Judge Parada's September 27, 2011, Order is based on the government's false representations and statements.  The government simply cannot be entrusted with identifying, segregating, and protecting privileged materials.  Even if the government's proposed taint procedures are sufficient, law enforcement personnel have proven that the taint group will not properly implement those procedures or be truthful about their review of privileged materials.  For these reasons, and as set forth above, Mr. Burum respectfully requests that this Court appoint an independent Special Master to review all seized material.

Dated:        October 3, 2011            Respectfully submitted,

                                          ARENT FOX LLP


                                          By: _____
                                             Stephen G. Larson
                                             Mary Carter Andrues
                                             *Attorneys for Jeffrey S. Burum*

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -
MEMORANDUM RE REVIEW OF ORDER RE APPOINTMENT OF SPECIAL MASTER
CASE NO.
ED CV 11-01570 VAP (OPx)

LARSON
DECLARATION

# DECLARATION OF STEPHEN G. LARSON

I, STEPHEN G. LARSON, declare as follows:

1.      I am an attorney duly admitted to practice law in California and before this Court. I am a partner in the law firm of Arent Fox LLP and counsel of record for Jeffrey Burum. I have personal knowledge of the matters set forth herein and, if called upon to testify, could and would do so competently. I make this declaration in support of Mr. Burum's Motion for Review of Magistrate Judge Oswald Parada's September 27, 2011 Order Denying *Ex Parte* Application for Appointment of Special Master to Review Seized Materials.

2.      On September 15, 2011, at approximately 9:30 a.m., Mr. Burum telephoned me and reported that FBI agents were executing a search warrant at his home at 5022 Earl Court, Rancho Cucamonga, California. At the time I was at Ontario International Airport waiting to board Southwest Airline flight 1535 for Oakland, California, which was scheduled to depart at approximately 10:00 a.m.

3.      After receiving the telephone call from Mr. Burum, I immediately left the airport and drove directly to Mr. Burum's residence, a distance of approximately nine miles. I arrived at Mr. Burum's home shortly before 10:00 a.m., and spent approximately 10 to 15 minutes speaking with him and several FBI agents. Sometime after 10:00 a.m., I left Mr. Burum's home and drove to Mr. Burum's office located at Diversified, a distance of approximately 11 miles.

4.      I arrived at Diversified at approximately 10:30 a.m. In the parking lot outside of the Diversified office building I met several FBI agents, including an agent who I believe was, and will be identified herein, as Special Agent ("SA") Anthony Montero. SA Montero told me that the agents executing the search warrant had discovered that I had a law office in the building based on the readily apparent brass sign at the door of the office that reads "Law Office of Stephen G. Larson." I also learned that the agents had asked for, received, and reviewed a copy of my lease for that office.

5.     While I was in the parking lot, SA Montero told me that the agents had conducted a security sweep of my law office, placed a "Do Not Search" sign on the door of my law office, and that the door to my law office had been closed. Other than the security sweep, I was assured by SA Montero that my law office had not been, and would not be, searched.

6.     SA Montero also asked me about the office adjacent to my law office that has a sign affixed to the door that states "Law Library." I explained to him that the "Law Library" office contained discovery materials from the state criminal case in which Mr. Burum and others are named as defendants. I further explained that the co-defendants and their counsel are parties to a Joint Defense Agreement, pursuant to which they have access to the materials in the "Law Library."

7.     SA Montero asked me if I would accompany him into the office marked "Law Library"—which is not a part of my law office lease—to confirm that it contained legal materials. I agreed. After apparently conferring with his colleagues, SA Montero and I walked upstairs, past my law office, to the adjacent office marked "Law Library" and entered the room. I pointed out to SA Montero the types of materials present (e.g., binders with grand jury transcripts, binders with grand jury exhibits, binders with discovery materials, etc.), and I demonstrated to him that a stack of approximately five or six unmarked boxes, about which he asked, were empty. Without further examining the contents of any materials in the room, we left the room and the door was closed. SA Montero told me that the FBI would not conduct any further search of that room, and that agents would place a sign on the door indicating that the "Law Library" office could not be searched.

8.     When I accompanied SA Montero to the office marked "Law Library," we walked by my law office. I observed that the door to my law office was closed, and that there was a "Do Not Search" sign on the door of my law office. Attached hereto as <u>Exhibit 1</u> is a true and correct copy of a floor plan of the floor at Diversified where my office is located. The floor plan accurately shows the layout

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  of my office, including the placement of furniture and file cabinets.  At no time

2  during the search of Diversified did I enter my law office.  Nor did I authorize SA

3  Montero or any other agent to enter my law office or to conduct any search of its

4  contents.  In fact, at no time did SA Montero or any other agent even request my

5  authority to enter my law office at Diversified.

