1   Stephen G. Larson (SBN 145225)
2   Mary Carter Andrues (SBN 138486)
    ARENT FOX LLP
3   555 West Fifth Street, 48th Floor
    Los Angeles, CA  90013-1065
4   Telephone:  213.629.7400
    Facsimile:  213.629.7401
5   E-mails:     larson.stephen@arentfox.com
                 andrues.mary@arentfox.com

6   *Attorneys for Jeffrey S. Burum*

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                      EASTERN DIVISION

11

12   UNITED STATES OF AMERICA,          Case No.  ED CV 11-01570 SJO (OPx)

13              Plaintiff,

14   v.                                 **JEFFREY S. BURUM'S NOTICE OF
                                        MOTION AND MOTION FOR:
15   THE PREMISES KNOWN AS:             (1) RETURN OF PROPERTY
     10621 CIVIC CENTER DRIVE,          PURSUANT TO RULE 41 BASED
16   RANCHO CUCAMONGA,                  ON VIOLATIONS OF COURT-
     CALIFORNIA,                        ORDERED SEARCH
17                                      PROCEDURES; (2) AMENDMENT
                Defendant.              OF COURT ORDERS RE SPECIAL
18                                      MASTER; and (3) AWARD OF
                                        ATTORNEYS' FEES;
19                                      DECLARATIONS OF LAURIE L.
                                        LEVENSON AND STEPHEN G.
20                                      LARSON; EXHIBITS D – K**

21                                      (Filed Concurrently With Jeffrey S.
                                        Burum's Application For Order to File
22                                      Under Seal)

23                                      COURT:  Hon. S. James Otero
                                        DATE:    January 6, 2014
24                                      TIME:    10:00 a.m.

25

26

27

28

**TO THE ABOVE ENTITLED COURT AND THE UNITED STATES ATTORNEY'S OFFICE:**

**PLEASE TAKE NOTICE** that on January 6, 2014, at 10:00 a.m., Jeffrey S. Burum will and hereby does respectfully move for return of seized property pursuant to Federal Rule of Criminal Procedure 41 based on the government's violation of Court-ordered search protocols, for amendment of the Court's Orders of October 31, 2011, and December 8, 2011 (collectively the "Orders"), and for an award of attorneys' fees relating to this motion.  Specifically, Mr. Burum moves to have: (1) all digital material seized pursuant to the September 13, 2011 search warrants returned or destroyed, including all copies of such material; (2) the government identify all recipients of seized digital material, including copies; (3) the government request the return of any seized digital material, including copies, from any such recipients; (4) the government provide "chain of custody" evidence for all seized digital material, including copies; (5) Professor Laurie L. Levenson be relieved from her appointment as Special Master; and (6) the government be sanctioned in the amount of Mr. Burum's attorneys' fees incurred in bringing this motion.

The basis for this motion is that the government improperly released digital material to state prosecutors without complying with the terms of the Orders and without following the Court-ordered search protocol, and that the federal investigation in this matter has been closed without any charges being brought, thus eliminating any need for a Special Master.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the attached Declarations of Laurie L. Levenson and Stephen G. Larson, the concurrently-filed Application For Order to File Under Seal and accompanying documents, all papers and pleadings on file in this matter, and such further evidence and argument as may be presented prior to or at the hearing of this motion, in the event any such hearing is needed.

1        This motion is made following the conference of counsel pursuant to L.R.

2   7-3 which took place telephonically and in writing beginning October 9, 2013, as

3   set forth in the attached Declaration of Stephen G. Larson.

4

5   Dated:  November 20, 2013         ARENT FOX LLP

6

7                          By: _____

                             Stephen G. Larson

8                                Mary Carter Andrues

                             *Attorneys for Jeffrey S. Burum*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND .................................. 3

    A.      The Search Warrants and Court-Ordered Review Procedure .............. 3

    B.      The Federal Investigation of Mr. Burum Appears to Be Closed ......... 5

    C.      The Government Turned Over to State Prosecutors Digital
        Material Subject to This Court's Orders .............................................. 7

III.    LEGAL ARGUMENT ............................................................................ 9

    A.      The Court Should Exercise Its Equitable Jurisdiction Under
        Rule 41(g) ........................................................................................ 9

    B.      The Government's Conduct Constitutes an Unlawful Seizure In
        Violation of the Terms of the Search Warrants, This Court's
        Orders, and Rule 41(e)(2)(B) ............................................................ 11

        1.      Further Searches of Seized Electronic Devices Are
             Necessary to Narrow the Scope of the Ultimate Seizure ......... 11

        2.      All Digital Material Outside the Scope of the Warrants
             Must Be Destroyed or Returned to Mr. Burum ....................... 14

        3.      These Limitations On the Handling of Digital Material
             Are Implicit In the Provisions of Rule 41 ............................... 14

    C.      The Government's Conduct Violates this Court's Order
        Regarding the Protection of Privileged Material ............................... 17

    D.      The Court Should Order the Return or Destruction of All Seized
        Digital Material In Order to Protect Mr. Burum From Further
        Violations of His Constitutional Rights ............................................ 17

    E.      The Court Should Relieve the Special Master From Any Further
        Responsibilities or Duties ................................................................. 18

IV.     CONCLUSION ................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Horton v. California,*
   496 U.S. 128 (1990) ............................................................................... 13

*In re Grand Jury Investigation Concerning Solid State Devices, Inc.*
*("SSDI"),*
   130 F.3d 853 (9th Cir. 1997) ................................................................. 11

*KRL v. Moore,*
   384 F.3d 1105 (9th Cir. 2004) ............................................................... 13

*Ramsden v. United States,*
   2 F.3d 322 (9th Cir. 1993) .................................................................. 9, 10

*United States v. Comprehensive Drug Testing, Inc.,*
   621 F.3d 1162 (9th Cir. 2010) ............................................................... 10

*United States v. Harper,*
   928 F.2d 894 (9th Cir. 1991) ................................................................. 16

*United States v. Scrushy,*
   366 F.Supp.2d 1134 (N.D. Ala. 2005) ................................................... 16

*United States v. Spilotro,*
   800 F.2d 959 (9th Cir. 1986) ................................................................. 13

*United States v. Stringer,*
   535 F.3d 929 (9th Cir. 2008) ................................................................. 16

*United States v. Voustianiouk,*
   685 F.3d 206 (2d Cir. 2012) .................................................................. 13

STATUTES AND RULES

18 U.S.C. 3282(a) ...................................................................................... 7

Fed. R. Civ. P. 53 ....................................................................................... 9

Fed. R. Crim. P. 6 ...................................................................................... 6

Fed. R. Crim. P. 41 ...........................................................................*passim*

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Over two years ago, federal law enforcement personnel executed search

4   warrants at Jeffrey Burum's home and business offices.  At the time, the U.S.

5   Attorney's Office was investigating whether any federal crimes had been

6   committed with regard to a 2006 settlement agreement between one of Mr. Burum's

7   companies, Colonies Partners, L.P., and the County of San Bernardino (the

8   "Settlement Agreement").  While this investigation was eventually closed without

9   any charges being brought, the government failed to return or destroy all copies of

10   the digital material seized from Mr. Burum's home and business offices that fell

11   outside the scope of the search warrants—a direct violation of the search protocols

12   set forth in the warrants.  Even worse, Mr. Burum recently learned that data from at

13   least some of the seized digital devices was turned over to state prosecutors over a

14   year ago in violation of the search warrants' terms and this Court's Orders of

15   October 31, 2011, and December 8, 2011 (collectively the "Orders").

16       These violations of the Court-ordered protocol for handling seized digital

17   data were no accident.  The Settlement Agreement is at the heart of a state criminal

18   prosecution brought against Mr. Burum and three co-defendants in San Bernardino

19   County Superior Court, *People v. Biane et al.*, Case No. FSB1102102.  As recently

20   as last month, San Bernardino County District Attorney Michael Ramos confirmed

21   that his office continues to partner with the FBI and U.S. Attorney's Office in the

22   "Inland Empire Joint Corruption Task Force," and that this partnership includes the

23   state prosecution of Mr. Burum.  (Ex. D (October 18, 2013, Press-Enterprise

24   article).[1])   Indeed, it is no secret that it was through this joint task force that the

25

26   _____

[1] Exhibits A through C in support of this Motion are attached to the Declaration of
27   Kathryane Foster, concurrently filed under seal.  Exhibits D through K are attached
     to this Motion and authenticated through the Declaration of Stephen G. Larson
28   ("Larson Decl."), which is attached hereto.

1   decision was made to execute the federal search warrants.  (*See, e.g.,* Ex. E (May 4,

2   2013, San Bernardino Sun article discussing the joint task force).)  It was no

3   coincidence, then, that the federal search warrants were executed shortly after five

4   of the seven felony counts against Mr. Burum were dismissed on demurrer in the

5   state action—including all of the bribery counts.

6       While there is certainly nothing inherently wrong with a joint task force

7   between the government and state prosecutors, the government's wholesale,

8   indiscriminate delivery of seized digital material to state prosecutors violates the

9   terms of the search warrants, this Court's Orders, and Mr. Burum's constitutional

10  rights under the Fourth Amendment.  The government ignored specific procedures

11  that were put in place – first in the search warrants and then by order of this Court –

12  to protect Mr. Burum's rights by appropriately restricting the scope of the seizure

13  and ensuring the proper handling of attorney-client privileged communications and

14  attorney work-product material.  Chief among these procedures were: (a) the use of

15  a Taint Group to conduct key-word searches of seized digital devices to cull out any

16  material that fell outside the scope of the warrants; and (b) a privilege review

17  procedure overseen by a Court-appointed Special Master, Professor Laurie L.

18  Levenson—a professor at Loyola Law School in Los Angeles and a preeminent

19  expert on criminal law and procedure.  The government failed to utilize either the

20  Taint Group or Special Master.  Instead, it simply kept all of the seized digital

21  material – including material that fell outside the scope of the warrants – and then

22  provided that material to state prosecutors without following any of the protocols

23  for narrowing the scope of the seizure or for protecting privileged material.

24      In order to remedy this situation, Mr. Burum respectfully requests that the

25  Court order that the government: (1) return or destroy all seized digital material,

26  including all copies of such material; (2) identify all recipients of seized digital

27  material, including copies; (3) request the return of any seized digital material,

28  including copies, from any such recipients; and (4) provide "chain of custody"

evidence for all seized digital material, including copies.  Additionally, Mr. Burum requests that the Court relieve Professor Levenson from her appointment as Special Master and order the government to pay sanctions in the amount of the attorneys' fees Mr. Burum has incurred in bringing this motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Search Warrants and Court-Ordered Review Procedure

On September 15, 2011 – a few months after all bribery charges against Mr. Burum were dismissed on demurrer in the pending state prosecution – federal law enforcement personnel executed search warrants at nine locations throughout Southern California, including at Mr. Burum's home and at his business offices at Diversified Pacific in Rancho Cucamonga.  (Larson Decl., ¶ 2; Exs. A & B.) Among other things, the search warrants authorized the seizure of digital devices – such as computers and cell phones – and set forth a procedure by which the government could conduct key-word searches at an off-site location in order to identify any digital material contained on those devices that fell within the scope of the warrant.[2]  (Exs. A & B, ¶¶ 12-15, pp. 7-12 & 21-26.)

Under the terms of the warrants' search protocol, the government was required to complete all off-site searches of digital devices "as soon as is practicable *but not to exceed 60 days* from the date of the execution of the warrant." (*Id.* at ¶ 14.a, pp. 8-9 & 22-23 (emphasis added).)  If additional time was needed, the government was required to seek an extension from the Court within this initial 60-day period.  (*Id.*)  If the search determined that a particular device did not contain any data falling within the scope of the warrant, the government was required to "as soon as practicable return the device and *delete or destroy all the forensic copies thereof*."  (*Id.* at ¶ 14.e, pp. 10 & 24 (emphasis added).)  If the search determined that a device did contain data subject to seizure under the

---

[2] By stipulation between the parties, the government has returned the original digital devices, retaining only forensic copies for its off-site searching.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   warrant, the government had two options: (1) it could "within the time period

2   authorized by the Court for completing the search, return to the Court for an order

3   authorizing retention of the digital device"; or (2) it could "retain only a copy of the

4   data found to fall within [the scope of the warrant] and return the digital device and

5   *delete or destroy all the forensic copies thereof*."  (*Id.* at ¶ 14.f (emphasis added).)

6         Because the seized digital devices and hard-copy material contained a

7   significant amount of material protected by the attorney-client privilege and

8   attorney work-product doctrine, Mr. Burum and the government reached an

9   agreement – which the Court subsequently issued as an order – setting forth

10   additional procedures for reviewing the seized evidence for privileged material,

11   including the use of a Special Master to mediate privilege disputes.  (Larson Decl.,

12   ¶ 5; Stip. re Appt. of Spec. Master, Oct. 27, 2011, Dkt. No. 11; Order re Appt. of

13   Spec. Master, Oct. 31, 2011, Dkt. No. 13.)  Prof. Levenson was then appointed as

14   Special Master on December 8, 2011.  (Order, Dec. 8, 2011, Dkt. No. 15.)  Under

15   these procedures, Mr. Burum's counsel was allowed to review all of the hard-copy

16   documents and records seized from his residence and business, and identify any that

17   were privileged.  (Oct. 31, 2011 Order, Dkt. No. 13, ¶ 2.)  Counsel for Mr. Burum

18   promptly followed this protocol and provided the government with a privilege log

19   (sent in two parts, on January 12 and February 15, 2012).  (Larson Decl., ¶ 6.)  The

20   government did not object to any of Mr. Burum's assertions of privilege, and none

21   of the hard-copy documents were ever submitted to Prof. Levenson for review.

22   (*Id.*; Levenson Decl., ¶ 4.)

23         As for the seized digital material, the Court-ordered procedure required the

24   government to establish a "Taint Group" to conduct the key-word searches of the

25   seized digital devices as required by the search warrants.  (Oct. 31, 2011 Order,

26   Dkt. No. 13, ¶ 3.)  This initial review was necessary to ensure that the seizure of

27   digital devices did not exceed the scope of the warrants by indiscriminately

28   including *all* digital material contained on those devices, regardless of whether it

1   was properly subject to seizure.  The Taint Group was then required to provide Mr.

2   Burum's counsel a copy of all materials deemed subject to seizure so that a

3   privilege review could be conducted, similar to what was done for the hard-copy

4   documents.  (*Id.* at ¶¶ 3-4.)  Mr. Burum's counsel was ordered to complete the

5   privilege review and provide a privilege log by January 13, 2012, or within 60 days

6   after being given this material, whichever was later.  (*Id.* at ¶ 5.)

7       In the more than two years since the execution of the search warrants and the

8   October 31, 2011 Order establishing this review procedure, the government has not

9   provided any electronically-searched data to Mr. Burum's counsel for review—and

10  to Mr. Burum's knowledge the government has not sought or obtained any

11  extension of time to review the seized electronic data as required by the warrants.

12  (Larson Decl., ¶ 7.)  Indeed, there is no indication that the Taint Group has ever

13  conducted any key-word searches or made any other attempt to identify what seized

14  digital material fell within the scope of the warrants.  (*Id.*)  Nor has Mr. Burum's

15  counsel been asked to conduct a privilege review of any digital material.  (*Id.*)

16  Consequently, Prof. Levenson has not been called on to review any seized material,

17  nor has she incurred or been paid any costs or fees associated with her appointment

18  as a Special Master.  (Levenson Decl., ¶ 4.)

19          **B.    The Federal Investigation of Mr. Burum Appears to Be Closed**

20      By all indications, the government's investigation of Mr. Burum is closed.

21  While counsel for Mr. Burum has learned that several individuals were interviewed

22  by the FBI during the Fall of 2011, and others testified before a federal grand jury,

23  it does not appear that the government has undertaken any further interviews, issued

24  any more grand jury subpoenas, sought any further search warrants, or conducted

25  any other investigative activities directed at Mr. Burum since that time.  (Larson

26  Decl., ¶ 8.)

27      Moreover, in late 2012, thousands of pages of financial records, investigative

28  reports, and transcripts of interviews and testimony relating to the federal

investigation of Mr. Burum were provided by the government to the state prosecutors, who in turn produced those materials to Mr. Burum as part of discovery in the state case.[3]  (*Id.* at ¶ 9.)  Not only does the disclosure of these investigative materials to the state prosecutors indicate that the federal investigation is closed, their contents include significant exculpatory evidence that make it extremely unlikely the investigation would ever be reopened.  Most notable among this exculpatory material was a transcript of an interview of William Postmus, the state prosecution's lead cooperating witness who confirmed that he was *never* bribed by Mr. Burum:

> [Q.] … So as you sit here now, looking back, your relationship with Mr. Burum, the many meetings that you had with Mr. Burum prior to the actual settlement vote, *did there ever come a point when Mr. Burum made you promise to secure your vote for the settlement*?
>
> [A.] Did I ever make him a promise?
>
> [Q.] No, *did he ever make you a promise*?
>
> [A.] *No.*
>
> [Q.] Did he ever threaten you in any way?
>
> [A.] *No.*

(Ex. F, p. 41 (emphasis added).)

In addition to directly contradicting the state prosecutors' bribery theory, Mr. Postmus undermined his own credibility as a witness by confirming his extensive history of methamphetamine abuse—including during the period leading up to the Settlement Agreement *and* during the time in which he has been cooperating with the state prosecutors.  (*Id.* at pp. 37-38, 45-46, & 55.)

---

[3] Some of this material comprised records and testimony obtained by the federal grand jury.  Mr. Burum's counsel has been advised by the U.S. Attorney's Office that it applied for and received an order permitting the release of this material pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure.  (Larson Decl., ¶ 9.)

1    In short, the government's actions with regard to the seized evidence,

2  coupled with the exculpatory evidence uncovered during its investigation and the

3  lack of any charges being brought in the more than two years since the search

4  warrants were issued, leads to one conclusion:  The federal investigation into Mr.

5  Burum is closed.  Nor could it be reopened at this late date given that the statute of

6  limitations has lapsed for all of the potential crimes identified in the affidavit

7  supporting the search warrants.[4]

8    **C.    <u>The Government Turned Over to State Prosecutors Digital</u>**

9    **<u>Material Subject to This Court's Orders</u>**

10    On September 20, 2013, the state prosecutors produced to Mr. Burum printed

11  copies of digital material from several electronic devices seized pursuant to the

12  federal search warrants.  (Larson Decl., ¶ 11.)  The prosecution also produced

13  documents confirming that this digital material had been given to them by FBI

14  Special Agent ("SA") Jonathan Zeitlin[5] in May of 2012 (*see* Ex. G), and that the

15  material had been reviewed and analyzed by Investigator Bremner.  (Larson Decl.,

16  ¶ 11.)  The government has since confirmed that the digital material turned over to

17  the state prosecutors included a disc containing data from two cell phones seized at

18  the business offices of Diversified Pacific, and a disk containing digital material

19  seized at Mr. Burum's residence.  (Ex. I.)

20    On October 9, 2013, counsel for Mr. Burum raised this issue during a

21  telephone call with Assistant United States Attorneys Antoine F. Raphael and

22  Joseph B. Widman.  (Larson Decl., ¶ 12.)  During that call, AUSAs Raphael and

---

[4] All of the target crimes identified in the affidavit supporting the search warrant are subject to a five year statute of limitations.  (Ex. C, ¶ 6, p. 42; 18 U.S.C. 3282(a).)  Because the last alleged bribe payment was in July of 2007, the statute of limitations expired in July of 2012.

[5] SA Zeitlin has been an active player in the Inland Empire Joint Corruption Task Force, particularly with regard to Mr. Burum.  (*See, e.g.,* Ex. C, ¶ 3, p. 40.)  He also has close ties to the San Bernardino District Attorney's Office, where his wife is a Deputy District Attorney.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Widman admitted that SA Zeitlin turned over the digital material in question to state prosecutors, recognized that the digital material in question was subject to the procedures established by this Court's Orders, and suggested that an initial step would be for them to recover the digital material from the state prosecutors. (*Id.*) Mr. Burum's counsel followed up with a letter dated October 11, 2013, confirming this conversation, further explaining the serious concerns raised by SA Zeitlin's conduct, and proposing a stipulation to remedy the situation. (Ex. H.)

The government rejected this proposed stipulation in a letter sent by AUSA Widman on October 17, 2013. (Ex. I.) AUSA Widman also backed away from his earlier acknowledgment that this Court's Orders governed turning over the digital material to state prosecutors. Instead, AUSA Widman argued that the Orders did not apply, and claimed that SA Zeitlin somehow did not know that the digital material he was turning over was material seized pursuant to the search warrants. (*Id.*) Then, in a letter dated November 1, 2013, AUSA Widman took this a step further. (Ex. J.) Although confirming that the government had retrieved the original CDs turned over to the state prosecutors, AUSA Widman stated that the government would not be destroying those CDs because the San Bernardino County District Attorney's Office was requesting that they be preserved pending determination by the state court regarding their admissibility in the state prosecution. (*Id.*)

In other words, at the state prosecutors' request, the government is preserving this digital material for the specific purpose of turning it over to the state prosecutors again at some point in the future. Notably, AUSA Widman has not provided any assurance that the government would comply with the search warrants and the Orders by screening this material for privilege and ensuring it only includes data falling within the scope of the warrants prior to again turning it over to the state prosecutors.