6       9.     After the search at Diversified had been completed, I learned that

7  agents did not seize the security videotapes from Diversified.  These security

8  videotapes include video surveillance of my law office at Diversified.  I thereafter

9  reviewed the security video footage from September 15, 2011, of my law office.  In

10  doing so, I learned that SA Montero's assurances to me on September 15, 2011—

11  namely, that other than an initial security sweep, my law office had not been, and

12  would not be, searched—were false.  As shown on the security video footage, at

13  approximately 9:20 a.m., agents did in fact conduct a security sweep of my office.

14  However, from approximately 9:23 a.m. to 10:57 a.m., agents entered my law

15  office 11 additional times.

16       10.    The security video footage also reveals that, while they were in my

17  office, FBI agents opened the cabinets above my desk and near the door.  The FBI

18  agents also moved off camera to a part of the office that contains only file cabinets

19  where I maintain my work-product and case materials related to Mr. Burum's

20  criminal prosecution, as well as work-product and case materials related to other

21  clients.

22       11.    As shown on the security video footage, FBI agents entered my law

23  office at Diversified a total of 12 times between approximately 9:20 a.m. to 10:57

24  a.m.  These entries into my law office were made without my knowledge or

25  consent.  Other than advising me of the initial security sweep, at no time did any

26  FBI agent, including SAs Montero, Almeda or Parris, advise me that FBI agents

27  had entered my law office an additional 11 times, opened and examined the inside

28  of my cabinets, and apparently searched my file cabinets.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

12.     Lodged herewith as <u>Exhibit 2</u> is a true and correct copy of the security video from September 15, 2011, of my office at Diversified.  Attached hereto as <u>Exhibit 3</u> are true and correct copies of photographs of my office, including photographs of my desk area and the file cabinets that are off camera.

13.     I have reviewed the declaration of FBI SA Jonathan Zeitlin which was filed by the government in support of the Government's Opposition to *Ex Parte* Application for Appointment of Special Master to Review Seized Materials.  Several statements made by SA Zeitlin are incorrect and false, including:

a.  Contrary to SA Zeitlin's declaration, I did not give, nor would I ever have given, consent to SA Montero, SA Christopher Parris, SA Kristin Almeda, and/or anyone else to enter or search my law office.  To my knowledge, SA Zeitlin's statement that I did give such consent to search my law office is false.

b.  When I arrived at Diversified, SA Montero told me that a security sweep by FBI agents already had been conducted in my office and that, thereafter, my office was closed and a "Do Not Search" sign was placed on the door.  To my knowledge, the only office to which I was asked to accompany SA Montero was the office marked "Law Library" which is adjacent to, but not connected with, my law office.

c.  Contrary to SA Zeitlin's declaration, I did not "walk[] through the office marked 'Law Office of Stephen G. Larson,'" with SA Montero and/or SA Almeda.  To my knowledge, and as confirmed by the security video, SA Zeitlin's statement to that affect is false.

14.     In addition to representing Mr. Burum in this federal investigation, I also represent him in the criminal case entitled *People v. Biane et al.*, Case No. FSB1102102, pending in San Bernardino County Superior Court.  It is to help facilitate this representation that I maintain my law office and a "war room" at

1  Diversified.  While working from this location, I often obtain assistance from Ms.

2  Lorraine Le Clear, a certified paralegal who serves as Mr. Burum's executive

3  assistant, as well as from Mr. Burum and other employees at Diversified.

4        15.    Late in the day on September 15, 2011, I reviewed the FBI's inventory

5  of property seized from Diversified.  In doing so, I identified a document prepared

6  at my direction by Ms. Le Clear for use in my representation of Mr. Burum in the

7  state court criminal prosecution.  The document itemized meetings between Mr.

8  Burum, San Bernardino County District Attorney Michael A. Ramos, and others.

9  Documentation of those meetings relates to a recusal motion based on Mr. Ramos's

10  conflict of interest in prosecuting Mr. Burum, which is being litigated in the state

11  court criminal action.  I informed the FBI agents that, although this document does

12  not contain my name and is not stamped "attorney-client privilege" or "attorney

13  work product," the document is attorney work-product and is protected by the

14  attorney-client privilege.  I specifically told the FBI agents that Ms. Le Clear had

15  created that document at my direction for purposes of Mr. Burum's criminal

16  defense.  The agents refused to accept my assertion of the attorney-client and work-

17  product privileges, and refused to leave the document at Diversified.  Instead, they

18  identified it for further "taint" review and seized the document.

19        16.    Over the course of my representation of Mr. Burum, I have on

20  numerous occasions directed that various projects be undertaken by Mr. Burum

21  and/or Ms. Le Clear for purposes of Mr. Burum's legal strategy and criminal

22  defense efforts.  I am informed and believe that both Mr. Burum and Ms. Le Clear

23  were in possession of numerous privileged documents and communications, both

24  hard copies and computer files, which were seized when the search warrants were

25  executed at Diversified and at Mr. Burum's home.  I understand that many of those

26  documents do not contain my name and are not stamped "attorney-client privilege"

27  or "attorney work product."   Following the seizure of this material, Mr. Burum and

28  I have been deprived access to these privileged documents.