## III.   LEGAL ARGUMENT

The government's conduct in turning over seized digital material to the state prosecutors raises serious issues regarding the scope of the seizure and violations of the attorney-client privilege and attorney work-product doctrine.  These issues were anticipated in the search protocol set forth in the search warrants, as well as in this Court's Orders of October 31 and December 8, 2011, which appointed a Special Master and established procedures governing the review of the seized material— procedures which the government has ignored.  Federal Rule of Civil Procedure 53, which governs the appointment of special masters, authorizes the Court to amend these Orders at any time after notice to the parties and an opportunity to be heard.  (Fed. R. Civ. P. 53(b)(4).)  Additionally, Federal Rule of Criminal Procedure 41 ("Rule 41") authorizes a person "aggrieved by an unlawful search and seizure of property or by the deprivation of property" to bring a motion for return of seized property.  (Fed. R. Crim. P. 41(g).)

### A.   <u>The Court Should Exercise Its Equitable Jurisdiction Under Rule 41(g)</u>

Where, as here, a court is asked to exercise its equitable jurisdiction to order return of seized property where no criminal proceedings are pending, the Ninth Circuit has identified four factors that typically should be weighed before the Court turns to the merits of whether the seized property should be returned:

> 1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned; 3) whether the movant would be irreparably injured by denying return of the property; and 4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Ramsden v. United States*, 2 F.3d 322, 324-25 (9th Cir. 1993) (citations omitted).  However, "[w]hen the district court determines that the government has obtained the evidence through intentional wrongdoing – rather than through a technical or good faith mistake – it should order return of the property without the need for

1   balancing that is applicable in the more ordinary case." *United States v.*

2   *Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1174 (9th Cir. 2010).

3       Here, even if the government's original seizure of this material was lawful,

4   its blatant disregard for the search protocols set forth in the search warrants and this

5   Court's Orders amounts to intentional wrongdoing.  The government has no

6   legitimate basis or authority for its continuing possession of the seized digital data,

7   let alone its wholesale dissemination of that data to state prosecutors.  As such, the

8   Court need not weigh the *Ramsden* factors before ordering the return or destruction

9   of all seized digital material.

10      Even if the Court were to apply the *Ramsden* factors, however, it should still

11  exercise its equitable jurisdiction because those factors weigh in Mr. Burum's

12  favor.  First, the government has displayed a callous disregard for Mr. Burum's

13  constitutional rights by indiscriminately seizing digital material outside the scope of

14  the search warrants, holding on to that data for over two years in violation of the

15  explicit terms of the search warrants, and turning over that data to state prosecutors

16  without first conducting key-word searches to appropriately limit the scope of the

17  seizure and without following the Special Master procedures put in place by this

18  Court to protect privileged information contained in that data.  Second, Mr. Burum

19  has an individual interest in this material as it contains data from his home and

20  business, and a need for return or destruction of the material so that he can

21  adequately protect the attorney-client privileged and work-product material

22  contained therein.  Third, as long as the government is in possession of this data,

23  there is a risk – indeed a likelihood – that they will turn over even more of this data

24  to state prosecutors without the protections set forth in the warrants and ordered by

25  this Court, thus subjecting Mr. Burum to further irreparable harm.  And fourth, Mr.

26  Burum has no other remedy at law to rectify this situation.

27      The Court should therefore exercise its equitable jurisdiction and turn to the

28  merits of Mr. Burum's request for return of property under Rule 41(g).  A Rule

41(g) motion should be granted "either when the movant is aggrieved by an unlawful seizure or, if the seizure was lawful, when the movant is aggrieved by the government's continued possession of the seized property."  *In re Grand Jury Investigation Concerning Solid State Devices, Inc. ("SSDI")*, 130 F.3d 853, 856 (9th Cir. 1997).  Here, as discussed below, both of these conditions are met.  The government's handling of the seized digital material – specifically, its violations of the search protocol in the warrants and this Court's orders – have transformed this into an unlawful seizure.  And the government's continued possession of the seized digital material poses an ongoing threat of further harm to Mr. Burum.

## B.   The Government's Conduct Constitutes an Unlawful Seizure In Violation of the Terms of the Search Warrants, This Court's Orders, and Rule 41(e)(2)(B)

Following the execution of the search warrants, Mr. Burum brought a motion for return of the seized property pursuant to Rule 41(g) in the related case of *Burum v. United States*, Case No. 5:11-cv-01593-SJO-OP.[6]  The Court denied that motion, but in doing so recognized two important limitations on the government's right to seize entire electronic devices given that only a small fraction of the digital material on a device will ultimately be subject to seizure under the terms of a typical search warrant.  These limitations are reflected in the search protocol set forth in the warrants here, are required by the Fourth Amendment, and are implicit in the provisions of Rule 41.

### 1.   Further Searches of Seized Electronic Devices Are Necessary to Narrow the Scope of the Ultimate Seizure

The first limitation involves the identification of what digital material is

---

[6] The prior Rule 41 motion was brought on different grounds.  Indeed, because the government's failure to timely return or destroy seized digital material – and its improper delivery of that material to state prosecutors – had not yet occurred, the issues raised herein could not have been raised in the prior Rule 41 motion.

1   ultimately subject to seizure.  As the Court explained, although the government

2   may be authorized to seize an entire electronic device, it must then utilize a search

3   protocol during its offsite review to determine which individual electronic files are

4   ultimately subject to seizure under the terms of the warrants:

5          In short, the warrants do not permit the seizure of all electronic
            **files**.  Rather, the warrants permit the seizure of all electronic
6          **devices**, so that those devices can be searched for that subset of
            information that is seizable under the warrant. … In seizing
7          electronic devices for off-site review (as permitted by Rule
            41(e)(2)(B)), the Government necessarily takes possession of
8          vast amounts of data not subject to seizure.  For this reason,
            warrants permitting seizure of electronic devices *must include a*
9          *search protocol so that the data on the devices that is seizable*
            *under the warrant can be separated from the data that is not*
10          *seizable*.

11   (Nov. 18, 2011 Order, Case No. 5:11-cv-01593-SJO-OP, Dkt. No. 21, at 17:5-19

12   (italics added).)  This limitation was acknowledged by the government when it

13   admitted during oral argument on the Rule 41(g) motion that a search protocol was

14   necessary to limit the seizure to digital files actually covered under the warrants:

15          [A]lthough the digital devices themselves are being seized, the
            Government is only searching for and retaining documents and
16          materials that are responsive to the other categories spelled out
            in  the  search  warrant.   *The  warrant  does  not  authorize  the*
17          *Government to seize and retain every bit of media contained*
            *within those digital devices.*

18   (Ex. K, p. 84:14-20 (emphasis added).)

19          And, as the government accurately noted, this limitation is also included in

20   the warrants at issue here, which provide that the off-site search team was only

21   permitted to search the seized digital devices "by using search protocols specifically

22   chosen to identify *only the specific items to be seized under this warrant*."  (Exs. A

23   & B at ¶ 14.b, pp. 9 & 23 (emphasis added).)  Furthermore, in order to ensure that

24   the government could not transform the warrants into general warrants, the

25   government was required to complete all off-site searches "as soon as is practicable

*but not to exceed 60 days* from the date of the execution of the warrant." (*Id.* at ¶ 14.a, pp. 8-9 & 22-23 (emphasis added).)  If additional time was needed, the government was required to seek an extension from the Court within this initial 60-day period.  (*Id.*)  Mr. Burum's counsel is unaware of any request for extension of time, let alone a Court order to that effect, and thus the deadline for further searches has long since passed.

    In summary, the government was required to promptly winnow out all digital material not within the scope of the warrants—a process that is necessary to meet the particularity requirement of the Fourth Amendment.  As the Ninth Circuit has explained:

> The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized.  The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized.  (Citation.)  This requirement prevents general, exploratory searches and indiscriminate rummaging through a person's belongings.  (Citation.)

*United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).  And, as the Supreme Court has held, "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant… the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990); *see also United States v. Voustianiouk*, 685 F.3d 206, 212 (2d Cir. 2012) (finding that a search violates the Fourth Amendment where "the agents executing the search exceeded the authority that they had been granted by the magistrate judge"); *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (noting that "the law is clearly established that a search may not exceed the scope of the search warrant").  By failing to follow the required search protocol here, the government has exceeded the scope of the warrants and violated Mr. Burum's Fourth Amendment rights.

**2.      All Digital Material Outside the Scope of the Warrants Must Be Destroyed or Returned to Mr. Burum**

The second limitation recognized by this Court in ruling on the prior Rule 41 motion involves what to do with digital material that is *not* captured by the off-site key-word searches—in other words, the material that falls *outside* the scope of the warrants.  In short, as this Court explained, the government cannot keep *all* of the seized electronic material indefinitely:

> Importantly, the warrants do not permit the Government to retain all information stored on the seized devices.  Upon review, the Government can only keep those files that are responsive to the 11 enumerated categories, and *the rest of the files must be returned or (if they are copies) destroyed.*

(Nov. 18, 2011 Order, Case No. 5:11-cv-01593-SJO-OP, Dkt. No. 21, at 16:22-17:2 (emphasis added).)  The Court went on to note that "[t]he parties have stipulated that this search protocol will be overseen by a court-appointed special master, further bolstering the Court's confidence that the Government *will not retain data that is not seizable under the terms of the warrant*."  (*Id.* at 17:21-24 (emphasis added).)

As with the requirement that further searches be conducted, this is consistent with the terms of the search warrants, which explicitly require that all digital material not subject to seizure be returned to Mr. Burum and all copies destroyed.  (Exs. A & B at ¶¶ 14.e & 14.f, pp. 10 & 24.)  And, as with the key-word search requirement, this requirement was completely ignored by the government.  (See Ex. J (letter from AUSA Widman indicating that the government is refusing to destroy copies of digital material from the seized electronic devices).)

**3.      These Limitations On the Handling of Digital Material Are Implicit In the Provisions of Rule 41**

Given the important Fourth Amendment rights implicated by the seizure of entire electronic devices, it is no surprise that the two limitations discussed above

1   are implicit in Rule 41.  Under Subdivision (c), a warrant for property may only be

2   used to search for and seize: "(1) evidence of a crime; (2) contraband, fruits of

3   crime, or other items illegally possessed; [or] (3) property designed for use,

4   intended for use, or used in committing a crime."  Yet, as this Court and the

5   government have recognized, electronic devices will nearly always contain

6   numerous files that do *not* fall within the scope of the warrant—thus necessitating a

7   search of the device to separate the files subject to seizure from those that are not.

8   Subdivision (e)(2)(B) therefore authorizes the government to take electronic

9   devices for "a later review of the media or information consistent with the warrant."

10   (Fed. R. Crim. P. 41(e)(2)(B); *see also* Fed. R. Crim. P. 41 Committee Notes on

11   Rules—2009 Amendment ("This rule acknowledges the need for a two-step

12   process: officers may seize or copy the entire storage medium and review it later to

13   determine what electronically stored information falls within the scope of the

14   warrant.").)

15        Notably, nothing in Rule 41 authorizes the government to hold on to *all* of

16   the seized electronic data indefinitely.  Nor can the government circumvent the

17   limitations of a warrant by turning over *all* of the seized electronic material from a

18   device to another prosecuting agency, particularly without performing the second-

19   stage search required to narrow the scope of the seizure.  Yet here, the government

20   has done both.  It has been over two years since the government seized the digital

21   material, and almost two years since this Court recognized that the government

22   "can only keep those files that are responsive to the 11 enumerated categories, and

23   *the rest of the files must be returned or (if they are copies) destroyed*."  (Nov. 18,

24   2011 Order, Case No. 5:11-cv-01593-SJO-OP, Dkt. No. 21, at 16:22-17:2

25   (emphasis added).)  If the government conducted key-word searches of the seized

26   electronic devices, then it should have returned or destroyed all digital material that

27   was not subject to seizure—and it was required to do so "within the time period

28   authorized by the Court for completing the search."  (Exs. A & B at ¶ 14.f., pp. 10

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

& 24.)  And if the government did *not* conduct those searches, the time has long since passed to do so—and the government cannot justify continuing to confiscate what it admits are vast amounts of digital material *not* subject to seizure under the warrants.

Even worse, by turning over the entire contents of several electronic devices to the state prosecutors without having conducted any key-word searches, the government has now irrevocably committed an illegal seizure of the material on those devices that falls outside the scope of the warrants.  While the government has apparently retrieved the digital material from the state prosecutors, that agency has *already reviewed all of the material*.  (*See* Larson Decl., ¶ 11; Ex. G.)  This is a blatant violation of Mr. Burum's constitutional rights under the Fourth Amendment—a violation the government has indicated it is likely to commit again in order to further assist the state prosecutors.  (*See* Ex. J.)

In essence, the government is improperly serving as a "stalking horse" for the state prosecutors, allowing them to obtain material they could never have obtained through their own search warrants.[7]  Because the government's conduct in handling the seized digital material falls squarely within the scope of misconduct Rule 41(g) is designed to remedy, this Court should not hesitate to order the return or destruction of all digital material seized by the government in order to protect Mr. Burum from further harm.

---

[7] Similar tactics have been found unconstitutional in other contexts.  *See, e.g.*, *United States v. Harper*, 928 F.2d 894, 896–97 (9th Cir. 1991), *overruled on other grounds*, (explaining that "stalking horses" may not be used to help the police evade the Fourth Amendment's usual warrant and probable cause requirements for searches); *United States v. Stringer*, 535 F.3d 929,  937 (9th Cir. 2008) (noting that district courts have suppressed evidence or dismissed indictments on due process grounds where the government improperly conducts an investigation for the purposes of advancing a criminal case); *United States v. Scrushy*, 366 F.Supp.2d 1134, 1140 (N.D. Ala. 2005) (excluding testimony where "the Government manipulated the simultaneous investigations for its own purposes").

**C.** **The Government's Conduct Violates this Court's Order Regarding the Protection of Privileged Material**

In addition to ensuring that only material subject to the search warrants was ultimately seized, this Court's October 31, 2011, Order established a process by which Mr. Burum could assert any claims of attorney-client privilege or attorney work-product protection. Specifically, the government Taint Group was to provide to Mr. Burum's counsel any digital material it found to be subject to seizure so that a privilege review could be conducted. Mr. Burum's counsel was then to provide a privilege log to the government, and Prof. Levenson would help resolve any disputes between Mr. Burum and the government regarding a claimed privilege.

The government failed to follow any of this procedure. In the more than two years since the digital material was seized, Mr. Burum's counsel has not been provided a single digital file to review for privilege. (Larson Decl., ¶ 7.) Nor has Prof. Levenson been asked to resolve any privilege issues. (Levenson Decl., ¶ 4.) Instead, the government effectively sidestepped this entire procedure by providing digital material to state prosecutors, depriving Mr. Burum of even the opportunity to assert any privilege claims and allowing state prosecutors to peruse the entire contents of seized digital devices with no protective procedures in place. And, although the government has purportedly recovered the digital material from the state prosecutors, AUSA Widman has made it clear the government may provide seized digital data to the state prosecutors again in the future. (*See* Ex. J.)

**D.** **The Court Should Order the Return or Destruction of All Seized Digital Material In Order to Protect Mr. Burum From Further Violations of His Constitutional Rights**

So long as the government is in possession of the seized digital material, there remains the risk of additional harm to Mr. Burum. Moreover, additional information is necessary for Mr. Burum to confirm the extent of the harm the government has already caused by turning over seized digital material to third

- 17 -

parties.  Consequently, Mr. Burum respectfully requests that this Court either issue a new order or amend its Order of October 31, 2011, as follows:

(1)   Order the government to destroy all seized digital material, including all copies returned by any other individuals or entities.

(2)   Order the government to identify all recipients of seized digital material;

(3)   Order the government to request the return of any seized digital material from any such recipients; and

(4)   Order the government to provide "chain of custody" evidence for all seized digital material.

These remedies will allow Mr. Burum to confirm how much of the seized digital material has been turned over and to whom, and will reduce the risk of further violations of Mr. Burum's rights.

## E.   The Court Should Relieve the Special Master From Any Further Responsibilities or Duties

Mr. Burum also requests that the Court relieve Prof. Levenson from her appointment as Special Master.  Prof. Levenson has never been asked to perform any duties as Special Master (Levenson Decl., ¶ 4) and is not needed given the government's decision not to pursue its investigation any further.  Moreover, she has indicated her desire to respond to press inquiries and provide public commentary regarding the state prosecution of Mr. Burum and the issues being reviewed by the California Supreme Court in that case.  (*Id.* at ¶ 7.)  Prof. Levenson is a leading expert in criminal procedure and criminal law in California, and is frequently consulted by the press to provide commentary and analysis regarding noteworthy cases.  (*Id.* at ¶ 6.)

The participation of legal experts such as Prof. Levenson is a key way that the public is ensured fair and accurate reporting of complex legal matters.  Prof. Levenson's expertise is particularly valuable here given the importance of the issues currently pending before the California Supreme Court and the complexity of the pre-trial motions Mr. Burum intends to bring after the Supreme Court issues its

1  ruling.  Yet, unless and until Prof. Levenson is relieved from her appointment as

2  Special Master in this matter, she is unable to participate in this important public

3  discourse.  (*Id.* at ¶¶ 6-7.)  The government has represented that it has no objection

4  to Prof. Levenson being relieved as Special Master.  (Larson Decl., ¶ 17.)

5  **IV.   CONCLUSION**

6       The federal investigation into Mr. Burum and the Settlement Agreement, by

7  all indications, has been concluded and no charges were filed against Mr. Burum.

8  As such, there is no reason why the government should be permitted to retain any

9  of the seized digital material—let alone the vast amount of material that was never

10 subject to seizure under the terms of the search warrants and which the warrants

11 require be returned or destroyed.  And there certainly is no reason why the

12 government should be permitted to turn over that un-reviewed, overbroad material

13 to the state prosecutors (or anyone else) in violation of the Fourth Amendment and

14 the procedures set forth in the search warrants and ordered by this Court.

15      Mr. Burum therefore respectfully requests that the Court order the

16 government to: (1) return or destroy all seized digital material, including all copies

17 of such material; (2) identify all recipients of seized digital material, including

18 copies; (3) request the return of any seized digital material, including copies, from

19 any such recipients; and (4) provide "chain of custody" evidence for all seized

20 digital material, including copies.  Additionally, Mr. Burum requests that the Court

21 relieve Professor Laurie L. Levenson from her appointment as Special Master and

22 order the government to pay sanctions in the amount of the attorneys' fees Mr.

23 Burum has incurred in bringing this motion.

24

25 Dated:        November 20, 2013        ARENT FOX LLP

26

27                                       By: _____

28                                       Stephen G. Larson
                                         Mary Carter Andrues
                                         *Attorneys for Jeffrey S. Burum*

- 19 -

## <u>DECLARATION OF STEPHEN G. LARSON</u>

I, STEPHEN G. LARSON, hereby declare as follows:

1.      I am an attorney duly admitted to practice law in California and before this Court.  I am a partner in the law firm of Arent Fox LLP, counsel of record for Jeffrey S. Burum in this matter, *United States v. The Premises Known As: 10621 Civic Center Drive, Rancho Cucamonga, California*, ED CV 11-01570-SJO(Opx), as well as in the state case titled *People v. Biane et al.*, San Bernardino County Superior Court, Case No. FSB1102102.  I have personal knowledge of the matters set forth herein and, if called upon to testify, could and would do so competently.

2.      This matter involves documents seized by federal law enforcement personnel pursuant to search warrants executed on September 15, 2011, at Mr. Burum's home and his business offices at Diversified Pacific in Rancho Cucamonga, California.  True and correct copies of both search warrants and the supporting affidavit are attached as Exhibits A-C to the Declaration of Kathryane Foster, which is concurrently-filed under seal.

3.      Attached to this Motion as Exhibit D is a true and correct copy of an article dated October 18, 2013, printed on November 18, 2013, from the Press-Enterprise's website at http://blog.pe.com/cassie-macduff/2013/10/18/san-bernardino-woes-multiply-for-stricken-city/.

4.      Attached to this Motion as Exhibit E is a true and correct copy of an article dated May 4, 2013, printed on November 18, 2013, from the San Bernardino Sun's website at http://www.sbsun.com/general-news/20130504/task-force-targets-alleged-corruption-in-inland-empire.

5.      Because the seized documents included material protected by the attorney-client privilege and attorney work-product doctrine, I negotiated an agreement with the government regarding procedures for reviewing these documents and resolving any privilege issues.  This agreement served as the basis for the Court's Order dated October 31, 2011.

6.      After Arent Fox reviewed the hard-copy documents seized by the government, an initial privilege log identifying a number of privileged documents was sent to Assistant United States Attorneys Jerry Behnke and Joseph Widman by letter dated January 12, 2012.  A supplemental privilege log identifying the remaining privileged hard-copy documents was sent to AUSA Behnke and Widman by letter dated February 15, 2012.  The government has not objected to, or otherwise challenged, any of these assertions of privilege.  As such, none of the hard-copy documents were ever submitted to the Special Master, Prof. Laurie Levenson, for resolution of any disputes over privilege claims.

7.      The Court's October 31, 2011, Order also established a procedure for review of the digital material seized by the government.  Specifically, the government was to utilize a "Taint Group" to conduct key-word searches to identify any material subject to seizure pursuant to the search warrants.  The government was then to provide Arent Fox a copy of any such identified material so that Arent Fox could conduct a privilege review.  To date, the government has not provided any digital material to Arent Fox for a privilege review.  In fact, to my knowledge, there has been no indication that the Taint Group called for in the Order has ever conducted any key-word searches of the digital material, or that the government has taken any further action with regard to the digital material.

8.      During my representation of Mr. Burum in this matter, I have learned that several individuals were interviewed by the FBI during the Fall of 2011 as part of the federal government's investigation of Mr. Burum, while several other individuals testified before a federal grand jury.  Since the Fall of 2011, however, I am not aware of the federal government pursuing any interviews, physical surveillance, grand jury subpoenas, search warrants, or any other investigative activities directed at Mr. Burum.

9.      Over the course of several months in late 2012, the San Bernardino District Attorney's Office produced to Mr. Burum thousands of pages of financial

records, investigative reports, and transcripts of interviews and testimony relating to the federal investigation of Mr. Burum.  It is my understanding, based on review of these materials and communications with the state prosecutors, that these were provided by the federal government to the state prosecutors, who in turn produced those materials to Mr. Burum pursuant to their ongoing discovery obligations in the state case.  Some of this material appears to be records and testimony obtained by the federal grand jury, and Arent Fox has been advised by the U.S. Attorney's Office that it applied for and received an order permitting the release of this material pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure.

10.    Attached to this Motion as Exhibit F is a true and correct copy of one of the documents from the federal investigation that was produced to Mr. Burum by the state prosecutors:  A cover letter and transcript of an interview of William Postmus, bates labeled 039113 to 039138.

11.    On September 20, 2013, the San Bernardino District Attorney's Office produced to Mr. Burum printed copies of digital material from several electronic devices seized pursuant to the federal search warrants.  Also produced were documents confirming that the material had been provided to Investigator Eric Bremner by FBI Special Agent ("SA") Jonathan Zeitlin in May of 2012, and indicating that Investigator Bremner had reviewed and analyzed all of the material.  Attached to this Motion as Exhibit G is a true and correct copy of the cover letter from the District Attorney's Office that accompanied this production, and a document bates labeled 079101 that lists the items turned over to Investigator Bremner.

12.    After reviewing the material produced by the state prosecutors, my colleague Mary Andrues and I called Assistant United States Attorneys Antoine F. Raphael and Joseph B. Widman on October 9, 2013, to discuss the situation.  During this telephone call, AUSAs Raphael and Widman admitted that SA Zeitlin turned over seized digital material to state prosecutors, recognized that the digital

material was subject to the procedures established by this Court's October 31, 2011 Order, and suggested that, as an initial step, they would seek to recover the digital material from the state prosecutors.

13.     Attached to this Motion as Exhibit H is a true and correct copy of a letter dated October 11, 2013, together with a proposed stipulation, that I sent to AUSAs Raphael and Widman.

14.     Attached to this Motion as Exhibit I is a true and correct copy of a letter dated October 17, 2013, that I received from AUSA Widman.

15.     Attached to this Motion as Exhibit J is a true and correct copy of a letter dated November 1, 2013, that I received from AUSA Widman.

16.     Attached to this Motion as Exhibit K is a true and correct copy of relevant portions of the transcript from the November 10, 2011 hearing before this Court.

17.     During the course of my communications with AUSAs Raphael and Widman over the past few months, we have discussed asking the Court to relieve Professor Laurie Levenson from her appointment as Special Master.  AUSAs Raphael and Widman have indicated that they do not oppose such an order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.  Executed on November 20, 2013, at Los Angeles, California.

_____
Stephen G. Larson

## <u>DECLARATION OF LAURIE L. LEVENSON</u>

I, LAURIE L. LEVENSON, hereby declare as follows:

1.      I am a Professor of Law, David W. Burcham Chair in Ethical Advocacy, at the Loyola Law School, located in Los Angeles, California.  In addition to my teaching responsibilities, I lead Loyola's Alarcon Advocacy Center, the Fidler Institute at Loyola, and Loyola's Project for the Innocent.  I am an attorney duly admitted to practice law in California and before this Court.  I have personal knowledge of the matters set forth herein and, if called upon to testify, could and would do so competently.

2.      On or about December 8, 2011, I was designated by the Court to serve as the Special Master in the case titled *United States v. The Premises Known As: 10621 Civic Center Drive, Rancho Cucamonga, California*, ED CV 11-01570-SJO(Opx).  This designation followed a stipulation entered into by the United States, by and through its counsel of record Assistant U.S. Attorneys Jerry A. Behnke and Joseph B. Widman, and Mr. Jeffrey Burum, by and through his counsel of record, Stephen G. Larson.

3.      It is my understanding, based on the stipulation and order, that I was designated as a Special Master to resolve any disputes concerning the attorney-client, work-product, or joint defense privileges that may arise regarding the seizure of documents and records pursuant to federal search warrants from Mr. Burum's home and business.  As part of my responsibilities, I was directed to submit a proposed report and recommendation to the Court regarding my evaluation of the assertion of any such privilege, and a proposed order for the Court's consideration regarding any dispute.  My reasonable fees and costs for serving as a Special Master were to be paid in equal parts by Mr. Burum and the government.

4.      Since my designation as a Special Master, I have not reviewed any documents or records seized by the government in this matter.  I also have not been contacted by anyone representing the government, including Assistant U.S.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Attorneys Behnke or Widman, to review any documents or privilege log, or to resolve any dispute regarding any claim of privilege asserted by Mr. Burum over the seized documents and records.  Nor have I been asked by Mr. Burum to conduct any such document review or resolve any dispute.

5.     In short, I have not performed any work of any kind, incurred any fees or costs, or received any monies from the government or Mr. Burum as a result of my designation as a Special Master in this matter.

6.     In addition to my responsibilities as a Law Professor, I often provide legal commentary to various news organizations and legal periodicals, write peer-reviewed articles, and lecture to legal and bar-related organizations in the areas of criminal law and procedure and on noteworthy federal and state criminal cases. While I believe that participation in such public discourse by legal scholars and experts plays an important role in keeping the public informed about the operation of our justice system, I refrain from engaging in such activities for cases on which I am designated as a Special Master.

7.     The state criminal case involving Mr. Burum, *People v. Biane et al.*, San Bernardino County Superior Court, Case No. FSB1102102, is now pending before the California Supreme Court.  I expect that I will be contacted to provide legal commentary regarding issues in the case.  If the court does not need me to provide any Special Master services regarding the matter, I would like to be at liberty to respond to these questions.  In order to do so, I would need to be relieved of my designation as a Special Master on the case.

8.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.  Executed on November 20, 2013, at Los Angeles, California.

_____
LAURIE L. LEVENSON

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

MOTION FOR RETURN OF PROPERTY AND AMENDMENT OF COURT ORDERS RE SPECIAL MASTER
CASE NO.  ED CV 11-01570 SJO (OPx)

# EXHIBIT D

Cars | Homes | Jobs       PE.com | Member Center/Welcome | Sign In | P-Edition Login | Advertise

# THE PRESS-ENTERPRISE PE.com

Blog Home    Authors    Audio File    Business    City News    Crime Blotter    Education    Environment

HS GameTime    iGuide    Political Empire    Watchdog

Home / Cassie MacDuff                                        Search this website...

# SAN BERNARDINO: Woes multiply for stricken city

OCTOBER 18, 2013 BY CASSIE MACDUFF



**Cassie MacDuff**

Columnist at Press-Enterprise/PE.com

**Cassie MacDuff** writes about issues in the public sector. A native Californian, she enjoys art and music in her spare time -- as a spectator, not as a creator. | **Email Cassie.** | Check out Cassie's **KVCR newscasts.**



**San Bernardino Councilman Chas Kelley awaits arraignment on (FILE PHOTO)**

**POLL QUESTION**

Who is responsible for motorcycle safety?

- Motorcyclists. They need to learn to ride safely.
- Motorists. They need to be more aware of their surroundings.
- Everyone. We're all invested in this.
- I don't know.

SUBMIT

San Bernardino Councilman Chas Kelley knew he was being investigated for campaign finance violations when he began cooperating with the FBI last June and secretly taping conversations as part of its investigation.

Kelley, 44, who pleaded guilty to felony perjury and resigned from office on Thursday, Oct. 17, was the target of a District Attorney's investigation and wearing a wire for the FBI when he filed papers to run for mayor of San Bernardino in August.

Was he just trying to keep up appearances while he was on the hot seat?

Or did he really believe he might escape prosecution and hold the highest elected office in city government?

Both, says his defense lawyer, Greg Kassel.

**Riverside Business Dire**

Exhibit D
Page 27

In any case, Kelley has left the city in a bind.

It's too late for his name to be removed from the Nov. 5 ballot as a candidate for mayor.

Ballots already have been printed and mailed out, City Clerk Gigi Hanna said in a prepared statement on Thursday, shortly after Kelley pled guilty in a San Bernardino courtroom and agreed to be barred from holding public office ever again.

His resignation and guilty plea — and withdrawal as a mayoral candidate — had the city clerk, county registrar of voters and their lawyers scurrying to figure out how that would affect the election.

Registrar Michael Scarpello's elections office will count Kelley's votes as if nothing had happened. The count will be turned over to the city clerk's office, as the law provides.

What happens from there has yet to be determined, Hanna said Friday, Oct. 18.

Will voters who cast their ballots for Kelley have their votes disqualified?

Will the third-place candidate move up to second position in a likely February runoff? (A runoff is considered likely with 10 candidates in the race.)

A mishmash of state election law, municipal code and city charter provisions will have to be untangled to determine that.

Kelley's cooperation with the FBI was revealed in an Oct. 15 letter from the U.S. Attorney's Office in Riverside to Lewis Cope, lead prosecutor in the San Bernardino County DA's public integrity unit, which charged Kelley.

Search by keyword or Zip

Chiropractic Injury Care

Splash Car Wash

Our Countryside Resort

Clinica Medica Familiar

Fair Price Carpets

Riverside Bars & Restaurants

Add your business here +



This Week's Ads

**Namm California1**
Namm California1 services customers

**Superior Hearing Aid**
Superior Hearing Aid loves the people

**Magner Sanborn**
Magner Sanborn loves the people of S

**Boys And Girls Clubs Of South County**

**San Joaquin College**
San Joaquin College loves the people

View This Week's Ads

In an impromptu news conference after Kelley pled guilty in a San Bernardino courtroom, DA Michael A. Ramos told reporters he had not seen the letter.

But he said Assistant District Attorney Michael Fermin, who oversees the public integrity unit, spoke with officials of the FBI and U.S. Attorney's Office on Wednesday, Oct. 16.

"They felt what we did today was very appropriate," Ramos said Thursday. "They congratulated us and we continue to be partners with them" in a corruption task force whose probes include the $102 million settlement in the Colonies case.

COUNCILMAN JENKINS ALSO CHARGED

Kelley's sudden downfall came on the same day Riverside prosecutors announced charges against San Bernardino Councilman Robert Jenkins.

Jenkins, 33, faces 18 felony counts and 12 misdemeanor counts of identity theft and stalking for allegedly posting personal ads on Craigslist that directed people seeking sex to Jenkins' ex-lover and the man's current boyfriend.

The ads used the names, photos and addresses of the victims to direct sex-seekers to their home, according to an investigator's affidavit and a civil suit filed against Jenkins. The men said they had been targeted by harassing text messages, emails and graphic images sent to them electronically.

Jenkins' lawyer, Virginia Blumenthal, said Jenkins will plead not guilty when he is arraigned Dec. 17. He has no plans to resign from office, she said.

Blumenthal questioned the timing of the charges, coming weeks before the Nov. 5 election in which Jenkins faces one challenger.

The alleged identification of Jenkins as the harasser came earlier this year.

She also said the investigation appeared to have been done by a private investigator working for the alleged victims.

John Hall, spokesman for the Riverside County DA's office, said the case was filed when prosecutors believed they had sufficient evidence.

DA investigators conducted their own investigation, including interviews and search warrants, Hall said.

In addition to the cyber-stalking, Jenkins is accused of creating a fake San Bernardino Police Department memo with city and police insignia, naming a police lieutenant and sergeant.

Police Chief Rob Handy said he was concerned that anyone would falsify a police memo, which could undermine the credibility of an agency that is founded on integrity.

Jenkins, a special-education teacher in the Riverside Office of Education since 2004, is being sued by one of the alleged victims, Scott Head, of Riverside.

He has been on unpaid leave since August, when he let his teaching credential lapse. Schools office spokesman Rick Peoples said he couldn't comment on whether Jenkins was in trouble before the credential lapsed because it would be a confidential personnel matter.

In a suit filed in September, Head claims the harassment jeopardized his physical safety, destroyed his business reputation and ended his career. He asks for $8 million in damages.

Exhibit D
Page 30

Head's lawyer, Doug Iler, of Newport Beach, didn't return a phone call seeking comment on Friday, Oct. 18.

A CITY IN TURMOIL

The felony charges against the two councilmen, and one's resignation, came as San Bernardino struggles with municipal bankruptcy, the election of a new mayor, three incumbent council members seeking re-election and recalls against the city attorney and two other council members.

Mayor Patrick Morris, who is not seeking re-election, called the events deeply saddening and frustrating. Elected officials, he said, are expected to be models of ethical behavior and good decision-making, and when they fall short, it erodes trust in government.

"Fortunately, this November our voters have the opportunity to decide who can best carry (the) heavy burden of responsibility for our city," Morris said in a prepared statement.

Councilwoman Virginia Marquez, who is running for re-election, said the charges against Kelley and Jenkins are an embarrassment to the city.

Councilman Fred Shorett, also seeking re-election, said it was a sad day for San Bernardino and gave the city another black eye.

"It just seems it never stops around here," Shorett said. "I'm so frustrated."

On Oct. 9, eight days before being charged, Kelley filed revised campaign finance reports that accurately report funds received and how they were spent.

He did so to correct the record for state and federal taxes, said

Exhibit D
Page 31

Kassel, his lawyer. "He wanted to do everything he could to make it right."

FILED UNDER: CASSIE MACDUFF
TAGGED: CRIME
CITY: SAN BERNARDINO

## TRENDING ARTICLES AND OFFERS



Simple solution to help your joints - flying off shelves



Here are 25 of the hottest cheerleaders on NFL sidelines.



New Rule in California: If you pay for car insurance you better read this...

ADVERTISEMENT



California Will this stock explode? Can you turn $1,000 into $100,000?



Los Angeles - New rule allows many California residents to get car insurance at half-price.



Revolutionary joint solution that is flying off shelves



Just days from now, the world will witness the most shocking event in the history of money.



The ugly side of snoring & how you can stop it tonight...

## MORE BY AUTHOR

SAN BERNARDINO: Hip-hop video of council candidate makes waves
REGION: MoVal told-you-so; S.B opportunity; surprise resignation
Cassie's KVCR newscast — Nov. 8, 2013
SAN BERNARDINO: Momentous election ousts city attorney
SAN BERNARDINO: Mayor says Penman jeopardized city by defending councilman

## Comments

You can now use other social accounts besides Facebook to log in and comment on this story -- Twitter, Google+, Yahoo and more! Comments are subject to our Privacy Policy and Terms of Service.

Exhibit D
Page 32

# EXHIBIT E

## Two medical marijuana dispensaries shut down in San Bernardino

*By Joe Nelson, Staff Writer*
*Saturday, May 4, 2013*                                              sbsun.com

In 2010, San Bernardino County District Attorney Michael Ramos announced the formation of the Inland Empire Joint Corruption Task Force, prompted by allegations of rampant corruption in local government. His announcement followed an FBI raid at the county-run Arrowhead Regional Medical Center in Colton, where it was alleged that some public officials had been receiving free medical care.

While that investigation didn't bear fruit, there was plenty more where that came from.

The following year, federal agents from the task force raided the Rancho Cucamonga offices of developer Jeff Burum and the homes of three former San Bernardino County officials in a corruption probe alleging a $102 million legal settlement between the county and Burum's investor group, Colonies Partners LP, was tainted by bribery, blackmail and extortion.

Since then, the task force has also investigated alleged corruption at the San Bernardino International Airport and in Upland, which have netted criminal charges and convictions against several officials and businessmen.

"I have a tremendous amount of respect for all our partners in the Inland Empire Joint Corruption Task Force," Ramos said in a statement Friday. "Together, through our combined efforts and resources, we are able to better address the issue of public corruption for our citizens. "

Now, the task force has set its sights on Riverside County.

On Tuesday, federal agents served search warrants at the home of Moreno Valley Mayor Tom Owing and at the offices of Highland Fairview, a company that wants to build a 41-million-square-foot warehouse center, the World Logistics Center, on the city's east side. The project has been met with opposition by neighboring residents who fear an influx of traffic and pollution.

Pooling resources

FBI spokeswoman Laura Eimiller said the task force is composed of agents from the FBI and the IRS, investigators from the San Bernardino and Riverside District Attorney's offices and the U.S. Attorney's Office.

While it is more common for task forces to investigate violent crimes, they are sometimes established to investigate public corruption, Eimiller said.

"It's a little more rare to have public corruption task forces, but not completely rare; we have a new one in the Orange County area," said Eimiller, adding that corruption cases are dealt with on a case-by-case basis.

Task forces allow for a pooling of resources for large-scale investigations that may otherwise not be available for autonomous law enforcement investigations, Eimiller said.

Exhibit E
Page 33

Federal involvement can potentially extend the reach of a task force in that the vast resources available at the federal level can be used to leverage investigations, said Mike Moriarty, chief investigator for the Riverside County District Attorney's Bureau of Investigations.

"We combine that knowledge of the local terrain with the tools of the federal statutes," Moriarty said. "Oftentimes, depending on how things turn out and what the evidence of an investigation shows, the federal statutes may be more appropriately applied or the state statutes may be more appropriately applied. "

Public corruption cases tend to involve the misuse of public funds, an area in which federal law enforcement agencies may be better suited, said Steve Lurie, a Los Angeles police lieutenant and adjunct professor at Loyola Law School who teaches police procedure and practices.

"These things can get very complicated when you're dealing with the tax code, and this is what the feds do," Lurie said. "Every agency is quite specific in their talents, and the concept here is to bring together all these talents. "

Federal court

Another benefit of federal involvement, Lurie said, is the possibility that cases will be filed in federal court, which tends to be less backlogged than the Superior Court system and the sentencing schemes much firmer when defendants are convicted of their crimes.

"If you're doing a longterm investigation you may prefer federal court so your case is presented the best it can be presented," Lurie said.

Riverside County District Attorney Paul Zellerbach, a former Riverside Superior Court judge, said Friday he had many discussions with Ramos about the task force and its success in rooting out corruption in San Bernardino County. Shortly after taking office as Riverside County District Attorney in January 2011, Zellerbach said he reached out to the U.S. Attorney's Office and the FBI, asking if his office could join the task force.

"In this economic climate where we're dealing with reduced budgets and manpower, by joining with the task force it's a force multiplier and we can accomplish more in a more expeditious manner," Zellerbach said Friday. "Taxpayers are getting a bigger bang for their tax dollar, and by combining resources we have the best of both worlds. "

Zellerbach wouldn't disclose if the task force is looking into any other public corruption allegations in Riverside County, but he did say the task force won't be going anywhere anytime soon.

"This task force, as far as I'm concerned, will exist as long as needed," he said.

Exhibit E
Page 34

# EXHIBIT F



**U. S. Department of Justice**

**United States Attorney**
**Central District of California**

*Joseph B. Widman*
*Assistant United States Attorney*
*(951) 276-6945 (telephone)*
*(951) 276-6202 (facsimile)*

*3880 Lemon Street*
*Suite 210*
*Riverside, California 92501*

December 6, 2011

**VIA HAND DELIVERY**

R. Lewis Cope
Deputy District Attorney
San Bernardino District Attorney's Office
303 West 3rd Street, 5th Floor
San Bernardino, California 924015

     Re:   Interview of William Postmus on October 14, 2011

Dear Mr. Cope:

Please see enclosed herewith (1) an FBI report regarding the above-referenced interview, (2) an audio recording of the interview, and (3) a draft transcript of the interview prepared by the FBI.

If you have any questions or would like to discuss this matter, please feel free to call me at the above number.

Sincerely,

ANDRÉ BIROTTE JR.
United States Attorney

JOSEPH B. WIDMAN
Assistant United States Attorney

Enclosures

039113

Exhibit F
Page 35

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/14/2011

WILLIAM POSTMUS was interviewed at the Riverside office of the FBI. Present for this interview was counsel for POSTMUS, Stephen P. Levine of Milligan, Beswick, Levine and Knox, LLP, 323 W. Court Street, Suite 402, First American Building, San Bernardino, California, telephone 909-888-5741. Also present were Assistant United States Attorneys Jerry Behnke and Joseph Widman. Parties were present pursuant to a proffer agreement. This interview was overtly recorded, and the recording was placed on a CD-Rom to be made part of the case file.

POSTMUS has not used methamphetamine in a couple of months, but has used it a "couple dozen" times within the last six months.

During this interview, POSTMUS appeared nervous and reserved but maintained eye contact and his answers were generally responsive to the questions asked. POSTMUS was observed frequently doodling shapes on his notepad. Midway through the interview, parties stopped for a short break.

Upon return from the break, POSTMUS appeared to be visibly more animated and more relaxed, and his answers to questions, though still generally responsive, provided significant detail and was far more conversational in tone. As opposed to the first half of the interview, POSTMUS frequently leaned back in his chair when responding to questions and turned his chair to face interviewers.

Investigation on   10/14/2011   at   Riverside, California

File # _____                    Date dictated _____

by   SA Jonathan B. Zeitlin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

039114

Exhibit F
Page 36

10/14/2011; 10:08 a.m.
Bill Postmus Interview

*DRAFT DOCUMENT, NOT REVIEWED FOR ACCURACY*

| | |
|---|---|
| Special Agent Jonathan Zeitlin | JZ |
| AUSA Jerry Behnke | JB |
| AUSA Joseph Widman | JW |
| William Postmus | WP |
| Stephen Levine | SL |

UNT: Unintelligible

| NAME | TRANSCRIPTION |
|---|---|
| JB | Okay, again, I'm Jerry Behnke. I'm an Assistant U.S. Attorney for the U.S. Attorney's Office here in Riverside. We just finished signing the proffer letter covering today's meeting. Before we get into the substance of any discussion, do you have any questions or concerns about the proffer letter that you UNT before we get started. |
| WP | Not regarding the letter, but I believe Mr. Levine had a question. |
| SL | We do have a question. I don't know if you want on this - - well I guess - - |
| JB | Once we start it - - |
| SL | Currently you're in an investigatory stage. You might have a grand jury, you might not. You might indict, you might not. Mr. Postmus' concern, and I didn't have an answer for him and that's why I wanted to ask you is, is there access to these interviews by the state defendants in the state case? |
| JB | There - - I think that you should have an understanding that is a possibility at some point. We certainly can't make any promises that any of this is going to be kept secret or anything. This certainly is not a grand jury proceeding. This is just an interview. So I do think that you need to understand that that is a possibility. We can't make promises to you that this interview will be kept secret or anything like that. Okay. |
| SL | Sure. |
| JW | Have you had enough time to discuss the proffer letter with your attorney? |
| WP | Yes uh huh. |
| JW | Would you like any more time to discuss it with him? |
| SL | And I believe he is understanding of the proffer letter and has done a knowing and intelligent decision. |
| JB | As we're going through this morning if at any point you feel like you want to take a break and talk to Mr. Levine you're certainly welcome to do that. Just let us know and we'll pause the interview and give you a chance to talk to your attorney about it. Anything you need to. Just let us know. The other thing is as the letter explains the most important thing for purposes of this interview is to be truthful. |
| WP | Absolutely. |
| JB | The agreement that is covered by this letter is based on the truthfulness of your responses. It's absolutely important that if you answer questions that the answers be truthful. |
| WP | Correct. |
| JB | And that said, first thing that I want to talk to you about is the issue of your, what I understand to be prior drug abuse. Along those lines, when was the last time that you abused drugs? |
| WP | It was back in - - it would've been now, it would've been a couple of months ago now. Back |

*August, 2010*

039115

| | |
|---|---|
| | in - - I don't know the exact time that I actually used. |
| JB | Would it have been in 2011? |
| WP | It was in 2011; correct. |
| JW | I think Mr. Behnke said the last time you abused drugs. I think what he's trying to get at is anytime that you used any illegal drugs. The last time. |
| WP | It was in 2011. Yeah, sometime in early part of 2011. I don't know the exact time though, or the exact date or anything. |
| JB | Can you explain those circumstances? |
| WP | Sure. I had purchased some methamphetamines and used them by myself at home. |
| JB | How many times has that occurred in 2011? |
| WP | I don't know the exact amount of times but probably a couple dozen times. |
| JB | And if you are able to, can you tell us what if anything the use of methamphetamine does regarding your memory? Does it have any effect at all on your ability to recall? |
| WP | Not really, no. |
| JB | During this past year and let's just focus on 2011 have you received, sought out or received any treatment for your metham - - |
| WP | In 2011. AA but that's it, which is Alcoholics Anonymous. |
| JB | Can you describe for us what if anything the methamphetamine does to you; how it affects you? |
| WP | It affects me, basically in terms of taking away the uh - it's going to sound kind of bizarre, but taking away the mental stress of everything. Kind of just takes your mind out of it, of per se where you're not focused on the things that are going on currently. |
| JB | Okay. As you sit here today are you under the influence of anything? |
| WP | No. |
| JB | Do you feel that even though you have used methamphetamine multiple times during this past year, in spite of that do you believe that you are able to clearly recall what has happened this year? |
| WP | Yes. |
| JB | Does your - - |
| WP | In 2011? |
| JB | Yes. |
| WP | Yes. Absolutely. |
| JB | Does your use of methamphetamine cause you to have any lapses in memory? |
| WP | No, I've not had that problem. |
| JB | So it's not a situation then that when you are using methamphetamine maybe you forget things? Nothing like that? |
| WP | Not that I've experienced. |
| JW | Have you ever had a problem with your memory when you're under the influence of methamphetamine? In other words, not just limited to this year but in the past also. |
| WP | Not really, no. Not that I know of I should say. Not that I've experienced. |
| JB | Obviously the events that we're dealing with here happened many years ago. |
| WP | Correct. |
| JB | Six years ago or more. Do you have any difficulty recalling incidents that happened back then? |
| WP | When I was going through the DA stuff I drew like a, kind of a chart out, with kind of a timeline because it was just, you know, a lot has happened in the last five years and so just wanted to make sure everything was clear. So I kind of did that, drew out a chart with specific dates and stuff like that. Went back and did that and that was very helpful. Because I mean, it was just, a lot happened in that five years. I mean, hundreds and hundreds of things occurred |

| | |
|---|---|
| | during that time. |
| JB | Do you have any concerns yourself as you sit here now about your ability to remember the incidents that happened in 199 - - excuse me, in 2006 for instance related to the Colonies? |
| WP | With the specific incidents, no, but actual, sometimes dates, you know, specific dates, you know, during usually parts of years, you know, like the early part, etc. And I was able to basically put together a timeline like I said with general, within like a month or two months or something like that. |
| JB | For instance, conversations that you testified to already with Mr. Burum. You were able to clearly recall the actual meetings? |
| WP | Correct. Pretty clear. (Pause) |
| JB | Would you say that in the 2006, 2007 timeframe your use of methamphetamine was more or less than it has been here this year? |
| WP | Oh, significantly more. That was the height of my addiction. Well, let's see. You said 2006 and 07? |
| JB | Yes. |
| WP | Yeah, that was the height of my addiction. |
| JB | And - - |
| WP | UNT usage. |
| JB | And in that time period - - first let's focus on 2006. During 2006 how often would you estimate you'd use methamphetamine? |
| WP | Every day. |
| JB | Back then, how did the methamphetamine use affect you physically? |
| WP | Basically in the same way. In the same way. It's basically the same thing. |
| JB | Did your methamphetamine use cause you any difficulty with carrying out day to day tasks? |
| WP | In terms of my job? |
| JB | Yes. |
| WP | Absolutely. |
| JB | How? |
| WP | Well I didn't really go to work. In 2007. In 2006 I was running a campaign for county assessor at the time. It was just really interesting how that whole thing was playing out. But I did not like. Yeah, 2007 was really bad. 2007 was like the worst year. |
| JB | That was the year when you were in the assessor's office; correct? |
| WP | Yes, sir. That was the year in the assessor's office and the year that the DA's office did the warrant in January of 2000 - - that was 2009. Yeah it was 2009. So no, but that was, 2007 was still my worst year. And then it escalated from there. |
| JB | Um - - |
| WP | I can't believe it's been that many years that this has been going on. |
| JB | Now I know that you've done several interviews with the district attorney's office and you went to the state grand jury. Other than your interviews with the district attorney's office and your testimony before the state grand jury have you discussed the facts and circumstances surrounding this case with anyone else? Any friends or anything like that? |
| WP | Yes. |
| JB | Who? |
| WP | With my father, Bill Postmus, William K. Postmus. With a close friend of mine who is Sharon Gilbert and that's really it. |
| JB | Okay. Focusing first on your father, if you're able to, can you estimate how many times you've talked about the case with him? |
| WP | Just as I have gone through the whole thing. He hasn't really asked me much. I would, you know, felt like I had some, needed someone to talk to about the whole situation. I mean, other |

039117

Exhibit F
Page 39

| | |
|---|---|
| | than my attorney. |
| JB | Yeah. Excluding your attorney. |
| WP | Yeah. Yeah. Probably several dozen times because I spent, you know, I'm going back up there for a couple of weeks here soon. I try to spend a lot of time up there. |
| JB | And how about Sharon Gilbert? |
| WP | Probably dozens of times. But not about the whole thing. Just little tidbits. We'll just talk about little things because she knows a lot, she has a lot of sources and she knows a lot about what's going on in the case so we'll just talk about the case in general. (consults with attorney) Well yeah, the assessor's case too which is, you know, not the Colonies' case but a different case. Discussed that case too with my father and Ms. Gilbert. And my former roommate. I should add one more. My former roommate Tadd Honeycutt who was a long time friend of mine. He was my roommate for years. I'll add him to the list too but that's it. |
| JB | Now - - |
| SL | His dad was a witness in the one case. The assessor's case. There was a check found on a search. So that's why I was reminding him and specifically that information in that regard. |
| JB | Let me ask you this way. Since you've talked to these individuals about this case is there anything that you have said to them about what happened in this case that in any way contradicts or is inconsistent with what you have said to investigators. |
| WP | To DA investigators? |
| JB | Yes. |
| WP | Absolutely not. It's been consistent. I've been consistent. Completely consistent on my statements. |
| JB | When was the last time you talked to anybody else, obviously other than your attorney about the case? |
| WP | Let's see, today is Friday. Like two days ago. |
| JB | And who was that? |
| WP | Ms. Gilbert. She's a UNT. She works there and I both kind of run a little consulting business so I work with her every day on stuff. So we talk dozens of times a day sometimes just depending on what's going on. She does some work for me. |
| JB | How did you first meet her? |
| WP | Believe it or not she was attacking me. I was county supervisor at the time and she was attacking me. Pretty, um, UNT attaching me so I got to know her once I left. She actually started recall against me, believe it or not. Once I left office just ended up meeting with her - - I never actually met up until that point. I ended up meeting her and we became really close friends. |
| JB | You say attacking you. She's the one that runs the UNT. |
| WP | Yes, attacking me. I'm sorry, attacking me on her blog in IE politics.com |
| JB | But subsequent to that you've become friends with her? |
| WP | Very close friends, uh huh. She's really helped me. She used to deal with substance abuse issues and she's been helping me in that. She's not my sponsor but she has been helping me. |
| JB | Are you able to recall, can you tell us what if anything you've told her about the relationship between yourself and Mr. Burum leading up to the Colonies' settlement. |
| WP | Yeah. Yes. Would you like me to tell you? |
| JB | Yes, why don't we go over that. |
| WP | Sure. What I've told her is basically the fact that prior to - - let's see, we ended up settling the Colonies at the end of 2006. Before I left I was chairman of the Board. At the time before I left the Board of Supervisors we ended up settling the Colonies. Prior to the infamous trip to China I had really never - - I did not have any real relationship or didn't even really know Jeff. It was kind of strange because Mr. Biane, he was elected with the serious assistance, you know financial help and assistance of the Colonies partners and their friends, allies, etc. None of |

039118

them supported me in my election because I was from the desert. Nobody really knew me. I was running against Ms. Davis who was the incumbent supervisor at the time. I just was kind of a fluke-type deal. You know, I'd beat her. So I was there and John Michaels was there at the time. He was the supervisor prior to Mr. Biane and he was the one when - - engaged with the Colonies on this whole issue. And what I - - getting back to your question. Getting back to so many directions on all this stuff. Getting back to your specific question. Prior to the China trip I had only met Mr. Burum maximum two or three times. It was never on a personal, you know one on one or it was never even a small deal where I was invited to say anyone to come have dinner with them or something like that. It was like at a fundraiser type deal where there is many people there and somebody just introduced me to him. But of course, Jeff was the big, you know, Jeff was a big guy on the block in terms of fundraiser, you know, supporting candidates, etc. I wanted to - - here I am somebody who is aspiring, you know, in political office and I want to raise campaign money at that time so I wanted to get to know him. Putting that aside, prior to the China trip I really had no relationship with Mr. Burum. It's during, and I told Ms. Gilbert all this, during the China trip is when I really kind of kindled a relationship. It's kind of interesting because if you were to do a personality test, you know how some employers will do personality tests when they bring different people in to see if they're opposites of their employers, etc. And Jeff is my opposite personality. Completely opposite. So him and I just mixed. We would get along real well. Even though during the Colonies settlement at the end we butted heads big time. So our relationship got stronger after the China trip until about halfway through 2006. Until the things got bad with the Colonies and then we didn't really communicate and Mr. Irwin and I started communicating at the time. But that's what I've told Ms. Gilbert in terms of how I know Jeff, etc.

| | |
|----|---|
| JB | Have you ever had any discussions with Ms. Gilbert, your father - - |
| WP | Mr. Honeycutt. |
| JB | Mr. Honeycutt or anyone else about any promises or pressure that Mr. Burum put on you related to the Colonies settlement? |
| WP | Mr. Burum specifically, no. And this is very clear. And if you were to ask any of them, if you had them in my seat right now they wouldn't, this is the question I've thought in my head. In fact, two days ago I discussed with Sharon Gilbert. Two days ago, this very thing that you're bringing up. Because this is the million dollar question in my mind is whether - - because I know what Mr. Irwin did to me. And Mr. Biane. |
| JB | We'll talk about that. |
| WP | Yeah. Yeah. I don't know if Jim was doing that on his own or if he was doing that on behalf of someone else. I do not know that. |
| JB | Then I just want you to elaborate a little bit more then. You said that sort of in your head the million dollar question is this issue. So as you sit here now, looking back, your relationship with Mr. Burum, the many meetings that you had with Mr. Burum prior to the actual settlement vote, did there ever come a point when Mr. Burum made you a promise to secure your vote for the settlement? |
| WP | Did I ever make him a promise? |
| JB | No, did he ever make you a promise? |
| WP | No. |
| JB | Did he ever threaten you in any way? |
| WP | No. |
| JB | Now you have testified previously about representations he made that I believe - - |
| WP | Yes. |
| JB | - - in terms of he would take care of you. |
| WP | Yes. Yes. |
| JB | Explain then, if he made those comments to you, explain then how you also don't feel that he |

039119

| | |
|---|---|
| | made you any promises related to this settlement. |
| WP | The question I believe you asked me was whether or not I felt threatened or if he made any threats towards me. I do not believe he made any. In fact I know for a fact he did not make any threats towards me with respect to the Colonies. With respect to settling the Colonies. |
| JB | What about promises? |
| WP | Promises, yes. Yes. |
| JB | In terms of promises related to the settlement. |
| WP | Yes, sir. |
| JB | That's what I want to focus on. |
| WP | Yes. Specifically to getting it settled. And not just getting it settled but the issue was getting it settled before I left. Because remember everyone knew I was running for assessor at the time. I'd be leaving. They knew that I was - - I had been publicly supporting the Colonies' settlement. I still, even though that I've read lots of things, I still believe - - this is a tough thing for me to deal with because after losing the two superior court trials that the county did, etc you know, we had a run around with our attorneys, you know as you gentlemen know with respect to this. It's a very confusing deal for a layman like myself who is just dealing with having to listen to your own legal counsel when you don't have real faith in your legal counsel because you think they just want to be able to keep billing you millions of dollars more. I mean, it's a confusing-type situation. But Jeff told me on several occasions that if we could just get this settlement done while I was on the Board of Supervisors before I left and we got it done like a few meetings before I left the Board or it was in December where there was a final vote, it was the end of November beginning of December and I left in January, the first week in January, that Jeff would take care of me when I, if I were to ever leave office, that he would take care of me in terms of helping me get a job or finding me a job or something to that extent. We had conversations about that. Another thing that we specifically discussed is I showed some interest about on the Board of directors for that non-profit - - at that time I think it was Cornelia well it's not his non-profit but the non-profit that he was chairman of the Board of. The non-profit housing corporation. |
| JB | That does - - (speaking over each other) |
| WP | You guys did the warrant. It was called something else previously. It was a smaller - - |
| JZ | Southern California Housing Development Corporation. |
| WP | Correct. It was a smaller entity at the time they emerged with a larger one and it's now I think one of the largest. At the time when it was the smaller version of it, I had shun some interest because when we went on the China trip there were some of the Board members attended the China trip from that nonprofit and it just kind of fascinated me. Mr. Burum said, hey, in the future maybe this is something we could get you on too but we got to get - - he was very specific to always say, you know we got to get all this behind us first in terms of the Colonies' settlement before I can, and he was also very clear to make mention that with regards to fundraising, you know that he would not give anybody any campaign money during this time and forward until the settlement was over with. We didn't actually have any- - him and I didn't have any specific discussions about contributions. He said he would support me for another office in the future because it was talked that at the time I might run for congress or something. He made mention several times that he could support me for another office - - higher office. |
| JB | Did he indicate to you whether or not those pledges of future support were contingent at all on getting the Colonies' lawsuit settled in favor of the Colonies? |
| WP | His exact statements to me many times were, "We've got to get this behind us." You know, the Colonies' settlement, "get this taken care of before you leave the Board." |
| JW | You mentioned a moment ago that he said that he wasn't prepared to make contributions before the settlement was approved. |

039120

Exhibit F
Page 42

| WP | Yeah, they actually -- at a certain time, I can't remember exactly when it was but somewhere around this time they actually stopped giving contributions all together, him and The Colonies partners because they didn't want to -- from what I had heard, Jeff never told me this specifically -- |
|---|---|
| JW | Did he say why? |
| WP | He never actually told me why but Mr. Biane and I discussed it because Paul was close, these were like Paul's friends. Some of these guys Paul actually went to school with. They went to some Catholic high school over in Upland, I believe or Rancho Cucamonga. He had just said that they didn't want to be construed as giving money during the time that they are trying to get UNT. But that after, if it settled, afterwards there would be campaign contributions. It wasn't, I never felt it as a Quid pro quo per se but it was very clear that afterwards there would be campaign contributions. |
| JB | Now, did these promises of future support by Mr. Burum have any impact at all on your decision to settle The Colonies' lawsuit or your decision regarding how much to settle it for? |
| WP | I would say for me it was just getting it settled. I had a serious problem - - the sticking point in the last four months of this, from August until the end of the year when we finally settled it was the amount because Paul and I were - - we had some real heart to heart discussions about this because the fact that we felt, we felt we were being bent over on this one big time, I mean, to be honest with you. We felt like in terms of the amount, I mean, we felt like it was a ridiculous amount of money. 102 million. Now, they would make representations that it should be 200 million dollars etc, but I'm telling you, I mean as I've stated in the grand jury and to the other gentleman, I still can't really justify 102 million dollars in my mind. But we had a short amount of time at this juncture here, I was like, Paul, we're either going to get it done now or not because we didn't know who was going to replace me on the Board. Ultimately, my chief of staff ended up replacing me, who's opposed to The Colonies. He's real independent minded kind of guy and he ended up getting my seat and he would've UNT against it. They didn't know who. It takes 3 Board, 3 of the remaining 4 would've had to support that person and Brad almost didn't get the appointment. They didn't know who was going to get it at that time. So the push was major at this point to get the settlement completed. I was a major person in pushing that at the end before I left. They just wanted to get it done with. I mean, no matter where we went, Paul and I, no matter where we went, no matter, we went to the store and we would see, say Ted Denton, Bob Denton's father. Ted's an older gentlemen but no matter if we saw him or - - they had so many friends in the community that no matter where we were we would get hit up on this issue. You know, when are you guys going to settle Colonies. We were badgered nonstop in terms of getting this thing done and we were sick of it. Then there's the previous stuff which had happened with respect to Mr. Irwin that I know you guys know about. UNT that had been behind him. I was in the heat of my election at the time and I was - - I didn't want anything coming out on me during the middle of the election. |
| JB | You said a few moments ago that while he made promises to you about supporting you after The Colonies was resolved I believe you also said that you didn't feel there was any quid pro quo. Is that what you said? |
| WP | Well. There was, Jeff and I had the discussion about Jeff was very clear to say he would support me for future higher office; would raise me money. I alluded that it was for congress because we had discussed that and if I had decided to leave office, because there was some discussion of that too, that he would assist me in finding a job, etc. But we had to get, he was very clear to say, "But we've got to get beyond this -- we have to get beyond where we're at now in terms of getting the settlement done, etc then we could talk about that later." |
| JB | What I'm trying to get at is when you indicated you didn't think that it was, that there was any quid pro quo, I'm just trying to figure out what you mean by that? |

| WP | I don't really know. I mean, that's what happened. I really don't know if that would be considered a quid pro quo, I mean that's that I'm just trying to - - |
| JB | Okay. Let me ask it this way then. |
| WP | Sure. |
| JB | Did you, up to the time The Colonies' settlement happened, did you feel as though - - |
| | (Intercom: Henry Melendez, Henry Melendez please report to reception.) |
| JB | Okay, little interruption. Let me start over. |
| WP | Sure. |
| JB | Prior to voting to settle The Colonies in November of 06, prior to that did you feel that if you did not get The Colonies settled before you left the Board of Supervisors that Mr. Burum would not support you? |
| WP | Yes. |
| JB | Okay. So did you believe then that the promise of future support was contingent to getting it done before you left? |
| WP | I guess. Yeah, that. Yeah. And no it's never been asked to me that way before, so I've never really thought about that question. |
| JB | I'm asking it this way because you just indicated you weren't real clear on what we would mean by quid pro quo. |
| WP | Correct. Correct. Yes, that is what you just stated was - - the answer is correct. |
| JB | You've said in the past I believe you posted on that Inland Empire blog prior to entering into the agreement with the DA's office statements to the effect that there is nothing illegal about the settlement or something along those lines. |
| WP | Correct. Yeah. Yeah. Yeah. |
| JB | Do you still believe that that's true? |
| WP | No. I mean, you know, I mean there is a whole other story to this deal which is - - you know Jim put me up to posting that, you know, to putting my name on that. |
| JB | The post on the blog? |
| WP | Correct. |
| JB | Explain that. |
| WP | Well, I mean, can I just explain quickly just the relationship between us? |
| JB | Sure. |
| WP | And kind of where things went south and how I ended up getting to where I'm at now here. Jim and I had a really interesting relationship going back to 2000 when I first met him when I was running for the Board of Supervisors and he was the president. He was a deputy sheriff and the president of the Sheriff's Employees Association which is the union protocol of the deputies which Jim to his credit created a pretty strong political organization out there in the county. They put $20,000 in that first election into my campaign and then more into the general election because I had ended up having to go two rounds against Kathy and I ended up beating her. At that particular time I knew that Jim was a high strung guy but didn't realize how high strung he was. How high strung he was. The rockiness of our relationship started right off the bat in our relationship when the 3 at 50 which I'm sure you are familiar with, the infamous 3 at 50 for state and local cops, which you get 3% times the amount of years at 50, 50 years, a lot of these guys go out at 90% or even higher. That was their holy UNT, that was the issue in my campaign and then it became an issue once I got elected they felt they could advance it at that point. And I had during the election I had supported early on, and I said I would support it even before then. I was a fool on that issue. In saying that though, Fred Aguirre was on the Board at the time and Fred brought up a lot of good arguments and things got rocky in that too and I just said, at one point I said to Jim, I said, "Jim, we need to get more from you guys in terms of the deputy sheriffs, you guys have to kick some more money into the kitty here because we just can't afford to pay back the whole thing." Because we were |

|    | doing it retroactivity and some of these guys had done 30 years so we were going all the way back and giving them an extra percent for all those years and that's a considerable amount of money.  Ultimately we ended up getting something for it but the reason why I bring this up is because this is when the rocky relationship started where Jim went to the Board meeting and their - - I'm gay and it had not been, it was basically in the closet at this time.  Jim - - it kind of became a little bit of an issue in my first campaign when my opponent, she didn't really know, they kind of just make like innuendo statements and stuff like that.  In saying that, Jim during the Colonies, I'm sorry, during the 3 at 50 started battering that around.  Saying, "Well my deputy sheriffs, my Board members they had a real strong group of rebel rousers on his Board and it's kind of UNT joined in on the union stuff.  People that are in trouble all the time it seems like.  So he had stated to me multiple times, you know, my guys are starting to talk about it, they're starting to ask questions about your sexuality, etc and stuff like that.  And that was, I started thinking about it when I was going through the whole DA interview process that that was the first time that Jim started his tactics of me with respect to that.  That's when our relationship started to get a little sour but then our relationship improved after that again.  Jim is a good manipulator.  I mean he's a master at it and he manipulated me greatly and many other people. |
|----|----|
| JB | When in relation to The Colonies' settlement was this battle over the 3 to 50 issue? |
| WP | It was prior to The Colonies. |
| JB | Oh, okay. |
| WP | I just wanted to set the groundwork from when our relationship started to go rocky when he started to first use the tactics on my sexuality and then he used them again of course during The Colonies. |
| JB | Okay. |
| WP | But it became more of an issue. |
| JB | Now, you said that that's when you started to have a rocky relationship with him.  Did your relationship with him continue to be rocky when Colonies became an issue or? |
| WP | Well yeah.  When Colonies became the issue in 2006 I was in the height of my drug use 2006, 2007, 2008 and here I am.  It was such a fool, I made so many mistakes.  I actually, I'm embarrassed to say this, but actually hired Jim Irwin.  Irwin actually came to work for me.  It's ironic enough in that, but he came to work for me and of course that didn't last very long.  I said, Jim - - |
| JB | You're talking about when you went to the assessor's office? |
| WP | Yes, sir.  In the assessor's office.  That didn't last very long and Jim left and said he was a whistleblower and went to the local county grand jury in that and lit the fuse on all this stuff we're here on now.  So I'm saying that, yes, it went, during 2006, 2007 our relationship went from worse to bad to explosive. |
| JB | What, if anything, did Mr. Irwin do that had any impact on your actions regarding The Colonies settlement? |
| WP | He significantly pushed me to support it. |
| JB | Was it direct?  Face to face conversations or how did he do that? |
| WP | Face to face over the phone and through Mr. Aleman.  Adam Aleman, who was another senior staffer of mine.  He had a lot of direct conversations with Adam too because they worked in the office together. |
| JB | Did Mr. Irwin's actions have any impact on your decision regard Colonies? |
| WP | Absolutely. |
| JB | How so? |
| WP | Well I mean, he helped significantly push me to get it done before - - I mean Jim, there's no doubt that The Colonies settlement would have not been, The Colonies would have not been settled if I would not have been pushed by Jim.  That's the clear message.  In terms of getting |

| | |
|---|---|
| | settled before I left the Board in 2006. |
| JB | What was it, if you can narrow it down even that he did that caused you to want to get The Colonies settled before you left office? |
| WP | There was a tentative settlement with Judge Norell, with Justice Norell at the JAMS center, I believe it's called the JAMS center over in Ontario and that tentative agreement was prior to the election. Okay. That was a tentative agreement. Then the staff and the attorneys put together the work and we voted on it at the end of November, beginning of December, sometime around there. As you notice, the tentative agreement was prior to the election. By doing that, they basically, and this is through Jim, this is through Jim and I don't know. We had lots of discussions with the DA folks with respect to if any of this came from Mr. Burum. I never had any - - Jeff and I weren't communicating at the time. Jeff totally cut off communications with me like mid-way through that year. |
| JB | Do you know why? |
| WP | We kind of had a blow up because I thought he was being unrealistic with regards to what he wanted. |
| JB | When you say you had a blow up did you actually have an argument with him? |
| WP | Oh yeah. It wasn't really, I mean, I thought he was being unreasonable and he just said maybe it's best we don't communicate on this anymore. I mean, for me it was best not to communicate with him because I felt - - Jeff's a very strong willed person on his issue and I don't understand his issue, you know one one million on what he does with respect to that. And I'm going to sit and argue with him on an issue it's not even appropriate? |
| JB | So did he actually tell you at some point let's not talk anymore? |
| WP | Yes. Well. |
| JB | Something - - |
| WP | Yeah. It would've been like mid-2006 somewhere around there. Maybe like July somewhere around there 2006. But then Jim that's when Jim Irwin became heavily active with respect to pushing The Colonies. And I remember I'm running at the time for county UNT election. I'm in the middle of my drug abuse. The papers were hounding me on this fire issue. There was a big fire up in the mountains and I was in rehab at the time. They were beating the crap out of me saying where was I, where was I. It was a pretty intense year. Jim wasn't very good at sticking with me on this issue. |
| JB | Correct me if I'm wrong but earlier in our conversation today did you use the word "threats"? |
| WP | Correct. |
| JB | What did - - now focusing on The Colonies settlement, during the period when Jim became heavily involved in The Colonies settlement what did he do or say that you perceived to be a threat? |
| WP | A few different things. First of all, with respect to - - there was also another campaign going on at the time, Paul Biane, who was supervisor at the time put an initiative on the ballot 2006. It was called Measure P. And what Measure P did was basically pass term limits for Board of Supervisors which basically initiated 3 term, 3, 4 year terms for supervisors and what it also did was, it also had a clause in there. It was called term limits. That's how it was packaged. You have to be careful with politicians because what they did in there, and this was Paul's brain child, is they put a pay raise and a significant pay raise. It basically deleted Measure K which was a Measure that was passed like in the 1980's. Measure K was actually a citizen reform since supervisors just couldn't give themselves a pay raise. Basically it moved their pay from like 100 to 150. So it gave them a pretty substantial pay raise. You could still serve 12 years on the Board. And for the supervisors that were there they could serve another 12 years on tope what they had served. Bottom line is, Jim, once negotiations broke down it was I believe August, September around there, things got really heated. We had some JAMS sessions. I believe we had four sessions with Justice Panelli. Prior that we had had some |

039124

Exhibit F
Page 46

| | |
|---|---|
| | discussions with Justice Ward. You know, who's an appellate court judge over here before he retired. That didn't really go anywhere. That's where Aguire was still on the Board. Fred Aguire. But we ended up, that Measure is going on and I'm running at the same time. That's all on the same ballot. Jim tells Paul and I, and I first learned of this through Adam Aleman. Adam first told me that this was going on. Adam was like at the time tied at the hip with Jim so Adam would - - any time Jim would even think anything Adam would know about it because they were communicating non-stop but even though they had a love-hate relationship. Adam basically communicated to me, and that's how Jim operates now. I mean, even with the way things are today, Jim sends messages to me through other people that I send back to the DA's office. It's still the same. Jim still operates the exact same way as of UNT with people. He was always trying to pick at me. He has a very big mouth too so he gives up a lot of information. So saying that though, he made it very clear to Adam that a campaign committee was being set up and that money was being deposited. And that campaign committee was being set up through some group in Sacramento. I can't remember specifically who it was being set up through. The Colonies were going to be putting several hundred thousand dollars into that committee and that committee had a two-fold purpose. The committee had a two-fold purpose. One being that if we did not, and this instance it was very clear in terms of the quid pro quo to me. Per se that they would campaign against Measure P and defeat it, which was Paul's baby, and that they would expose my sexuality and drug use in the mail before my election. Then subsequently after that Jim told me that directly. |
| JB | Other than those two issues was there anything else that he did that he took as a threat? |
| WP | Yeah. I was going to say the other one first but now I forgot the other one. There was one other issue that occurred. I'll come back to it. It'll pop in my mind. |
| JB | It's okay. |
| WP | Just thinking about it. |
| JB | Now, one thing that I wanted to try to clarify with you is if he was making these threats to you in late 06 and putting that kind of pressure on you why did you then just a month or two later bring him into the assessor's office? |
| WP | Because I committed to him prior to the June primary election and I shouldn't have but I knew that, I mean, number one, it was a very bad time for me. Number two, I knew he was, little did I know what was going to happen ultimately, you know, what he was going to end up doing. But I knew the situation would be very bad that he would come at me if I went back on my agreement. Because Dick Larson who was the county treasurer at the time had offered him a job previously like within the year period prior to mine and he had reneged on it like at the last minute. Jim had a going away party from the sheriff's department, actually resigned from the sheriff's department and then Dick said, the county treasurer said, oh sorry, I'm not going to bring you on now. Well Dick got wise and a lot of people going to Dick saying, don't do this. So Dick went back on it. All of a sudden Jim has already resigned, sheriff's already accepted his resignation and so it was kind of. Jim was very much embarrassed and I knew that. And Jim was humiliated and I knew, and I was feeling very vulnerable at the time with everything that I was dealing with and my sexuality. And now I don't even care. The DA's office outed me in the affidavit, in the first affidavit so you know, doesn't really matter. It's sad for your family to have to learn about it in the newspaper. But you know, it is what it is. So. |
| JB | Now, let's get back to the post that you put on that IE politics. |
| WP | Yes, sir. |
| JB | You indicated earlier that Jim put you up to that. |
| WP | He asked me to do it. Yes, he did. I believe and I'm not 100% positive but it's my understanding that he wrote it but I'm not 100% positive on that. |
| JB | Well, did you write it? |
| WP | No. Oh heck no. I'm not a writer at all. |

039125

Exhibit F
Page 47

| | |
|---|---|
| JB | Who gave it to you? |
| WP | Jim. It's very clear to anyone that's ever worked for me that I'm not a writer. They all know that. Brad UNT was my writer. |
| JB | Now when he gave it to you and asked you to post it on the blog. |
| WP | I didn't post it. He posted it. |
| JB | Oh, he posted it. |
| WP | He had it posted. I just looked at it, I mean, yeah and said okay. |
| JB | Did you tell him, you said you just indicated okay or something? |
| WP | Yeah. It was like, you know, I don't mean to go off track a little bit here, but just to kind of set another stage. Because the Irwin thing is complex. In saying at the time Jim really, it's kind of hard to explain this but Jim really had a manipulative type on him and I had a manipulative type relationship after we had been charged. I had not talked to him from the day he left the assessor's office until we were both charged and arrested on The Colonies charges. When Attorney General Brown was down and they had this big press conference and everything. I had not talked to Jim in all that time. All of a sudden it's like you have a common, you have a common deal now that you're both involved in something. And Jim over time truly convinced me and I believed it for a long time until many other circumstances happened that this whole deal that was going on by the DA in order to persecute us, etc. And Jim, I truly believed that at the time. So Jim, so whatever I needed to do to fight the battle against the DA and the AG, I was involved in that. |
| JB | Well, the post itself. That blog post itself. Was the content of that posting accurate? |
| WP | No. |
| JB | But you didn't say anything to Jim -- |
| WP | No, absolutely not. Not at the time. No. (pause) No. I mean everything was, you know, we were being persecuted in this. You know, we need to fight this, I mean, at one point the DA was involved in it and Jim kept telling all of us, you know, we need the state AG to come in and we need them to engage in this investigation UNT. Well then Mike Ramos calls the AG himself and says help me. Well then they came in and now they are prosecuting us. And as soon as that happens Jim starts saying, we need the U.S. Attorney's Office to come in and investigate me, you know. It's like every time he says that, the next domino falls and ends up getting charged by those individuals. It's hard to explain this but Jim is a strong manipulative type person and he's very convincing. And if you talk with other people that know him they will tell you the same thing. |
| JB | I'm going to change subjects here. |
| WP | Yes, sir. |
| JZ | Before you change subjects, it's been around an hour. Do you need anything else? Do you need a bathroom break? |
| WP | No, I'm fine. |
| JB | I want to get back to Mr. Burum. When you were still speaking with Mr. Burum prior to The Colonies settlement you said before that you had personal meetings with him where the topic of Colonies was discussed. Was Adam, it's Aleman, is that how you pronounce it? Was Mr. Aleman present for any of the meetings that you had with Mr. Burum? |
| WP | No he was not. And I believe that he had stated that he was at some of those meetings but he was not. I know that for a fact. |
| JB | None? |
| WP | Not -- |
| JW | How could you be so sure? |
| WP | Not the morning meetings that we had. Because I would have never invited Adam to those meetings. They were just meetings between Jeff and I. |
| JB | Was he there for any meetings when Mr. Burum made any promises of support for The |

039126

Exhibit F
Page 48

| | |
|---|---|
| | Colonies? |
| WP | No. I know that for a fact. Absolutely not. Absolutely not. The only time Adam was in two places. Twice I went over to Jeff's office and one time Adam went over there by himself to -- Jeff had a BlackBerry problem and I said, "Hey, Adam go over and help Jeff fix his," he had couldn't figure out some minor BlackBerry issues so Adam went over and helped him fix it. And twice, Adam and I when we were both on the west end of the county we stopped to gather over at Jeff's office. But absolutely not did Adam, no. I'm positive. 100% positive. |
| JB | Do you have any idea why he would say those things? (pause) |
| SL | I mean just speak freely. |
| JW | The truth. |
| JB | I mean, you know. |
| WP | I believe a lot -- |
| JB | You know him Mr. Postmus. |
| WP | Yes, I know him very well and I've learned a lot about Adam and Adam I believe was untruthful in many things that he stated. Many, many, many, many things. Many things in the assessor's case I believe he was dishonest. I believe he's been dishonest in many things. |
| JB | Are you still in contact with him? |
| WP | No. Last time I communicated with him |
| JB | Yes. |
| WP | We communicated probably half a dozen times after I cut my deal because I was kind of feeling, you know, isolated, lonely for a while. You know, it's like you cut this deal and everyone kind of shuts you out. And then I started hearing what Adam was saying and I started reading through a lot of stuff. A lot of old discovery that I hadn't read previously. Adam was very very dishonest in my opinion in many, many, different things with the whole case. I mean the assessor's case too. The entire deal. |
| JW | You're referring both to The Colonies and the assessor or only to one of the -- |
| WP | No, I'm referring to both of them. Like for instance, I've been told, I have not read this myself but I've been told by somebody that, I don't know if it was the DA's office, somebody who had read, the transcripts come out now public, the grand jury, the state grand jury testimony. It's my understanding that Mr. Aleman stated that Mr. Kirk had told him that, and I've been told this I did not read this, again, told that he had taken a bribe or he was going to solicit a bribe or take one or something to that effect. Well I know for a fact that that is not true because Adam and I talked about that. That the fact that we didn't know anyone that had been solicited that $100,000 previously. Adam stated contrary to that. I mean, in the assessor case there's dozens and dozens and dozens of things where he changes his statements. Several times he changes his statements in the interviews and we've actually, I've heard some of them. |
| SL | I think it's probably safer for you to stick to your own personal knowledge. |
| WP | Okay. Okay. |
| JB | That's why I wanted to ask you specifically about the meetings that you've had with Mr. Burum. Whether he was present for any of those meetings. |
| WP | No he wasn't. Just, just, we never discussed The Colonies at those meetings. I'm positive. |
| JB | Okay. |
| WP | Adam was never in those meetings. I'm 100% positive on that. |
| JB | Now, did you hear from anybody prior to the settlement occurring that $100,000 would be contributed to you or anyone else after the settlement? |
| WP | No. |
| JB | Okay. When was the first you heard about the $100,000? |
| WP | It was after the settlement had taken place. After I had already become the county assessor. It was late January, I've stated, or early February, something like that. I first learned about it, it was either through Mr. Irwin or Irwin through Aleman. I can't remember specifically. That's |

039127

| | |
|---|---|
| | when I first learned about it. And then Jim and I talked about it that each of the principles would be receiving, that supported would be receiving $100,000 in campaign money. And also Jim Irwin himself, he was going to be creating a pack and that pack would receive $100,000 Jim told me. |
| JB | Did anyone ever explain to you why the $100,000 was coming in to packs, particularly for some of the other individuals who never had a pack before? |
| WP | Like? |
| JB | I think like, I think Mr. Kirk. I don't think he had a pack prior to this. Was there ever any discussion about why the money UNT |
| WP | I know Matt Brown has had his pack previously. The Young Republicans. He had his previously. I don't believe though that Mark didn't and I know that Jim didn't previously. The way it was put by Jim was basically this was goodwill by The Colonies guys since they hadn't supported anybody. Up until this point I think I'd taken maybe 1,000, maybe 2,000 max contribution from them up until this point in total. Because I didn't really know the guys until The Colonies started and then they weren't contributing at the time. Jim had made it clear that it was a goodwill gesture by the partners, by The Colonies partners. |
| JB | Have you ever said anything to anybody else except your lawyer of course, but have you ever said anything to anybody else along the lines that you feel as though you'd been coached at all through this process? |
| WP | Coached? |
| JB | Yes. |
| WP | No. Not coached. Absolutely not. |
| JW | You just said, "not coached" like emphasizing "not coached." Is there another word that you think is better than "coached" per |
| WP | Well coached to me would mean. I'll tell you what I think coached would mean. I believe that coached would kind of mean you would be helped along, you know, like if you were asking me questions you would kind of help push me along into an answer that you wanted. Is that what you believe a coach would be? Okay. |
| SL | You can see from Mr. Postmus' conversational style that he needs to be brought back on point. |
| WP | Which my attorney does. |
| SL | And the district attorney's investigator would as well. |
| WP | But, but -- |
| SL | They needed to bring him back on point to the issue they were trying to discuss -- |
| WP | But they, but I never felt, I mean that I would tell you that, if you would listen to my interviews, which I believe you have, I mean there were several times that they, they wish, you know, I know because I can't read their mind of course but they wish, but that's not what happened. It was very clear many times during our interviews that, no that's not what happened. Especially with Mr. Randalls (phonetic), you know, we kind of clashed from time to time. And no, I do not believe that -- and the reason why I gave you that expression when you said that is because, I'm not even going to get into the Adam stuff, but that's a whole other issue. That's why it went to my mind when you brought up that word. |
| JB | Has there been any point during this process, and what I'm referring to is from the time you started doing interviews with the DA's office, focusing on your relationship with the DA's office. Has there been a time at all when you have felt pressured by them? By the district attorney's office? |
| WP | What do you mean by pressured? |
| JB | Pressured to give certain answers or anything like that. |
| WP | No. I felt pressured to make the deal happen because the statutes were running out. Absolutely. But there's not, you know, but not pressured to give specific answer, etc, no. I told them the truth. Yeah. No, I did not. I mean, I asked my attorney about this question |

039128

Exhibit F
Page 50

| | |
|---|---|
| | earlier today because I thought - - but I did not feel.  Of course I felt pressured to cut a deal but I never felt pressured to say one thing over another in terms of a question.  No, not at all. |
| SL | I did explain to Mr. Postmus that the legal coercion of a plea bargain is - - |
| WP | Yeah which I had to ask him about that because I wasn't quite sure how that all works but I did feel a lot of pressure and they were hot and heavy for me to cut a deal.  And because I was out of it, I was not in the mindset to cut a deal and Jim really had - - bottom line |
| SL | That was all intermediary by me. |
| WP | Correct. |
| JB | Yeah, okay.  What I'm trying to get at is at any point did they ever put words in your mouth? |
| WP | No.  Absolutely not.  No. |
| JW | Have you ever heard the expression "goon squad?" |
| WP | No goon squad. |
| JW | What have you heard? |
| WP | Thug squad. |
| JW | What does that refer to? |
| WP | Well that how some people refer to the public integrity unit. |
| JW | Have you ever used that phrase? |
| WP | I don't believe I've used it.  I may have, but I don't usually use phrases like that.  When it comes to - - I'm pretty proper but I know that many other people around use it still to this day. |
| JW | Do you think it's a fair description?  Do you think that, actually, you know, I'm just going to leave it at that. |
| WP | Okay. |
| JB | So when you say people around you, who, for instance? |
| WP | Well, Jim Irwin always used it.  Sharon uses it just as kind of a, now as kind of, she doesn't know what's going on.  She doesn't know who to - - what side's the good side anymore.  But, and then Ted Gair whose a former association of mine who used to work for me who is a friend of mine.  He uses it to on a fairly regular basis.  But it became kind of a, you know, the term in terms of their roughness and you know, the perception I should say. |
| JB | One looking at this case and if it continues to proceed to trial for instance, there may be attempts to make an issue of how the DA's office went about putting the case and securing your testimony - - |
| WP | I'm sure they will. |
| JB | That's why I'm just trying to get it in your mind - - |
| WP | Yes sir.  Correct.  And I have been told, just to let you guys know too, since we are finally here, I've been, Ms. Gilbert had discussed this with me months and months ago.  Well first she discussed this with me before my deal had been - - I don't even think I've told you about this because that didn't go anywhere.  There is so much UNT stuff.  You know when you're dealing in a political atmosphere where you have all these politicians and the DA is a politician too, it's kind of different you know.  But all of a sudden you are being prosecuted by them.  By the people that you used to work with, you know.  It's kind of a weird type dilemma and I had been, Ms. Gilbert had told me over a year ago the first time that I may be contacted by the FBI, U.S. Attorney's Office and I had said, hey, they need to call my attorney, you know, because I can't do anything without my attorney being involved.  And then I was contacted, and then Ms. Gilbert, not contacted because I communicate with her all the time.  She brought it up again to me after my plea bargain like I could be contacted again by the feds, just you know, UNT by the feds to discuss the case with them.  Kind of put it at that. |
| JB | Have you felt that they've done anything improper in treating you as their cooperator over the last year or so? |
| WP | Since I cut the deal? |
| JB | Yes. |

039129

| | |
|---|---|
| WP | Absolutely not. |
| JB | What about prior to cutting the deal. |
| WP | Well I mean, I don't know what's, I don't know what's, I mean, a couple of things. Okay. I've already mentioned the one, they did not in the first arrest warrant where my house was raided and the one I was arrested subsequently for the drug possession. At that time, Mr. Eisler, I wasn't charged yet. You know how you go to court and just kind of wait around to be charged and you have to go every six weeks or something like that. Well finally we were charged. They all show up. They went and picked up Mr. Eisler who I used to have a relationship with and Greg, you know, they arrested him and in the arrest warrant they detailed some of the stuff that they did not have to detail. In that, it was stuff that had nothing to do with the case. You know, about the sexuality, about the relationship, stuff like that, stuff they didn't even have to go into. I felt that was extremely heavy handed. I thought that was, you know, and I told them that too in the interview. |
| JB | You said they went and picked up Mr. Eisler? |
| WP | The DA's office. Well he was arrested. |
| JB | Oh, okay. |
| WP | He was not arrested yet. I had to court and kind of wait around until he had not been arrested so they went to pick him the same, while I was at court that day because they were filing the charges against us. Then once I had read the arrest warrant, you know, I was in custody trying to make bail and they had, people were reading me the parts of the affidavit, you know, that had been released. |
| JB | Okay. |
| WP | And that's when I started to make -- when I'm having to deal with, you know, not just all the other stuff, you know, the normal course of all this but having to deal with the fact that now I have to deal with, you know, the other issue, dealing with my family. |
| JB | So earlier, in this interview today you made some mention to the DA outed you in the warrant. Is this what you were talking about? |
| WP | Yes, that's what I was talking about. |
| JB | Other than the way they handled that warrant and arrest was there something else? |
| WP | I mean technically no because it was not -- |
| SL | they tended to be heavy handed with the perp walks. They love to have the publicity of showing them handcuffing him. The time they arrested him in the courtroom for under the influence -- |
| WP | He was with me. |
| SL | -- they were very heavy handed in that. But that was more the investigators that -- |
| WP | It was the investigators, yeah. I mean they -- |
| SL | -- but they, they, and then they secured my parking lot for 8 hours. |
| WP | It was because my car was in his parking lot and I got a warrant for my car and did the whole thing, I mean. |
| SL | But they then became his best buddy, so. |
| JW | Have you -- |
| JB | Let me ask this. When was the last time DA investigators met with you? |
| WP | Oh, I was with them this morning. Because we were in court this morning. |
| JB | Okay. I knew you were in court this morning -- |
| WP | I communicate with them every day. In fact -- |
| SL | He's on a -- |
| WP | Short leash. |
| SL | -- a leash. He's supposed to report in every -- |
| WP | I report every morning at 9:30 I report in but I also, I have a lot of people communicating with me information, they don't, of course they're just fools. Talking and so I send back |

039130

Exhibit F
Page 52

|     |     |
| --- | --- |
|     | information every day, all sorts of stuff.  Plus I monitor the blogs and send back comments that I know people that are writing them.  You know, just that kind of stuff. |
| JB  | Okay. |
| JW  | Have you discussed with any of the DA investigators the fact that you'd be meeting with us today? |
| WP  | Well they knew because they set up, the main guy knew because of the fact that we had set it up through the deputy DA.  Yes, yes I have. |
| JW  | Can you describe UNT discussions? |
| WP  | Eric, uh.  Hold on I'll tell you the gentleman's name right now.  Would you like to know his name? |
| JW  | Okay. |
| ?   | Eric Brettner. |
| WP  | Yes, Eric Brettner. |
| JW  | Can you describe those discussions? |
| WP  | I had just said that, you know, my attorney, I mean I tell him basically everything that's going on from the legal UNT.  One of my attorneys had talked to Mr. Cope.  I had just stated that I would be meeting with you guys but I didn't get into specifics or anything because I didn't know what you guys were going to ask me even though I had a feeling. |
| JW  | Did the investigators give you any guidance about what topics we might be asking about? |
| WP  | No.  They did not.  In fact when I was walking over, because they met me at my car this morning because I had a court hearing this morning.  They met me at my car and the other investigator, Hispanic gentleman can't think of his name he asked, "Well what are you doing today?" He didn't know.  Mr. Eric just said, "Oh, he had a meeting."  But he didn't even say to him what I was doing.  He was pretty, I could tell he was being sensitive because he didn't bring it up. |
| SL  | Let me preface that also.  We were in open court and you had a reporter behind you. |
| WP  | Correct.  Correct. |
| SL  | So -- |
| WP  | Yeah, but I knew I had the reporter behind me. |
| SL  | So the conversation was being cryptic for a reason. |
| WP  | Oh yeah, yeah, yeah, yeah yeah.  But he said that when we were walking over. |
| SL  | Okay. |
| WP  | Yeah, about that.  So Eric was being sensitive to not even say in front of the other investigator that we were, that I was coming here today.  But Eric did know because I told him. |
| JW  | Was there any guidance other than from your attorney, any guidance regarding what, anything you should tell us during our interview? |
| WP  | Absolutely not, no.  He never went into any of that.  He was very, he didn't go there.  I mean I had just made a comment to him, I was telling Steve, you know, I like to just try to, you know, it's just interesting what all you guys do, from perspective of never, cause you know I grew up in a family of law enforcement too and I had just, I said, you know, because I know they had stated that, I think my attorney had told me from Mr. Cope that they had given you guys our tapes from the interviews, etc.  So I made some comment to Eric, you know, you're going to get copies of the stuff, and he goes, yeah right.  He goes, you know, it's one sided.  That usually, you know, but I'm not saying that to, you know, but that's all he said.  That's the only discussion we had about this meeting.  But he did not say anything.  He's very proper.  And I had no other discussion with anyone else there about it, so. |
| JB  | Well, I don't have any other questions at this point. |
| WP  | This is the first time I've been interviewed by an attorney before so that was, you know, other than a depo, you know. |
| JB  | It might be a good idea, I think at this point to go ahead and just take a break so I can talk to |

039131

Exhibit F
Page 53

| | |
|---|---|
| | Agent Zeitlin and Mr. Widman.  Make sure there isn't anything else that we want to cover with you since you're here. |
| WP | Sure.  Okay.  Great.  Might was well get it. |
| JZ | UNT ask questions, you want to talk first, or? |
| JB | Yeah, let's take a break.  It's been - - we've been going for a while anyways. |
| JB | Let me turn this off.  It's 11:24 we are taking a break and I will turn off the recorder. |
| JZ | It is still October 14.  The time is 11:44 a.m.  It is Steve Levine, William Postmus and AUSAs Jerry Behnke and Joe Widman and myself, Agent Jon Zeitlin. |
| JB | We just finished taking a break; correct? |
| WP | Yes, sir. |
| JB | We do have just a couple of more questions that we wanted to follow up on before we break today for good.  First, you indicated earlier that you're in regular contact with Sharon Gilbert. |
| WP | Yes, sir. |
| JB | Do you recall having lunch with her a couple weeks ago on Monday the 26th? |
| WP | I probably did.  I meet with her multiple times a week.  But I don't know specifically if I had lunch for sure with her that specific day. |
| JB | But you have lunch with her on a regular basis? |
| WP | Yes.  Probably like twice a month. |
| JB | Have you ever told Sharon Gilbert that the thug squad coached you to testify in a way that you would give them what they needed without lying?  Or anything to that effect? |
| WP | Can you ask me that one more time?  The last part was - |
| JB | Whether you have ever said to her that the thug squad coached you to testify so that you would give them what they need without telling any lies? |
| WP | No. |
| JB | Anything to that effect? |
| WP | No.  No.  I've been very clear with Sharon.  I mean, Sharon and I are pretty close and I've been very clear to her about what has been, you know, and the things that I said to you today.  So, no. |
| JB | And have you told Sharon Gilbert that you didn't feel as though you were bribed in relation to the settlement? |
| WP | Yes, I have said that to her.  (Pause)  And specifically, can I elaborate? |
| JB | Sure.  Sure. |
| WP | Specifically where I said that was with regard to the $100,000.  You know, I have made that comment to her multiple times, to Ms. Gilbert due to the $100,000 because of the fact that because there was never any discussion about that $100,000 prior with myself and Mr. Burum.  There were other discussions about future things, about higher officer, discussions about business dealings or endeavors, except there were never UNT with respect to the $100,000.  That's a very true statement. |
| JB | After the fact, after the settlement when the $100,000 did come in, was it your understanding that the $100,000 was somehow related to the settlement? |
| WP | I mean you know, as I stated earlier it was, as Mr. Irwin stated, you know, it was goodwill from The Colonies Partners for getting everything done, so I mean, you know, I guess so.  But you know, when I think of a bribe I think of not looking at the exact legal definition of a bribe because I have read it a few times.  But looking at it from just a perspective of discussing something ahead of time and saying, you know, if you do this I'll give you this.  I mean that's how I looked at a bribe pretty, I guess it's not quite that simplistic. |
| JB | Well, no but - - |
| WP | But that's the understanding, with that understanding that's why I made that comment to Ms. Gilbert. |

039132

Exhibit F
Page 54

| JB | Yeah, that's what I want to get at. Is if you did make the comment to Ms. Gilbert, what did you mean by it? |
|----|----|
| WP | Correct. What I just stated. |
| JB | Okay. |
| WP | That's the one piece of the case that the state case, that's always been perplexed to me is the bribery portion with the $100,000 specifically. Now of course they, in the affidavit and in the grand jury they get into all the other specifics with respect to me, you know of course, but I was just talking about the $100,000 specifically. |
| JB | When you mad that comment to Ms. Gilbert - - |
| WP | Ms. Gilbert. Yes, yes. |
| JB | - - you were referring to the $100,000? |
| WP | Yes. |
| JB | That you didn't see that as a bribe? |
| WP | Yes. |
| JB | Okay. |
| WP | In the definition that I gave you of you know of discussing it ahead of time and saying if you do this, you know, if you vote for this I will give you this. With respect to the $100,000 that did not happen. |
| JB | So, prior to voting on the settlement there was no discussion of the $100,000? |
| WP | No sir. No, not with anyone. |
| JB | We also had some questions for you getting back to your methamphetamine use. When did you start using methamphetamine? |
| WP | It would've been in 2000 and uh sometime in 2004. I believe the summer of 2004. Somewhere around there. |
| JB | How did you become involved with methamphetamine? |
| WP | That's an interesting question. No one has ever asked me that before. I had met up with a guy to have sex with him and he had methamphetamines with him. I had never, you know, I had never even tried marijuana or anything at that point. Didn't even drink because I came from a family that didn't even drink alcohol. He had tried it a couple of times and the first time I didn't try it. The second time I met up with him again and I just said, let me just, you know, he just seemed so relaxed and everything else and so I tried it that second time. |
| JB | Have you ever used methamphetamine around Jim Irwin or Jeff Burum? |
| WP | Absolutely not. Around no one government-wise in the county or anything. Absolutely not. Not with Mr. Biane, no one. |
| JB | Have you ever discussed methamphetamine or drugs with Mr. Burum or Mr. Irwin? |
| WP | Not Mr. Burum but Mr. Irwin, you know, I thought when he was my friend he was helping me, etc, yes, he was involved in one of the rehab instances. |
| JB | So he tried getting you off methamphetamines? |
| WP | Well, yes. That was the perception but while I was in rehab in Washington, in Yakama, Washington, he uh, I found out that he was the one who leaked to the press that why I wasn't at the fire so you know, he, you think he's your friend yet he's knifing you in the back. Here, I'm in rehab trying to, you know, deal with this and I've got these urgent calls, you got to get back now because the fire is going on. We had this major, remember the major forest fire that was going on in the mountains? I was vice-chairman at the time and it was just a real cluster. So yes I have discussed it with Jim from that perspective. |
| SL | Counsel, by use I take it you mean the ingestion. |
| JB | Yes. |
| WP | Yes. |
| SL | You have been under the influence in presence of those people. |
| WP | No, no. |

039133

Exhibit F
Page 55

| JB | I'm talking about actually ingesting it in their presence. |
| WP | Oh, absolutely not. No, absolutely not. |
| JB | Has - - |
| WP | No one with the county at all or with - - involved in any of this. Or Mr. Aleman or. |
| JB | Has Mr. Irwin been involved at all in your procurement of methamphetamine? |
| WP. | Absolutely not. |
| JB | Mr. Burum? |
| WP | No. Absolutely not. |
| JZ | You don't have to tell us who, but do you get it from the same person every time? |
| JB | I just spoke earlier. There is one other question that we have for you. |
| WP | Yes, sir. |
| JB | I know you at some point I think gave some BlackBerry phones to the DA, right? |
| WP | Yeah. We were just talking about that. Three of them to be exact and the ones they took. |
| JB | Other than those BlackBerrys do you have any documents anything in computer, anything at all that would relate to the topics we've been discussing - - The Colonies settlement? |
| WP | No, sir. I've given everything up. When we went in to cut our deal, you know, when we finally did our deal I brought them everything. They missed some stuff during the search warrant but I brought them everything. I mean, I'm going to dance with them now, so you know, I brought them, they didn't even know that I had all this stuff but I brought them everything. All my phones, everything. Because I saved all my phones, everything. Not because of that, I just saved them. I brought them and I brought them some documents. I didn't really have a lot of documents because I'm not really a paper person. But they already had all of my computers when they did the warrants they took all my computers, etc so they still have them. |
| SL | They took 3 computers at the apartment you were at. |
| WP | Yeah. |
| SL | Then they then out of your UNT. |
| WP | Old BlackBerry. They have lots of my BlackBerrys. I'm like a BlackBerry addict more so than anything else. They took many of my every time I was arrested they would confiscate the BlackBerry too. |
| JB | Even the best law enforcement officers can miss things so that's why I was just asking if there was anything else. |
| WP | Absolutely not. I've given them everything and I've been totally cooperative to the point of they've asked me to prepare numerous documents for them on other issues too in the county. Just like, you know stuff will come through the pipeline, through the channels that I'm feeding stuff through to. You know, Irwin and stuff like that that they'll want to know about. Through my time on the Board as chairman. You know, I just have knowledge of, you know, of stuff that, not necessarily legal stuff, but just stuff that they want to know about that may help put another piece in the puzzle, you know, etc. So I've prepared a lot of technical memos for them just on how things work, etc. |
| JZ | Before we move on, just about the BlackBerrys when you were communicating between, with your BlackBerrys, between you and Jeff Burum, maybe Jim Irwin back in maybe 2006, 2007 -- |
| WP | Correct. It was 2006. |
| JZ | Well, when you received those messages whether they were pens or texts or emails to your phones - - |
| WP | They were, with Jim Irwin they were pens because - - |
| JZ | I don't want to stop you, but my specific question though when you received whatever those communications were, did you save them, delete them? |
| WP | No. I did not save them like I do everything now. I didn't even - - I was not really computer, I had technical people. I wasn't really savvy with computers. Like I've had to learn myself now |

039134

Exhibit F
Page 56

| | |
|---|---|
| | because I don't have anybody to do it for me. At the time, no I did not. And that's why I turned over the BlackBerrys I know for sure that the BlackBerrys that I turned over were during the time that The Colonies occurred. |
| JZ | And just to clarify, when you say you didn't save them, did you actually - - |
| WP | Delete them? |
| JZ | - - use the phone and delete them? |
| WP | I would text sometimes up to 30,000 texts a month. So you know, you have to, I was a UNT texter and all my communications in the whole county were done through - - |
| ? | 30,000 a month |
| WP | I actually did that many, yes, in a couple of months - - |
| ? | Thousand a day. |
| WP | Not anymore. Now, I mean you know, who do I talk to other than the few - - |
| SL | Like a teenager. |
| ? | 660 or 70 an hour - - |
| WP | Don't remind me, okay. I'm going to get carpal tunnel. I UNT file a workers' comp deal with the county on that but - - |
| | Those buttons are going to break. |
| WP | No, I actually went through. It was kind of the ongoing joke that I would go through literally every other month I'd go through a BlackBerry in those days. |
| JZ | Other than the 3 you provided the Public Integrity Unit? |
| WP | They have all, they have all the others |
| JZ | There might be 50 more. |
| WP | You know, they had all of them from the ones that they took from and those three, they have all of them during that time period, I know that. |
| JZ | Did you ever sync them with any of your computers? |
| WP | They were synced within the county system. Which the DA's office UNT. Now I know how to do it. Now I can every night when I'm at home it just downloads it into the BlackBerry server automatically. I have to do it midnight. But before I didn't know how to do all this stuff. I would put it in a pod, you know, on my desk and then it would link it with the county system, which was kind of foolish. But that's how it worked. |
| JZ | So you believe you actually manually deleted those? |
| WP | Well yeah because I would not keep stuff cause at the time, now you have conversations, now they have like BlackBerry messenger where, like with when I send stuff to the PIU now it's all conversational like in BlackBerry messenger, you know what I mean, where it shows where you don't have a separate text for every, you know, how are you? And then another text, good. Another text. It's all just like conversational so I could just copy and paste one conversation now and send the whole thing to them. We didn't have that then. And then Jim Owen had a BlackBerry but Jeff Burum did not have a BlackBerry at first, he just had, remember we stopped communicating midway through 2006, Jeff and I, and so once we stopped communicating, you know, he didn't communicate - - what Jim, what Jeff, what Jim Irwin eluded to me is that, you know, during the settlement discussions the four of them that occurred in late 2006 is that I would communicate with Je - - with Jim Irwin and that Jim was communicating with Jeff. Because remember Jeff was in the other room just down the hall. But this was per Jim Irwin. |
| JZ | And at some point Mr. Burum used a different phone? |
| WP | Yes, yes during the last - - yeah, there was a gentleman by the name of uh, uh, I've probably given it to the investigators, I gave him his name and everything. Ruse. Mike Ruse, I think. He's the former under Willy Brown, UNT, Mike Ruse was the chairman of the rules committee. Mike's a prominent democrat in Los Angeles I believe, or Sacramento. I think he's in LA. Mike is, I've never met the gentleman, but he's a mentor to Jeff. I do know that. |

039135

| | |
|---|---|
| | Jeff had told me before we, you know - - |
| SL | Is that a democratic mentor? |
| WP | Mmm, hm.  Jeff actually has a lot of democratic - - you know how it is.  To be successful you got to UNT to everyone, you know what I mean, because being one party ain't gonna get you anywhere.  In saying that though, he had told me that Mike had recommended, he had told me earlier on that Mike was giving him advise on the settlement, you know, to be cautious, etc.  But then Jim told me later on, cause Jeff and I weren't communicating, that he was very clear about the fact that Jeff would have another phone and that Jim was using his regular phone.  I know that.  He was using his regular - - but Jim had a BlackBerry. |
| JZ | Do you have that number that Jeff was using?  Do you know the number? |
| WP | No. |
| JZ | Would you have saved it in your contacts? |
| WP | It could be in one of those phones but I - - |
| JZ | Would you have saved his contact information under his name or - - |
| WP | No, because I wasn't communicating with that phone.  It was Jim. |
| JZ | Ah. |
| WP | Remember?  No, the phone - - the dummy phone or probably throwaway phone or whatever, that was the phone I discussed that he had communicated with in the last four sessions.  But I was not communicating directly with Jeff.  I was communicating with Irwin and Irwin told me he was communicating - - which made sense because we were like in the say we're in the settlement, say we're the Board of Supervisors right here and you got 50 attorneys in the back and they are say 3 doors now, you know the Colonies guys are down there.  And then Judge Norell is going back and forth, Justice Norell and so here I am, I'm the chairman at the time so I'm like saying, so say you are Paul Biane and you say, "I'm not going to go past, you know, a hundred million."  Say you are Hansberger saying, "I'm not going to go past a million dollars."  See, if all these, you know, UNT doesn't know what the hell is going on.  See, you have all these different opinions that are going on in the room so I would say to Jim, there is no way the Board is going to go past a certain amount of money.  Say 50 million or whatever.  So I assumed through what Jim was telling me that he would send back and Jim would say, you know, it's not gonna work the whole thing is going to blow up.  We are not going to be able to settle it Juncan, things like that. |
| JZ | Okay.  As I was looking for some of my notes here, there was a, what Mr. Behnke asked whether part of the settlement you had been feeling pressured to settle and you'd given us a couple of things and then said that - - |
| WP | Yeah, there's still one more.  I know and I still can't.  I was going to say that item first but I'll have to |
| JZ | Keep thinking. |
| WP | - - get you that information?  If you give me your card I'd be happy to. |
| JZ | Okay. |
| WP | No, it was a big - - I just can't, it's just one of those brain - - |
| JZ | Mental block? |
| WP | Yeah.  You know it's weird because the extortion stuff, I mean, when we first met with the DA's office I had never discussed, that stuff had never come out of my mouth.  The extortion stuff.  In realizing what had happened and it took several interviews for stuff to start flowing, I mean, at the time because we had never discussed that.  It had never come out of my mouth because I didn't, it was just dealing with all this it's been such a crazy insane 5 or 6 years that it didn't really - - |
| SL | Weren't you actually shown a published flyer? |
| WP | I was not shown a published flyer but Adam Aleman stated that he was and do not know if he was or not.  I was never shown a flyer.  But I was told there were flyers. |

| | |
|---|---|
| JZ | I just have one more. |
| WP | You guys always have one more question. |
| JZ | No, I mean it this time.  This is the last question I wrote down for myself. |
| SL | UNT attorney's one more question and investigator's one more question are different things. |
| JZ | Right. |
| SL | I don't know which one's worse. |
| JZ | You made almost an off-hand remark about the judges in the first two hearings in superior court which would've been Judges Norell, Warner. |
| WP | And Warner. |
| JZ | And then during your JAMS session which we talked about there was retired Justice Panelli - - |
| WP | Correct and we actually had a hearing with the sitting appellate court judge Justice who was Ward I believe. |
| JZ | Ward, right. |
| WP | Yes, sir. |
| JZ | As to any of those did you ever feel like one of them had been compromised by - - |
| WP | No. Absolutely not.  I mean I may have been asked that lots of times.  People have eluded - - people have tried to like look at me and say well you know this occurred.  People who are not even involved in.  Like a newspaper reporter or something like that.  I have never believed that with respect to - - now I do not.  Let me, let me, I'm going to be very clear here.  With respect to Justice Norell, I mean, sorry, with respect to superior court, retired superior court Judge Norell I don't know him well.  Okay, he, as I was coming in he was exiting the scene within the county deal.  That was not really under my watch, that whole trial was kind of ending, you know when I was engaging in this whole thing.  Everything I've heard is just not any observation, I had just gossip through other people, etc.  With respect to Judge Warner, I know him personally.  He's the utmost man of integrity as far as I know.  I know nothing, and I was actually in the courtroom several days during the trial myself and Supervisor Biane were.  Because we kind of really wanted, because Jeff is telling us all these horrible things, you know, we're going to lose all these hundreds of millions of dollars, so, you know, we're talking about attorneys, you know, - - because here we are, you know, we're two guys in our 30's, okay.  And we're being told by Jay Helsel, Burum, and Jeff's a real, you know, he's a hard charger and Jeff will read every document.  I mean he, I guarantee he had read every document and I guarantee you like, in the Tate case he's already read every document that he's got in discovery, UNT every day.  That's just how Jeff is.  I mean he'll study it more than his attorneys.  So here we're getting badgered on this thing.  You guys need to do this because you're going to lose all this money and we're being, this, this, you know, this hole here in the ground.  We've been harmed big time and we need hundreds of millions of dollars for this.  And our attorneys are saying, you know, nothing's worth a million bucks.  You know, I mean so it was just, it was a real tough deal.  So to watch Judge Warner rule on that second case knowing the integrity that I believe he has and he has shown in the past and he was a long time judge in our county and had a good career.  He put out a very, which I have actually read myself twice, actually put out and discussed with attorneys, he put a real thorough opinion together that he wrote himself.  It's lengthy.  I'm sure you gentlemen may have looked at it.  So, I mean, in looking at that for me it was kind of like, you know, and that just confuses the whole situation more when he rules against the County in that.  So I mean, it was, the answer is no with respect to Justice Panelli also.  I never saw it.  I mean, Justice Panelli was retired and the whole JAMS atmosphere is much different.  It's real kind of loosy goosy and they just want to get in and get out and get paid.  I've learned.  So they don't want to be around very long and he had many other appointments, etc to do.  I could tell he was very rushed through the process, the former Justice, and. |
| JZ | As chairman of the Board back then, no doubt you were aware there was a federal lawsuit as |

| | |
|---|---|
| | well, right? |
| WP | Yeah.  Yeah there was a federal and state I believe but I'm not, but I can't really talk much about the federal.  I mean, we didn't really - - |
| JZ | You never appeared in federal court? |
| WP | No sir.  I've never been.  In fact I was even asking him where the courthouse is.  I've never been there, so. |
| JZ | Okay.  See, that wasn't too bad.  I have no other questions. |
| JB | Okay, I think we're finished then. |
| WP | How close did you get?  My attorney you know, at noon he starts to growl.  Hey, it's 9 minutes after, it's pretty impressive. |
| JZ | 5 to 8 minutes or so.  I'm going to turn this off.  UNT kind of.  It is 12:08 p.m. and we are signing off. |



039138

Exhibit F
Page 60

# EXHIBIT G



County of San Bernardino

# Office of the District Attorney

### MICHAEL A. RAMOS, District Attorney

September 20, 2013

Stephen G. Larson
Attorney at Law
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065

RE:  People v. Jeffrey Burum, et al., FSB 1102102

Dear Mr. Larson:

Enclosed is additional discovery in the above-entitled matter.  It consists of pages

79054 through and including 79762.


Sincerely,

MICHAEL A. RAMOS
District Attorney

GINA LONG
Secretary
Public Integrity Unit

FD-597 (Rev 8-11-94)                                                      Page ___/___ of ___/___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File #  _194B-LA-258147_

On (date)  _5/23/2012_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☒ Released To
- ☐ Seized

(Name)  _ERIC BREMNER_

(Street Address)  _303 W 3RD ST_

(City)  _SAN BERNARDINO   CA_

Description of Item(s):

OCRCFL EXAM REPORTS @11-0310-02B, 03B, 07B, 05C, 10A, 02,
06B, 04, AND OTD LAB # 110802253 UA

1B256 (CD-ROM OF EXTRACT IMAGE OF 1B66)

1B262 (CD-ROM OF IXTRACT IMAGE FROM 1B47)

1B257 ( "   "   "   "   "   1B67)

1B254 ( "   "   "   "   "  . PHIL BURUM CELL PHONE

COVER LETTER, PRIVILEGE LOG AND CD-ROM FROM STEPHEN LARSON

AT&T PHONE RECORDS

1B180 - RECORDS SEIZED FROM PATRICK O'REILLY

Received By: _____ D7069          Received From: _____
                    (Signature)                                        (Signature)

079101

# EXHIBIT H

# Arent Fox

Arent Fox LLP / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA / Washington, DC
www.arentfox.com

October 11, 2013

*VIA E-MAIL & U.S. MAIL*

**Stephen G. Larson**
Partner
213.443.7616 DIRECT
213.629.7401 FAX
stephen.larson@arentfox.com

**Ref. No. 033648.00001**

Antoine F. Raphael, Esq.
Joseph B. Widman, Esq.
Assistant United States Attorneys
United States Attorney's Office
3403 10th Street, Suite 200
Riverside, California 92501

Re:   <u>USA v. The Premises Known As 10621 Civic Center Drive, Rancho Cucamonga, CA</u>
        USDC Central District Case No. ED CV 11-01570-SJO

Dear Tony and Joe:

I write to follow up on our conversation on Wednesday.

We appreciate you confirming the release of certain digital evidence by Special Agent ("SA") Jonathan Zeitlin to the San Bernardino County District Attorney's Office, which was seized by the FBI during the execution of federal search warrants on September 15, 2011. Specifically you confirmed that SA Zeitlin released digital information contained on two cell phones seized on at the business offices of Diversified Pacific, and a CD-ROM containing digital information seized at the residence of our client, Jeffrey S. Burum. As you recognized, this digital evidence was released in contravention of Judge Otero's order of October 31, 2011, which set forth specific protocols that were to be strictly followed when searching digital evidence seized at Diversified Pacific and Mr. Burum's residence (an order resulting from a stipulation between your office and Mr. Burum). We accept your representation, based on your investigation, that the three items identified above were the only items containing digital information that were transferred to state authorities; if that is not the case, or if there is any uncertainty in this regard, please advise us immediately.

As we know you both understand, the fact that SA Zeitlin somehow accessed and then released to state authorities digital information seized during the search warrants violated at least two express provisions of Judge Otero's order: First, under the terms of the order, a taint team, completely insulated from SA Zeitlin and the investigating agents, was required to conduct initial "key word" searches of those materials to identify any material subject to seizure under the

555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065
T 213.629.7400   F 213.629.7401

1675 Broadway
New York, NY 10019-5820
T 212.484.3900   F 212.484.3990

55 Second Street, 21st Floor
San Francisco, CA 94105-3470
T 415.757.5500   F 415.757.5501

1717 K Street, NW
Washington, DC 20036-5342
T 202.857.6000   F 202.857.6395

# Arent Fox

Antoine F. Raphael
Joseph B. Widman
October 11, 2013
Page 2

search warrant *prior* to any investigating agent, including SA Zeitlin, receiving or having access to the evidence; second, following the taint team's review, and again *prior* to any investigating agent, including SA Zeitlin, receiving or having access to the evidence, the evidence was to be submitted to defense counsel for our review, compilation of a privilege log and, if necessary, further review by the court-appointed Special Master (Professor Laurie Levenson). Both provisions were violated. Instead, by some unexplained set of circumstances, SA Zeitlin obtained and then disclosed digital information without review by the taint team for responsiveness, without review by the defense for privilege, and without any review by the Special Master to resolve any dispute.

As you appeared to recognize in our telephone conversation on Wednesday, which we truly appreciate, SA Zetilin's violation of the Court's order must be remedied. Your suggestion of entering into a stipulation whereby the state authorities would agree to return the evidence to the federal authorities is a start; however, after considering your suggestion, discussing it with our client, and in light of the history of this matter, we believe that your suggested remedy is inadequate to address the harm to which Mr. Burum is continuing to be subjected by the actions of your office and SA Zeitlin.

As you know, this is not the first time that SA Zeitlin has violated Mr. Burum's rights. You may recall SA Zeitlin made a false statement in a sworn declaration that was filed as part of your opposition to our Rule 41 Motion concerning the search of Diversified Pacific, and in particular my law office at that location. That false statement resulted in your office explaining to Judge Otero that "SA Zeitlin's September 26, 2011, declaration incorrectly stated that Mr. Larson also accompanied SA Montero on a walk through of the law office. . . . The error was not intentional and the agents in no way meant to deceive anyone." We have now learned that this was not the first time that SA Zeitlin had presented false and misleading information to a federal court. In the course of discovery in the state case, we were provided with a redacted copy of the affidavit that he submitted in support of the search warrants in question. Our review of that affidavit revealed additional "errors" and demonstrably false statements by SA Zeitlin, including references to "incriminating" phone records belied by the actual records in question (we will provide you documentation on this point upon request). And, now, we have the recent revelation of SA Zeitlin's violation of Judge Otero's court order in May, 2012. Notably, your office and the FBI failed to provide us with any notice that the digital evidence was being released to the state authorities, which would have provided us with an opportunity to object to the release and ensure that the procedures ordered by Judge Otero regarding any examination of this evidence were enforced. Instead, SA Zeitlin released the digital evidence over a year ago, unbeknownst to us, and DA Investigator Bremner, who we understand has a close relationship with SA Zeitlin, has spent a year perusing the evidence along with the state prosecutors.

# Arent Fox

Antoine F. Raphael
Joseph B. Widman
October 11, 2013
Page 3

When this well-documented conduct is combined with SA Zeitlin's relentless pursuit of our client (which, as we now know, ultimately revealed nothing), and with his wife's employment relationship with District Attorney Michael Ramos, the architect of what we sincerely believe to be a legally and factually flawed and politically-motivated prosecution, I trust you can understand why our client sincerely believes that he has been the subject of a miscarriage of justice. Indeed, if your office and SA Zeitlin had conducted the interview of the state's singular direct witness, now disgraced County Supervisor Bill Postmus who is an admitted methamphetamine addict, the month *before* the execution of the search warrants instead of the month after, the government would have easily learned that Bill Postmus himself admits that he was neither bribed nor threatened by Mr. Burum, he was under the influence of narcotics when the alleged conduct took place, and he continued to abuse drugs while he was cooperating with the state prosecutors without any drug testing or repercussions for his illegal conduct. But apparently, this is not the information that SA Zeitlin wanted to learn before executing highly publicized search warrants, and with apparently no oversight from your office.

I, along with my partners Mary Andrues and Pierre-Richard Prosper, have asked you and your office for a declination letter to remove the sting of what has been a massively unfair burden on my client, a burden caused in material part by your agents. Not only have you and Bob Dugdale deferred or declined our request, U.S. Attorney Andre Birotte will not even meet with us to discuss the issue despite our repeated requests. Although I well understand that issuance of such a declination letter is within your office's sound discretion, what deeply disturbs me is that I have learned that the core concern motivating your office's reluctance to provide such a letter in this case is your office's relationship with the San Bernardino County District Attorney.

To say the least, we find it very unsettling that political considerations and political relationships can trump the pursuit of a just, decent, and fair result. Mr. Burum's personal and professional life has been utterly ruined by these events, in which the highly publicized federal search warrants, and SA Zeitlin's actions, have played a material and substantial role. To our thinking, basic human decency requires your office to publicly recognize the truth: The well-publicized federal investigations into allegations of corruption concerning the Colonies settlement and Mr. Burum's non-profit organization benefiting low income housing, National CORE, have both been concluded with your office's decision not to bring any charges. In light of this, Mr. Ramos' opinion of the matter should not prevent you from doing what is right.

Neither we nor our client can stand by and allow the conduct in this case to simply fade away, which appears to us to be your office's approach. Perhaps our understanding is mistaken, but that is our perception. The harm created by SA Zeitlin's irresponsible and unlawful actions must be brought to a proper and public close. There was no shortage of fanfare when SA Zeitlin's search warrants were executed (similar to that generated by Mr. Ramos when he brought his indictment), publicity that continues to be drummed up to this day whenever there are a new

# Arent Fox

Antoine F. Raphael
Joseph B. Widman
October 11, 2013
Page 4

round of federal public corruption-related search warrants or arrests (most recently in Moreno Valley), all of which are unrelated to Mr. Burum and are being used by business competitors to unfairly discredit and disable his professional work.

Following up on your suggestion that we resolve the unlawful disclosure by SA Zeitlin with a stipulation to essentially claw-back the digital material from the District Attorney, as well as your recent agreement that the time has come for the Special Master to be relieved of her duties so that she can conduct consultative work related to this matter (as she has requested), we have prepared the attached stipulation for you and your office's consideration. We will also need, of course, agreement by the District Attorney (and associated Attorney General's office) to comply with the requirement to return the material and not use the material, directly or derivatively, in their attempted prosecution of Mr. Burum.

We have taken the stipulation you sent us concerning the release of the Special Master and expanded it to provide Judge Otero with what we believe is the essential background for him to issue the order, as well as the remedial provisions needed to address the violation of his earlier order. If the stipulation is acceptable, we can resolve this matter by submitting a fully-executed stipulation to Judge Otero for his approval along with a proposed order to effectuate the stipulation; if not, we will proceed with a motion before Judge Otero explaining the grounds for our position in detail, seeking the relief sought by the stipulation, and appropriate sanctions for the expense involved in responding to SA Zeitlin's breach. If we are required to proceed by motion, I trust your office will arrange to make SA Zeitlin available for examination as a critical witness to what happened and why the breach occurred. I understand that he has a special assignment in Washington, D.C. but that he is still in the employ of the FBI. Please advise, at your earliest, whether you will agree to the stipulation or, if not, your position, for meet and confer purposes, concerning the proposed motion.

Best wishes,

Stephen G. Larson

SGL/oc

cc:     Mary Carter Andrues

Enclosure

1   ANDRÉ BIROTTE JR. (Cal. Bar No. 155627)
    United States Attorney
2   ANTOINE F. RAPHAEL (Cal. Bar No. 214919)
    Assistant United States Attorney
3   Chief, Riverside Office
    JOSEPH B. WIDMAN (Cal. Bar No. 256189)
4   Assistant United States Attorney
    Deputy Chief, Riverside Office
5        3403 10th Street, Suite 200
         Riverside, California 92501
6        Telephone: (951) 276-6945
         Facsimile: (951) 276-6202
7        Email:    Joseph.Widman@usdoj.gov

8   Attorneys for Plaintiff
    UNITED STATES OF AMERICA
9

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                   EASTERN DIVISION

13  UNITED STATES OF AMERICA,    )   No. ED CV 11-01570-SJO
                                 )
14             Plaintiff,        )   **[DRAFT] STIPULATION TO DESTROY**
                                 )   **SEIZED EVIDENCE AND RELIEVE**
15             v.                )   **SPECIAL MASTER**
                                 )
16  THE PREMISES KNOWN AS:       )
    10621 CIVIC CENTER DRIVE,    )
17  RANCHO CUCAMONGA,            )
    CALIFORNIA,                  )
18                               )
               Defendant.        )
19                               )

20

21       Plaintiff, United States of America, by and through its

22  counsel of record, Assistant United States Attorney Joseph B.

23  Widman, the San Bernardino District Attorney's Office, by and

24  through its counsel of record, Deputy District Attorney R. Lewis

25  Cope, the Attorney General of California, by and through its

26  counsel of record, Deputy Attorney General Melissa Mandel, and

27  Jeffrey S. Burum, by and through his counsel of record, Stephen

28
                         - 1 -

    CASE NO. ED CV 11-01570-SJO          STIPULATION TO DESTROY SEIZED
                                         EVIDENCE & RELIEVE SPECIAL MASTER

1  G. Larson and Mary Carter Andrues, hereby stipulate and agree as

2  follows:

3      A.   Execution of the Search Warrants

4      WHEREAS, on September 15, 2011, the government executed

5  search warrants at Diversified Pacific Development Group, LLC,

6  located at 10621 Civic Center Drive, Rancho Cucamonga, California

7  and at Jeffrey S. Burum's home, located at 5033 Earl Court,

8  Rancho Cucamonga, California (hereinafter collectively referred

9  to as the "Search Warrants");

10     WHEREAS, during the execution of the Search Warrants, hard-

11 copy documents and devices containing digital information,

12 including computers and cell phones, were seized; and

13     WHEREAS, some of the seized documents and digital materials

14 contained material that were protected by the attorney-client,

15 attorney work-product, and joint defense privileges.

16     B.   Procedures for Protecting Seized Privileged Materials

17     WHEREAS, on or about October 4, 2011, Mr. Burum filed a

18 motion for return of property pursuant to Federal Rule of Civil

19 Procedure 41 ("Rule 41 Motion");

20     WHEREAS, prior to the hearing on Mr. Burum's Rule 41 Motion,

21 the government returned all of the original hard-copy documents

22 and digital devices that were seized during the execution of the

23 Search Warrants; however, the government retained copies of all

24 of the seized materials;

25     WHEREAS,  Mr. Burum's counsel raised concerns regarding the

26 seizure of hard-copy documents and digital materials that may be

27 protected under the attorney-client, work-product, and joint

28 defense privileges, and therefore sought appointment of a Special

                                   - 2 -

Exhibit H
Page 68

1  Master to review the seized materials to determine if they were

2  protected by any of the aforementioned privileges;

3      WHEREAS, on October 26, 2011, Mr. Burum and the United

4  States of America, through their respective counsel, entered into

5  a stipulation and agreement that the appointment of a Special

6  Master was both warranted and appropriate given the circumstances

7  of the case and, on October 31, 2011, the Court entered an order

8  approving this stipulation (hereinafter referred to as the

9  "October 31st Order);

10      WHEREAS, on December 1, 2011, Mr. Burum and the United

11  States of America, through their respective counsel, entered into

12  a stipulation and agreement to appoint Professor Laurie Levenson

13  to serve as Special Master and, on December 8, 2011, the Court

14  entered an order approving this stipulation and appointing

15  Professor Levenson to serve as Special Master in this case;

16      WHEREAS, the October 31st Order set forth the following

17  procedures for reviewing and resolving issues relating to seized

18  privileged materials:

19      a.   Mr. Burum's counsel was to review seized hard-copy

20          documents, identify any privileged documents, and

21          provide a privilege log to the government.

22      b.   The government then had the option of objecting to

23          any of Mr. Burum's privilege assertions by notifying

24          Mr. Burum's counsel to initiate a meet-and-confer

25          process.

26      c.   If the parties were unable to resolve the dispute,

27          the matter was to be referred to the Special Master,

28

- 3 -

STIPUPLATION TO DESTROY SEIZED
EVIDENCE & RELIEVE SPECIAL MASTER

Exhibit H
Page 69

| | |
|---|---|
| 1 | who would then submit a report and recommendation to |
| 2 | the Court. |
| 3 | d. Regarding the digital materials, the procedure |
| 4 | required a "Taint Group" to conduct initial "key |
| 5 | word" searches of those materials to identify any |
| 6 | material subject to seizure under the search |
| 7 | warrants. |
| 8 | e. The Taint Group was then to provide a copy of those |
| 9 | materials to Mr. Burum's counsel, who would conduct |
| 10 | a privilege review and provide a privilege log |
| 11 | similar to that provided for the hard-copy |
| 12 | documents. |
| 13 | C. Privilege Review |
| 14 | WHEREAS, on or about January 12, 2012, counsel for Mr. Burum |
| 15 | provided the government with a privilege log based on their |
| 16 | review of the seized hard-copy documents.  The government did not |
| 17 | object to any of Mr. Burum's assertions of privilege and none of |
| 18 | the hard-copy documents were ever submitted to Professor Levenson |
| 19 | for resolution; |
| 20 | WHEREAS, the government has never provided any digital |
| 21 | materials to Mr. Burum's counsel for review, and Professor |
| 22 | Levenson has not been asked to review any digital materials; |
| 23 | WHEREAS, Professor Levenson has not performed any services |
| 24 | as a Special Master, or incurred or been paid any costs or fees |
| 25 | associated with her appointment as a Special Master; |
| 26 | WHEREAS, the federal investigation upon which the Search |
| 27 | Warrants were based has been closed by the U.S. Attorney's Office |
| 28 | |

- 4 -

CASE NO. ED CV 11-01570-SJO

STIPUPLATION TO DESTROY SEIZED
EVIDENCE & RELIEVE SPECIAL MASTER

1  without any charges being brought or the need for the Special

2  Master to review any of the seized materials; and

3      WHEREAS, Mr. Burum and the United States of America agree

4  that Professor Levenson's services as Special Master have not

5  been and will not be needed in this matter, and she should be

6  relieved as the Special Master.

7      D.    Release of Seized Digital Materials by the FBI to the

8            San Bernardino District Attorney's Office

9      WHEREAS, on or about September 20, 2013, counsel for Mr.

10  Burum received discovery from the San Bernardino District

11  Attorney's Office ("SBDA"), in the case entitled *People v. Paul*

12  *Biane et al*, Case No. FSB 1102102, (herein referred to as the

13  "state criminal case") in which Mr. Burum is a named defendant;

14      WHEREAS, the discovery contained digital materials that were

15  subject to the October 31st Order, and released by FBI Special

16  Agent ("SA") Jonathan Zeitlin to District Attorney Investigator

17  Eric Bremner on or about May 25, 2012;

18      WHEREAS, the discovery also contained a report prepared by

19  Mr. Bremner which indicated that he had reviewed and analyzed the

20  digital material released by SA Zeitlin;

21      WHEREAS, on or about September 27, 2013, Mr. Burum's counsel

22  brought the FBI's release of the seized digital materials and the

23  October 31st Order to the attention of the presiding judge in the

24  state criminal case, and the court ordered the materials to be

25  sealed;

26      WHEREAS, on or about October 2, 2013, the SBDA advised Mr.

27  Burum's counsel that on or about May 16, 2012, SA Zeitlin had

28  released additional digital materials to the SBDA, and those

– 5 –

1   materials had been placed in a box in the SBDA's Office for the

2   past year;

3        WHEREAS, the SBDA advised that it had sealed this later-

4   found digital materials and placed it into evidence, pending an

5   order from the state court regarding its disposition; and

6        WHEREAS, counsel for Mr. Burum advised Assistant U.S.

7   Attorneys Raphael and Widman about the release of the digital

8   materials by FBI SA Zeitlin to the SBDA, and that the release had

9   occurred without notification to Mr. Burum's counsel, and without

10  any opportunity for counsel to conduct a privilege review as

11  required by the October 31st Order.

12       NOW THEREFORE it is hereby STIPULATED that:

13       1.   The U.S. Attorney's Office and the SBDA have agreed to

14  return to the FBI all of the released digital materials,

15  including all copies of such evidence, that were seized during

16  the execution of the Search Warrants to the FBI;

17       2.   The U.S. Attorney's Office will instruct the FBI to

18  destroy all originals and all copies of the seized digital

19  materials and provide to Mr. Burum's counsel written verification

20  of the destruction of said materials;

21       3.   The U.S. Attorney's Office, the SBDA, and the

22  California Attorney General's Office agree not to make any direct

23  or derivative use of the seized digital materials in the state

24  criminal matter, or any other civil, criminal or administrative

25  investigation, case, or matter involving Mr. Burum; and

26       4.   Professor Laurie Levenson shall be relieved of her

27  appointment as Special Master in this case and shall have no

28

- 6 -

CASE NO. ED CV 11-01570-SJO

STIPULATION TO DESTROY SEIZED
EVIDENCE & RELIEVE SPECIAL MASTER

1  further duties or obligations under the Court's orders dated

2  October 31, 2011, and December 8, 2011.

3                              Respectfully submitted,

4                              ANDRÉ BIROTTE JR.
                               United States Attorney
5
                               ANTOINE F. RAPHAEL
6                              Assistant United States Attorney
                               Chief, Riverside Office
7

8

9  DATE _____        JOSEPH B. WIDMAN
                               Assistant United States Attorneys
10
                               Attorneys for Plaintiff
11                             United States of America

12                             KAMALA HARRIS
                               Attorney General of California
13

14

15
   DATE _____        MELISSA A. MANDEL
16                             Deputy Attorney General

17                             Attorneys for Plaintiff
                               United States of America
18
                               MICHAEL A. RAMOS
19                             District Attorney

20

21
   DATE _____        RICHARD LEWIS COPE
22                             Deputy District Attorney

23                             ARENT FOX LLP

24

25

26 DATE _____        STEPHEN G. LARSON
                               MARY CARTER ANDRUES
27
                               Attorneys for Jeffrey S. Burum
28
                                    - 7 -

# EXHIBIT I



# United States Department of Justice

### United States Attorney's Office
### Central District of California

Joseph B. Widman
Assistant United States Attorney
Deputy Chief, Riverside Office
951-276-6945

3403 10th Street
Suite 200
Riverside, California 92501

October 17, 2013

**Via Electronic Mail and U.S. Mail**

Stephen G. Larson, Esq.
Partner, Arent Fox LLP
555 West 5th Street, 48th Floor
Los Angeles, California 90013
Tel: 213-629-7400
E-mail: larson.stephen@arentfox.com

Re:  *United States v. Premises Known as 10621 Civic Center Dr.,*
      *Rancho Cucamonga, CA*, No. ED CV 11-1570-SJO

Dear Mr. Larson:

I write in response to your letter of October 11, 2013, regarding the two disks (the "disks") containing digital data seized by the FBI from your client's residence and Diversified Pacific (the "search locations in question"). Consistent with our discussion and your letter, one disk contained data of two cellular telephones seized from Diversified Pacific, and the other disk contained digital information seized from your client's residence.

At the outset, I feel obliged to respond to some of the factual statements in your letter. Your letter suggests that Special Agent Zeitlin reviewed the contents of the disks before giving them to the District Attorney's Office. The FBI has informed us that that is not correct. The FBI has informed my office that, aside from the initial review of the disks by an FBI taint agent, neither Special Agent Zeitlin nor any other investigating agent reviewed the content of the disks before they were given to the District Attorney's Office.

Page 1 of 3

Exhibit I
Page 74

Stephen G. Larson, Esq.
Re:     *United States v. Premises Known as 10621 Civic Center Dr., Rancho Cucamonga, CA,*
        *No. ED CV 11-1570-SJO*
October 17, 2013
Page 2 of 3

Also, your letter suggests or at least implies that Special Agent Zeitlin turned over the disks to the District Attorney's Office with knowledge that they contained data seized from the search locations in question and thus were subject to Judge Otero's order, entered October 31, 2011 at Docket No. 13 (the "Order"). We have been informed that when Special Agent Zeitlin turned over the disks to the District Attorney's Office, he did not realize that they were seized from the search locations in question.

More generally, we do not believe that the FBI's provision of the disks to the District Attorney's Office violated the Order. Nothing in the Order prohibited or even addressed provision of the data covered by the Order to the state prosecuting agencies. And during the hearing on your client's motion for the return of property, which took place 10 days *after* the Order was issued, the Court stated that if any seized data was turned over to state prosecutors, "the judge handling the state case would have to make a determination as to whether that could or could not be used or what ramifications it would have." (Transcript at 20.) During the related discussion on the record, neither you nor the Court suggested that provision of these materials by the FBI to state prosecutors would violate the previously–issued Order.[1]

Finally, your letter appears to attribute to the government certain statements or understandings which are not accurate. For example, we did not make any statements during our telephone call on October 9 contrary to our view that the Order did not prohibit the FBI's provision of the disks to the District Attorney's Office. Similarly, nothing we said during the call was meant to "recognize" that the alleged violation of the Order must be remedied.

---

[1]     To the contrary, during the hearing you seemed to acknowledge that the government would be free to make such a disclosure. (Transcript at 18) ("We don't know the extent to which the federal search warrants and the evidence obtained from [the] federal search warrants are or will be used in the state prosecution. We can't bring a challenge to the federal search warrants in the state prosecution, but there is nothing, short of destroying these copies, which stops [the U.S. Attorney's Office] . . . [from] fully cooperating and working with the state prosecutor.").

Exhibit I
Page 75

Stephen G. Larson, Esq.
Re:  *United States v. Premises Known as 10621 Civic Center Dr., Rancho Cucamonga, CA,*
     No. ED CV 11-1570-SJO
October 17, 2013
Page 3 of 3

All of that said, we propose to resolve your grievances as follows:

     1.    I have asked the District Attorney's Office to return to the FBI the two disks in question, and to delete any copies of the data contained on the disks that the District Attorney's Office may have retained.

     2.    I have asked the FBI to forensically wipe the digital data contained on the disks and to provide written confirmation of that to you in the form of a letter. In addition, if and when the FBI receives the disks in question from the District Attorney's Office as set forth in item 1., the FBI has agreed to forensically wipe those disks as well.

As to the other demands contained in your letter, we are not willing to revisit our position with respect to your request for a "declination letter." In addition, our position as to a stipulation regarding the special master is unchanged; we remain willing to enter into the stipulation I proposed by e-mail dated September 13, 2013. We believe that the justification contained in our proposed stipulation is sufficient for the Court to release Professor Levenson as special master. In the event Judge Otero declines to issue the proposed order, we can revisit what additional information we should provide.

Sincerely,

ANDRÉ BIROTTE JR.
United States Attorney

*/s/ Joseph B. Widman*
JOSEPH B. WIDMAN
Assistant United States Attorney

Copy:

Antoine F. Raphael, Assistant United States Attorney
(Via e-mail)

Mary Carter Andrues, Esq., Partner, Arent Fox LLP
(Via e-mail)

Exhibit I
Page 76

# EXHIBIT J



# United States Department of Justice

## United States Attorney's Office
## Central District of California

Joseph B. Widman
Assistant United States Attorney
Deputy Chief, Riverside Office
951-276-6945

3403 10th Street
Suite 200
Riverside, California 92501



November 1, 2013

**Via Electronic Mail and U.S. Mail**

Stephen G. Larson, Esq.
Partner, Arent Fox LLP
555 West 5th Street, 48th Floor
Los Angeles, California 90013
Tel: 213-629-7400
E-mail: larson.stephen@arentfox.com

Re:   *United States v. Premises Known as 10621 Civic Center Dr.,
      Rancho Cucamonga, CA,* No. ED CV 11-1570-SJO

Dear Mr. Larson:

Late last week, after reviewing my letter of October 17, 2013 and your letter of October 11, 2013, the District Attorney's Office requested that my office and the FBI delay any destruction of the two "disks"[1] and the data contained thereon pending further order of the Superior Court in the pending criminal case. The District Attorney's Office expressed concern with the possible irrevocable destruction of materials the status and admissibility of which the Superior Court has yet to rule on. In light of the District

---

[1]       As defined in my letter of October 17, 2013, "disks" refers to the two disks containing digital data seized by the FBI from your client's residence and Diversified Pacific. As you know, one disk contained data of two cellular telephones seized from Diversified Pacific, and the other disk contained digital information seized from your client's residence.

Page 1 of 2

Stephen G. Larson, Esq.
Re:   *United States v. Premises Known as 10621 Civic Center Dr., Rancho Cucamonga, CA,*
      No. ED CV 11-1570-SJO
November 1, 2013
Page 2 of 2

Attorney's Office's concerns and the procedural posture of the pending criminal case,
we intend to comply with the District Attorney's Office's request.

Sincerely,

ANDRÉ BIROTTE JR.
United States Attorney

*/s/ Joseph B. Widman*
JOSEPH B. WIDMAN
Assistant United States Attorney

Copy:

Antoine F. Raphael, Assistant United States Attorney
(Via e-mail)

Mary Carter Andrues, Esq., Partner, Arent Fox LLP
(Via e-mail)

# EXHIBIT K

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                   CENTRAL DISTRICT OF CALIFORNIA
 4
 5
    JEFFREY BURUM,                )   Case No. EDCV11-01593-SJO
 6                                )
            Plaintiff,            )
 7                                )
    vs.                           )   Los Angeles, California
 8                                )
    UNITED STATES OF AMERICA,     )   Thursday, November 10, 2011
 9                                )
            Defendant.            )   (11:01 a.m. to 12:42 p.m.)
10   _____)
11
12                     TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE S. JAMES OTERO
13                UNITED STATES DISTRICT COURT JUDGE
14
15  Appearances:               See next page.
16  Court Reporter:            Recorded; CourtSmart
17  Courtroom Deputy:          Victor Paul Cruz
18  Transcribed by:            Shonna Mowrer
                               Echo Reporting, Inc.
19                             6336 Greenwich Drive, Suite B
                               San Diego, California 92122
20                             (858) 453-7590
21
22
23
24
25

    Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
```

*Echo Reporting, Inc.*

Exhibit K
Page 79

```
 1 APPEARANCES:

 2 For the Plaintiff:            STEPHEN GERARD LARSON, ESQ.
                                 MARY CARTER ANDRUES, ESQ.
 3                               Arent Fox, LLP                    2
                                 555 West Fifth Street
 4                               48th Floor
                                 Los Angeles, California  90013
 5                               (213) 629-7400

 6 For the Defendant:            JERRY A. BEHNKE, ESQ.
                                 JOSEPH B. WIDMAN, ESQ.
 7                               Office of the United States
                                    Attorney
 8                               3880 Lemon Street
                                 Suite 310
 9                               Riverside, California  92501
                                 (951) 276-6944
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Echo Reporting, Inc.*

Exhibit K
Page 80

1                          I N D E X

2 <u>EXHIBITS</u>                          <u>IDENTIFIED</u>   <u>RECEIVED</u>

3 <u>Plaintiff's</u>                                              3

4 A    Chronology of key events              36         --

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

Exhibit K
Page 81

1  Los Angeles, California; Thursday November 10, 2011 11:01 am

2                        --oOo--                              4

3                   (Call to Order)

4          THE CLERK:  Calling Item Number 1, Case Number

5  EDCV11-01593-SJO.  Jeffrey Burum versus United States of

6  America.  Counsel, would you please state your appearances.

7          MR. LARSON:  Good morning, your Honor.  Stephen

8  Larson and Mary Andrues for the movant, Jeffrey Buram.

9          MS. ANDRUES:  Good morning, your Honor.

10          MR. BEHNKE:  Good morning, your Honor.  Jerry Behnke

11  and Joseph Widman for the United States.

12          THE COURT:  Okay.  Good morning.  It's nice to be out

13  at the courthouse in Riverside here.

14          The matter today is here on Mr. Buram's motion for

15  return of property.  Before we get to the business of addressing

16  the issue, there are a couple of disclosures that the Court would

17  place on the record for purposes of the community in general.

18          I think everyone knows that counsel for the moving

19  party was a former District Court judge.  He was a colleague

20  of mine.  We sat together for several years, I believe, three

21  or four years.  Our relationship was professional.  We did not

22  socialize out of -- outside of court-related activities.  And

23  so that disclosure, I think, needs to be made for the public.

24          Another disclosure that should be made for the public

25  is that my son was in the honor's program with the FBI at one

   point in time.  He is not employed by the FBI.  He is with the

*Echo Reporting, Inc.*

Exhibit K
Page 82

1   And the same thing is true on a good number of these paragraphs

2   on the nondigital front.

                                                                            55

3           I appreciate your Honor's patience.  I understand

4   from your comments where you're going on this, but I just want

5   the record to be clear that this -- from Mr. Burum's perspective,

6   a significant number of these paragraphs are fatally defective

7   under clear Ninth Circuit law and fallen short of the

8   particularity not only that could have been there, but that

9   should have been there.

10          THE COURT:  Thank you.

11          Does the Government wish to be heard on any of the

12  matters?

13          MR. BEHNKE:  Briefly, your Honor.  First, regarding

14  the first 10 or 11 categories.  The Government doesn't have any

15  further comments.  The Government agrees with the Court.  The

16  only comment that the Government has is to disagree with the

17  assertion by counsel that the entire warrant rises and falls

18  as one.  That is simply not correct.

19          In the context of suppression hearings, the law is

20  clear in this Circuit that if certain parts of a warrant are

21  sufficiently narrow and other parts of a warrant are overbroad,

22  the Court can simply suppress the evidence that was seized

23  pursuant to the overbroad provisions.  So I mean, just to clarify

24  the law on that point, I don't think that that's correct.  That

25  said, the Government does not concede that any of the provisions

    in the warrant are overly broad.

1          The main point that I wanted to make, however, relates

2     to the argument on the digital devices.   The Government is

3     concerned that the language at paragraph 15 is being taken out

4     of context.   It's important to read the entire warrant in its

5     entirety.

6          And it's important to keep in mind that this is not

7     something that the U.S. Attorney's Office has elected.   This

8     notion of seizing digital devices and reviewing them later

9     off-site, that is specifically called for in Rule 41.   Rule

10    41(e)(2)(B) states that when a warrant authorizes the search

11    of electronic media, that search can be conducted later off-site,

12    and that the timing provisions related to the search warrant

13    relate only to the seizure of the device itself.

14         And when you read the entire warrant, although the

15    digital devices themselves are being seized, the Government is

16    only searching for and retaining documents and materials that

17    are responsive to the other categories spelled out in the search

18    warrant.   The warrant does not authorize the Government to seize

19    and retain every bit of media contained within those digital

20    devices.

21         So the language that's been argued, the Government

22    believes has been taken out of context.   And when you read the

23    warrant related to the computers as a whole, the warrant is

24    sufficiently particular.

25         THE COURT:   And in reference to the Comprehensive case

      which I've spent much time reviewing, the -- in the Comprehensive

56

*Echo Reporting, Inc.*

Exhibit K
Page 84

*UNITED STATES OF AMERICA v. THE PREMISES KNOWN AS: 10621 CIVIC CENTER DRIVE, RANCHO CUCAMONGA, CALIFORNIA*
*ED CV 11-01570 SJO (OPx)*

## PROOF OF SERVICE

I am a citizen of the United States. My business address is Arent Fox LLP, 555 West Fifth Street, 48th Floor, Los Angeles, California 90013.  I am employed in the County of Los Angeles where this service occurs.  I am over the age of 18 years, and not a party to the within cause.

On the date set forth below, according to ordinary business practice, I served the foregoing document(s) described as:

**JEFFREY S. BURUM'S NOTICE OF MOTION AND MOTION FOR: (1) RETURN OF PROPERTY PURSUANT TO RULE 41 BASED ON VIOLATIONS OF COURT-ORDERED SEARCH PROCEDURES; (2) AMENDMENT OF COURT ORDERS RE SPECIAL MASTER; AND (3) AWARD OF ATTORNEYS' FEES; DECLARATIONS OF LAURIE L. LEVENSON AND STEPHEN G. LARSON; EXHIBITS D – K**

Served VIA the CM/ECF Notice of Electronic Filing
to the parties on the attached service list

☒ (Federal) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 20, 2013 at Los Angeles, California.

*/s/  Nancy J. Peters*
_____
Nancy J. Peters

*UNITED STATES OF AMERICA v. THE PREMISES KNOWN AS: 10621 CIVIC CENTER DRIVE, RANCHO CUCAMONGA, CALIFORNIA*
*ED CV 11-01570 VAP (OPx)*

## SERVICE LIST

| | |
|---|---|
| **Assistant US Attorney LA-CV**<br>Assistant United States Attorney<br>Office of US Attorney Civil Division<br>300 North Los Angeles Street<br>Suite 7516<br>Los Angeles, CA 90012<br><br>Tel.: (213) 894-2879<br><br>E-mail: USACAC.Civil@usdoj.gov | Counsel for<br>UNITED STATES OF AMERICA |
| **Jerry A Behnke**<br>Assistant United States Attorney<br>Office of US Attorney<br>3403 Tenth Street, Suite 200<br>Riverside, CA 92501<br><br>Tel.: (951) 276-6211<br>Fax: (951) 276-6202<br><br>Email: jerry.behnke@usdoj.gov | Counsel for<br>UNITED STATES OF AMERICA |
| **Joseph B. Widman**<br>Assistant United States Attorney<br>Riverside Branch<br>3403 Tenth Street, Suite 200<br>Riverside, CA 92501<br><br>Tel.: (951) 276-6945<br>Fax: (951) 276-6202<br><br>E-mail: Joseph.Widman@usdoj.gov | Counsel for<br>UNITED STATES OF AMERICA |

PROOF OF SERVICE